Andrew Goodman, Esq. (State Bar No. 115685)
**GOODMAN LAW OFFICES**
**A PROFESSIONAL CORPORATION**
30700 Russell Ranch Road, Suite 250
Westlake Village, California 91362
PHONE: (818) 802-5044; FAX: (818) 975-5256
E-Mail: agoodman@andyglaw.com

Attorneys for Creditor Richard Willingham

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### NORTHERN DIVISION

| | |
|---|---|
| In Re<br><br>DEEPA BISWAS WILLINGHAM,<br><br><br><br><br>Debtor | CASE NO. 9:20-bk-10858-MB<br>[Chapter 7]<br><br>**MOTION OF RICHARD WILLINGHAM FOR ORDERS: (1) ABSTAINING FROM ENTIRE CASE PER 11 U.S.C. § 305; AND/OR (2) DISMISSAL PER 11 U.S.C. § 707(B); DECLARATIONS OF RICHARD WILLINGHAM**<br><br>**Hearing Date Via Zoom**<br>**DATE:  August 26, 2020**<br>**TIME:  11:30 a.m.**<br>**CTRM:  "202"**<br>**1415 State Street**<br>**Santa Barbara, CA.**<br>**HEARING TO BE CONDUCTED PER ZOOMGOV AUDIO AND VIDEO** |

TO THE HONORABLE MARTIN BARASH, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE DEBTOR AND HER ATTORNEY OF RECORD AND ALL OTHER PARTIES IN INTEREST.

Richard Willingham, ("Richard") the husband of Deepa Biswas Willingham (the "Debtor") and creditor in the above-referenced Chapter 7 case hereby moves for an order: (1) Abstaining from hearing this Chapter 7 case pursuant to 11 U.S.C. § 305 and/or (2) Dismissing this case on the grounds that it was filed in bad faith pursuant to 11 U.S.C. § 707(b).

## I.    JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) – (b) and

1334(b).

## II.    STATEMENT OF FACTS.

Richard and Debtor were married on or about April 23, 1983. They ceased living together in or about 2004. On or about September 7, 2018, Richard filed for divorce in the District Court, Harris County, Texas. Richard's Petition for Divorce is attached hereto as **Exhibit "A"**.

On March 9, 2020, prior to the Mediation, Debtor filed a Second Amended Counter-Petition for Divorce. A copy is attached hereto as **Exhibit "B"**. In this document, Debtor states:

1.      She has been a domiciliary of Texas for the preceding six-month period and a resident of Harris County, Texas for the preceding ninety-day period.[1]

2.      She and Richard will enter into an agreement for the division of their estate. If an agreement is made, she requests the Court approve the agreement and divide their estate in a manner consistent with the agreement. If an agreement is not made, she requests the Court divide the estate in a manner that the Court deems just and right, as provided by law.

On March 10, 2020, Richard, Debtor and their counsel participated in a Mediation before Judge Sheri Y Dean. At no time during the Mediation did Richard or his counsel have any contact with Debtor or her attorney. All parties stayed in separate rooms. The only parties they spoke with were their attorneys and the Mediator. (Richard Declaration, ¶ 4 ).

As a result of the Mediation, Richard and Debtor entered into a Mediated Settlement Agreement, (the "Agreement") a copy of which is attached hereto as **Exhibit "C"**. In addition to providing for the division of assets and liabilities, the Agreement provides in relevant part as follows:

1.      This agreement is made and performable in Harris County, Texas and must be construed in accordance with Texas law.

2.      Each signatory to this settlement has entered into the settlement freely and without duress after having consulted with professionals of his or her choice. Each party has been advised by the mediator that the mediator is not the attorney for any party and that each

---

[1] If Debtor admits to being domiciled in Texas, this may raise a question re her ability to claim a homestead under California law.

1    party should have this agreement approved by that party's attorney before executing it.

2        3.      This stipulation is signed voluntarily and with the advice and consent of counsel

3    on the dates set out below and subject to the court's approval, and its provisions are intended to

4    be incorporated into an order.

5        4.      The parties agree to appear in court at the first available date to present evidence

6    and secure rendition of judgment in accordance with this Mediated Settlement Agreement.

7        5.      This Agreement is not subject to revocation.

8           The Agreement and each page of the Agreement was signed by all parties including

9    Richard and Debtor and a Final Decree of Divorce (the "Final Decree") was prepared for

10   submission to the Court for signature. A true and correct copy of Final Decree is attached hereto

11   as **Exhibit "D"**,

12          Notwithstanding the terms of the Agreement, Debtor's voluntary participation in the

13   Mediation, the division of assets and liabilities and the binding nature and language of the

14   Agreement, on July 13, 2020, Debtor filed here voluntary petition under Chapter 7 of the

15   Bankruptcy Code. In Schedule G, Debtor listed the Agreement as an Executory Contract stating

16   that she "believes that she was coerced into signing settlement agreement, which inequitably

17   divides community assets in favor of separated spouse. Debtor has attempted to repudiate and

18   withdraw from agreement without success. A true and correct copy of her Affidavit Revoking

19   Consent to Agreement is attached hereto as **Exhibit "E"**.

20          As part of the Agreement, the Solvang Property will be sold. Upon sale the lienholders

21   will be paid first, the parties unsecured creditors will be paid second and the net proceeds will

22   then be split between Richard and Debtor. This will allow for a prompt, efficient and full

23   payment of the parties obligations. Allowing the bankruptcy to proceed will result in Richard

24   (who is 76 years old) being left responsible for paying creditors while Debtor received a

25   discharge of her liability.

26   **III.    DEBTOR'S CHAPTER 7 CASE SHOULD BE DISMISSED PURSUANT TO 11
         U.S.C. § 305(a).**

27

28       **A.    Abstention In Connection Of Entire Case**.

1    11 U.S.C. § 305(a)(1), provides as follows:

2    The court, after notice and a hearing, may dismiss a case under this title, or may
     suspend all proceedings in a case under this title, at any time if —
3    (1) the interests of creditors and the debtor would be better served by such
     dismissal or suspension;
4

5    Courts that have construed § 305(a)(1) generally agree that while abstention in a properly

6    filed bankruptcy case is an extraordinary remedy, dismissal is appropriate under § 305(a)(1)

7    where the court finds that both "creditors and the debtor" would be "better served" by a

8    dismissal. *See, e.g., In re RAI Marketing Services, Inc.*, 20 B.R. 943, 945-46 (Bankr. D.Kansas

9    1982).

10    The analysis as to whether "the interests of creditors and the debtor would be better

11    served by such dismissal" is based on the totality of the circumstances. *Eastman v. Eastman (In*

12    *re Eastman),* 188 B.R. 621, 624 (9th Cir. BAP 1995) *In re Macke Intern. Trade, Inc.*, 370 B.R.

13    236 (B.A.P. 9th Cir. 2007). Before a court may refrain from exercising jurisdiction over an

14    otherwise proper case, it must make specific and substantiated findings that the interests of the

15    creditors and the debtor will be better served by dismissal or suspension. *See In re Spade*, 258

16    B.R. 221, 225 (Bankr.D.Colo.2001), aff'd, 269 B.R. 225 (D.Colo.2001); see generally 2 *Collier*

17    *on Bankruptcy*, supra, ¶ 305.02[2] at 305-6 to 305-9. *In re Macke Intern. Trade, Inc.*, 370 B.R.

18    236 (B.A.P. 9th Cir. 2007).

19    In applying Section 305(a), courts have considered a wide range of factors, including but

20    not limited to who filed the bankruptcy petition, the availability of another forum to resolve the

21    pending disputes, the necessity of federal proceedings to achieve a just and equitable solution,

22    the expense of the federal proceedings in comparison with proceedings in another forum, the

23    purpose of the party seeking to remain in bankruptcy court, the economy and efficiency of

24    having the bankruptcy court handle the matter and the possible prejudice to the various parties.

25    *See, e.g., In re 801 South Wells Street Ltd. Partnership*, 192 B.R. 718, 723 (Bankr.N.D.Ill. 1996)

26    *In re Mazzocone*, 200 B.R. 568 (E.D. Pa. 1996).

27    In this case both Richard and Debtor voluntarily participated in a family law court

28    proceeding that started in 2018. At any time, Debtor could have sought to withdraw from this

proceeding and filed a bankruptcy case. She did not. She continued to participate in the family law proceeding, responded to discovery, had her deposition taken and voluntarily participate in a Mediation. Not only did she participate in the Mediation but agreed to the Agreement, signed the Agreement and signed each and every page of the Agreement.

In her sworn bankruptcy schedules, Debtor alleges she was coerced into signing the Agreement. As set forth in Richard's declaration, neither Richard nor his attorney saw or spoke with Debtor during the Mediation. In her Schedules, Debtor fails to state who coerced her and lists no claim again either the Mediator or her attorney.

### B.    Application of Texas Family Law

The Agreement provides that it is "made and performable in Harris County, Texas and must be construed in accordance with Texas Law[2]. (Agreement, ¶ 3). According to Texas Family Code § 6.602 Richard is entitled to entry of judgment of the Agreement as a matter of law. § 6.602 states in relevant part that:

(b)    A mediated settlement agreement is binding on the parties if the agreement:
  (1)    provides, in a prominently displayed statement that is in boldfaced type or capital letters or underlined, that the agreement is not subject to revocation[3];
  (2)    is signed by each party to the agreement; and
  (3)    is signed by the party's attorney, if any, who is present at the time the agreement is signed.
(e)    If a mediated settlement agreement meets the requirements of this section, a party is entitled to judgment on the mediated settlement agreement notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law.
(e-1)    Notwithstanding Subsections (d) and (e), a court may decline to enter a judgment on a mediated settlement agreement if the court finds:
  (1)    that:
    (A)    a party to the agreement was a victim of family violence, and that circumstance impaired the party's ability to make decisions; or
    (B)    the agreement would permit a person who is subject to registration under Chapter 62, Code of Criminal Procedure, on the basis of an offense committed by the person when the person was 17 years of age or older or who otherwise has a history or pattern of past or present physical or sexual abuse directed against any person to:
      (i)    reside in the same household as the child; or
      (ii)    otherwise have unsupervised access to the child; and
  (2)    that the agreement is not in the child's best interest.

---

[2] Copies of Texas Statutes and Case Law are attached as **Exhibit "F"**
[3] See Agreement, Page 3, Paragraph 9.

1

2      None of the above exceptions are applicable in the case. The Agreement provides that it

3  is NOT subject to revocation, was signed by each party to the Agreement and was signed by each

4  party's attorney, who were present at the time the Agreement is signed. Accordingly, this Court

5  must abstain from hearing Debtor's Chapter 7 case and allow judgment on the Agreement to

6  proceed and be entered in Texas.

**IV.    THE DEBTOR'S CHAPTER 7 CASE SHOULD BE DISMISSED ON THE
7         GROUNDS THAT BASED ON THE TOTALITY OF THE CIRCUMSTANCES IT
          WAS FILED IN BAD FAITH.**

8

9      **A.    Grounds for Finding Bad Faith.**

10     Bankruptcy and circuit courts have long observed, "[t]he cornerstone of the bankruptcy

11  courts has always been the doing of equity." *In re Waldron*, 785 F.2d 936, 941 (11th Cir.1986).

12  *Accord In re Am. Capital Equip., LLC*, 688 F.3d 145, 157 (3d Cir.2012) (underscoring the

13  Bankruptcy Code's objective of "achieving fundamental fairness and justice"); *In re Marrama*,

14  430 F.3d 474, 477 (1st Cir.2005) ("[A] bankruptcy court sitting in equity is duty bound to take

15  all reasonable steps to prevent a debtor from abusing or manipulating the bankruptcy process to

16  undermine the essential purposes of the Bankruptcy Code, including the principle that all the

17  debtor's assets are to be gathered and deployed in a bona fide effort to satisfy valid claims."); *In*

18  *re Beck Indus., Inc.*, 605 F.2d 624, 634 (2d Cir.1979) (Friendly, J.) ("We need not belabor the

19  point that a bankruptcy court sits as a court of equity[.]"). It follows that both Chapter 7 of the

20  Code and § 707(b) should be applied with the aim of effectuating justness and equity. *See In Re*

21  *Mottilla, 306 B.R. 782 (Bankr. M.D. Penn. 2004)*. In this case, Richard filed for divorce in

22  September 2018. In March 2020 Richard and Debtor participated in a Mediation leading to the

23  Agreement. **(Exhibit "C")**. Both parties were represented by counsel and both signed and

24  initialed every page of the Agreement which provides: (1) it was made performable and must be

25  construed in accordance with Texas law; (2) was signed voluntarily with the advice and consent

26  of counsel (3) is subject to court approval and intended to be incorporated into an order; (4) was

27  entered into freely and without duress after consultation with professionals; and (5) was not

28  subject to revocation.

What amounts to "buyer's remorse" and/or "forum shopping", Debtor, being unable to set aside the Agreement in Harris County Family Court, filed a Chapter 7 bankruptcy with the intention of either (1) asking this Court to set aside (or reject) the Agreement or obtaining a discharge (and revenge) and leaving Richard with the obligation of paying creditors.

Bankruptcy is a way for "honest" debtors to get a fresh start. As set forth below, the schedules, etc. fail to properly and fully disclose all Debtor's assets and debts. Debtors actions and disclosures are anything but honest. Richard believes that Debtor's goal is to leave Richard with having to pay the debts as retribution for having to sell the Solvang Property.

Debtor forgets/ignores that if the Agreement is implemented and the Solvang Property sold, the following debts will be paid: (1) Joint Amerant Line of Credit used to pay the Solvang Mortgage; (2) Wells Fargo Line of Credit also used to pay the Solvang mortgage; (3) 2019 IRS taxes; (4) Credit Cards for both Parties; (5) Equalization Payment to Debtor in the amount of $69,503.00. Until sold, Richard will pay the Amerant and Wells Fargo Lines of Credit.

This bankruptcy is not about "coercion" into signing an agreement. It is about revenge by Debtor. A close review of the Agreement establishes it is an excellent deal for both parties – better and faster than a bankruptcy for both Debtor, Richard and creditors and should be allowed to be consummated.

**B.    Case Law Supports Strict Compliance With Texas Family Code Section 6.602 and Section 153.0071.**

In *In re Minix*, 543 S.W.3d 446, 452 (Tex. App.—Houston [14th Dist.] 2018); the Court stated:

> "The Legislature has provided no other circumstances under which the trial court may refuse to enter judgment on the Agreement. If the Legislature had intended to permit the parties to agree to set aside an Agreement, which meets all requirements that make the Agreement binding, the Legislature could have included such an exception in section 153.0071, but chose not to do so.".
> The Court went on to state:

> "Therefore, the statute does not allow the parties to agree to revoke a Mediated Settlement Agreement that satisfies the requirements of section 153.0071(d), nor does it allow a judge to set aside a Mediated Settlement Agreement in accordance with the parties' agreement." *In re Minix*, 543 S.W.3d 446, 452 (Tex. App.—Houston [14th Dist.] 2018).

"If a mediated settlement agreement meets [certain requirements], a party is entitled to judgment on the mediated settlement agreement notwithstanding. . . another rule of law." *In re Lee*, 411 S.W.3d 445, 447 (Tex. 2013). "A trial court generally does not have discretion to decline to enter judgment on or deviate from a Mediated Settlement Agreement. *Scruggs v. Linn*, 443 S.W.3d 373, 378 (Tex. App.—Houston [14th Dist.] 2014).

**C.    Schedules Filed By Debtor Under Penalty of Perjury.**

1.    <u>Petition: Page 6, Question 16</u>: Debtor swears that her debts are primarily business debts. Her bankruptcy documents lists personal property, cars, credit cards and real estate. Debtor doesn't list any business debts (Schedule "B", question 42, no income from business interests, SOFA, question 5).[4]

2.    <u>Petition: Page 11[5], Question 1.1</u>: Debtor does not own 100% of the Houston Property. She only owns 50% of the Property and doesn't live there. She lives in Solvang, California and claims a homestead on the Solvang Property in the amount of $175,000.00 in contradiction to Exhibit "B".

3.    <u>Petition: Page 12, Question 1.2</u>: The Solvang Property is owned by Debtor AND Richard and Richard pays the mortgage, taxes, etc. as Debtor does not have a job and cannot afford to pay or maintain the Solvang Property. (Deposition of Debtor, Pages 25-30, copies of which are attached as **Exhibit "G".**)

4.    <u>Petition: Page 12, Question 1.3</u>: This is a false statement. Debtor has no ownership interest in this property as it was and is Richard's separate property. Debtor admitted to this during her deposition. (Deposition Pages 40 – 53, **Exhibit "H"**)

5.    <u>Petition: Page 13, Question 3.3</u>: Debtor has no interest in this vehicle. The Vehicle has always been in Richard's name and Richard has always made the payments.

6.    <u>Petition: Page 14, Question 6</u>: Debtor has a Waterford collection, antique Chinese

---

[4] BBW Energy and Millenium Operating Corp.and CRW Capital have no debt. CR Willingham LLP are non-operating entities
[5] The page number references the Page number at the top of the filed copy of Debtor's Schedules, Statement of Financial Affairs.

and oriental furnishing.

7.    Petition: Page 14, Question 8: Debtor fails to disclose that she owns a Picasso painting.

8.    Petition: Page 14, Question 10: Firearms are Richard's separate property and have been since before marriage.

9.    Petition: Page 16, Question 19: The proper name is Millennium Operating Company and Debtor only owns 16.665%

10.    Petition: Page 16, Question 19: Proper name is BBW Energy, LP. Debtor's ownership interest is only 16.665%.

11.    Petition: Page 16, Question 19: Lawco offshore value is $0.00. It was kept alive as protection for plugging and abandonment liability for offshore well.

12.    Petition: Page 16, Question 21: Fidelity SEP is Richard's separate property. However, the Agreement gives her 50% of the monies in the SEP.

13.    Petition: Page 17, Question 25: There are no current life insurance policies of any kind. Policies for last 20 years were term policies. Previous whole life policies going back to '90's were cancelled by mutual agreement of Richard and Debtor.

14.    Petition: Page 18, Question 33: No valid claims exist and there is no basis for any lawsuits. Evidence negating all claims exist in the form of bank statements and affidavits produce in family law discovery on file with the Texas Court.

15.    Petition: Page 18, Question 35: Debtor has not accounted for three years of grape harvest proceeds. The value of these harvests could range from $30,000 to $150,000.

16.    Petition: Page 18, Questions 37 and 38: The answers to these questions seem to conflict and be inconsistent. If Debtor has interests in business-related property shouldn't she have made money or have A/R?

17.    Petition: Page 20, Question 53: Debtor has at least $3000 in party equipment, including tents, serving materials, chairs, tables, lights, propane heaters, etc.

18.    Petition: Page 24, Question 2.3: The parties obtained a loan from Washington Mutual. Buy mutual agreement of Richard and Debtor the proceeds paid off the existing

mortgage and paid off loans on the 2006 Mercedes (Debtor's car) and a 2005 Mercedes (Richard's car-which was totaled).

19.    <u>Petition: Page 25, Question 2.4</u>: This is incorrect and inaccurate. Loancare is a servicer for CIT bank. The loan they service is for 230 E. Ralston NOT Nantucket Drive.

20.    <u>Petition: Page 25, Question 2.5</u>: Loan is for $128,000 and the value of the property in current condition (exclusive of loan) is about $250,000.00 net.

21.    <u>Petition: Page 27, Question 4.1</u>: This is for a car purchased by Richard after divorce was filed. Title is in husband's name and Richard makes the payments.

22.    <u>Petition: Page 31, Question 4.1.1</u>: The Mediation Agreement assigned to Debtor all Rotary and PACE Universal debts.

23.    <u>Petition: page 31, Question 4.1.3</u>: Richard has no idea who these creditors are or what theses debts are for.

24.    <u>Petition, Page 33, Question 2.1</u>: This is a false statement. Debtor doesn't state who "coerced" her. Richard and his counsel were in a separate room during the mediation. A review of the Agreement **(Exhibit "C")** establishes an equal division of assets resulting in all creditors getting paid. This bankruptcy is nothing more than buyer's remorse and forum shopping by Debtor. The Agreement is binding under Texas law. If Debtor desires to unwind the Agreement, she must bring an action in the Texas Family Law Court.

## IV.    CONCLUSION

Based on the above and the Exhibits, Richard respectfully requests that this Court Abstain and/or dismiss this Chapter 7 case to allow a final judgment on the Agreement to be entered by the Court in Harris County, Texas where this dispute was commenced, where the parties agreed to binding mediation, entered into the Agreement and where the Court has sole jurisdiction.

DATED: August 5, 2020                          GOODMAN LAW OFFICES
                                               A Professional corporation

                                               By: _/s/ Andrew Goodman_____
                                               Counsel for C. Richard Willingham

## DECLARATION OF C. RICHARD WILLINGHAM

I, C. Richard Willingham declare as follows:

1. I am an individual over 18 years of age. I make this declaration of my own personal knowledge and if called to testify, I could and would competently testify thereto.

2. Debtor and I were married on or about April 23, 1983. We ceased living together as spouses on or about September 7, 2018. Soon thereafter I filed for divorce in the District Court, Harris County, Texas. A true and correct copy of my Petition for Divorce is attached hereto ass **Exhibit "A"**.

3. On March 9, 2020, Debtor filed her Second Amended Counter-Petition for Divorce, a copy of which is attached hereto as **Exhibit "B"**. In Exhibit B, Debtor makes the following statements:

 A. She has been a domiciliary of Texas for the preceding six-month period and a resident of Harris County for the preceding ninety-day period.

 B. She believes the she and I will enter into an agreement for the division of our estate and if such an agreement is made, she requests the Court approve the agreement and divide our estate in a manner consistent with the agreement. If such an agreement is not made, she requests the Court to divide our estate in a manner that the Court deems just and right, as provided by law.

4. On March 10, 2020, Debtor, myself and our counsel participated in a Mediation before Judge Sheri Y Dean. At no time during the Mediation did I or my counsel see or have any contact with Debtor or her attorney. All parties were kept in separate rooms and the only parties we were able to speak with were our attorneys and the Mediator.

5. As a result of the Mediation, Debtor and I (and our counsel) signed a Mediated Settlement Agreement, (the "Agreement") a copy of which is attached hereto as **Exhibit "C"**.

6. Exhibit "C" to the Agreement sets forth the process for selling the Solvang Proprety. Upon sale of the Solvang Property the following debts will be paid from the proceeds: (1) Joint Amerant Line of Credit; (2) Wells Fargo Line of Credit used to pay the Solvang mortgage; (3) 2019 IRS taxes; (4) Credit Cards for both Parties; (5) Equalization Payment to

1  Debtor in the amount of $69,503.00. Until sold, I will pay the Amerant Line of Credit and Wells

2  Fargo Line of Credit.

3      7.    In addition to providing for the division of assets and liabilities, the Agreement

4  provides in relevant part as follows:

5          A.    This Agreement is made and performable in Harris County, Texas and

6  must be construed in accordance with Texas law.

7          B.    Each signatory to the settlement entered into the settlement freely and

8  without duress after having consulted with professionals of his or her choice. Each party was

9  advised by the mediator that the mediator is not the attorney for any party and that each party

10  should have the Agreement approved by that party's attorney before executing it.

11          C.    The Agreement was signed voluntarily and with the advice and consent of

12  counsel on the dates set out below and subject to the court's approval, and its provisions are

13  intended to be incorporated into an order.

14          D.    The parties agree to appear in court at the first available date to present

15  evidence and secure rendition of judgment in accordance with this Mediated Settlement

16  Agreement.

17          E.    The Agreement is not subject to revocation.

18      8.    The Agreement and each page of the Agreement was signed by all parties

19  including Richard and Debtor and a Final Decree of Divorce (the "Final Decree") was prepared

20  for submission to the Court for signature. A true and correct copy of Final Decree is attached

21  hereto as **Exhibit "D"**. Unfortunately, the Final Decree and Order could not be signed by the

22  Court in Harris County due to Covid19 as the Court's closed on March 11, 2020.

23      9.    Notwithstanding the terms of the Agreement, Debtor's voluntary participation in

24  the Mediation, the division of assets and liabilities and the binding nature and language of the

25  Agreement, Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code in the

26  Central District of California on July 13, 2020.

27      10.    In Schedule G, Debtor listed the Agreement as an Executory Contract stating that

28  she "believes that she was coerced into signing settlement agreement, which inequitably divides

1    community assets in favor of separated spouse. Debtor does not state who coerced her or how

2    she was coerced.

3        11.    Before filing her bankruptcy Debtor attempted to repudiate and withdraw from

4    the Agreement in the Texas Family Law Court without success.

5        12.    Debtor has accused me of hiding money in Swiss accounts. This is false. One of

6    my clients was a Swiss based company. I formed an LLC for them and their accounts showed up

7    on our Wells Fargo online accounts page for me to monitor. I received a stipend from the LLC in

8    the amount of $4500/month. Affidavits supporting these statements and this arrangement were

9    filed in my divorce proceeding. There is and never has been any hidden money.

10       13.    I believe she ultimately filed bankruptcy, in part to avoid having to pay her share

11   of our mutual debt, thereby leaving me to have to pay for all of the debt.

12       11.    I personally reviewed the initial paperwork Debtor filed with the Bankruptcy

13   Court. The misstatements, inaccuracies and omissions are listed above at heading "C", pages 8 –

14   10.

15       12.    I firmly believe that this bankruptcy is not about "coercion" into signing the

16   Agreement. It is about revenge against me by the Debtor. A close review of the Agreement

17   establishes it is an excellent deal for both parties – better and faster than a bankruptcy for both

18   Debtor, myself and creditors and it should be allowed to be consummated. I believe, based on

19   threatening emails and letters that I have received, that Debtor is being advised and influenced by

20   a gentleman named Davis Woodward, who states that he is the Treasurer of PACE Universal.

21       I declare under penalty of perjury under the laws of the United States of America, that the

22   forgoing is true and correct.

23       Executed this 5th day of August 2020 at Houston, Texas.

24

25

26       C. RICHARD WILLINGHAM

27

28

# EXHIBIT "A"

NO. _____

| | | |
|---|---|---|
| **IN THE MATTER OF** | § | **IN THE DISTRICT COURT** |
| **THE MARRIAGE OF** | § | |
| | § | |
| **CHARLES RICHARD WILLINGHAM** | § | **____th JUDICIAL DISTRICT** |
| **AND** | § | |
| **DEEPA BISWAS WILLINGHAM** | § | **HARRIS COUNTY, TEXAS** |

## ORIGINAL PETITION FOR DIVORCE AND MOTION FOR TEMPORARY ORDERS AND REQUEST FOR TEMPORARY RESTRAINING ORDER

*1.    Discovery Level*

Discovery in this case is intended to be conducted under level 2 of rule 190 of the Texas Rules of Civil Procedure.

*2.    Objection to Assignment of Case to Associate Judge*

Petitioner objects to the assignment of this matter to an associate judge for a trial on the merits or presiding at a jury trial.

*3.    Parties*

This suit is brought by CHARLES RICHARD WILLINGHAM, Petitioner. The last three numbers of Petitioner's driver's license number are 013. The last three numbers of Petitioner's Social Security number are 303.

DEEPA BISWAS WILLINGHAM is Respondent.

*4.    Domicile*

Petitioner has been a domiciliary of Texas for the preceding six-month period and a resident of this county for the preceding ninety-day period.

*5.    Service*

Process should be served on Respondent at 725 Croft Lane, Solvang, CA 93463 or wherever she may be found.

*6.    Protective Order Statement*

No protective order under title 4 of the Texas Family Code is in effect, and no application for a protective order is pending with regard to the parties to this suit.

015

7.    *Dates of Marriage and Separation*

The parties were married on or about April 23, 1983 and ceased to live together as husband and wife on or about August 13, 2018.

8.    *Grounds for Divorce*

The marriage has become insupportable because of discord or conflict of personalities between Petitioner and Respondent that destroys the legitimate ends of the marriage relationship and prevents any reasonable expectation of reconciliation.

9.    *Child of the Marriage*

There is no child born or adopted of this marriage, and none is expected.

10.    *Division of Community Property*

Petitioner believes Petitioner and Respondent will enter into an agreement for the division of their estate. If such an agreement is made, Petitioner requests the Court to approve the agreement and divide their estate in a manner consistent with the agreement. If such an agreement is not made, Petitioner requests the Court to divide their estate in a manner that the Court deems just and right, as provided by law.

11.    *Separate Property*

Petitioner owns certain separate property that is not part of the community estate of the parties, and Petitioner requests the Court to confirm that separate property as Petitioner's separate property and estate.

12.    *Request for Mutual Temporary Restraining Order*

Petitioner requests the Court to dispense with the issuance of a bond, and Petitioner requests that Petitioner and Respondent be temporarily restrained immediately, without hearing, and after notice and hearing be temporarily enjoined, pending the further order of this Court, from:

1.    Communicating with the other party in person, by telephone, or in writing in vulgar, profane, obscene, or indecent language or in a coarse or offensive manner.

2.    Threatening the other party in person, by telephone, or in writing to take unlawful action against any person.

3.    Placing one or more telephone calls, anonymously, at any unreasonable hour, in an offensive and repetitious manner, or without a legitimate purpose of communication.

4.    Causing bodily injury to the other party.

5.    Threatening the other party with imminent bodily injury.

6.    Destroying, removing, concealing, encumbering, transferring, or otherwise harming or reducing the value of the property of one or both of the parties.

7.    Falsifying any writing or record relating to the property of either party.

8.    Misrepresenting or refusing to disclose to the other party or to the Court, on proper request, the existence, amount, or location of any property of one or both of the parties.

9.    Damaging or destroying the tangible property of one or both of the parties, including any document that represents or embodies anything of value.

10.    Tampering with the tangible property of one or both of the parties, including any document that represents or embodies anything of value, and causing pecuniary loss to the other party.

11.    Selling, transferring, assigning, mortgaging, encumbering, or in any other manner alienating any of the property of Petitioner or Respondent, whether personalty or realty, and whether separate or community, except as specifically authorized by order of this order.

12.    Incurring any indebtedness, other than legal expenses in connection with this suit, except as specifically authorized by order of this order.

13.    Making withdrawals from any checking or savings account in any financial institution for any purpose, except as specifically authorized by order of this order.

14.    Spending any sum of cash in each party's possession or subject to each party's control for any purpose, except as specifically authorized by order of this order.

15.    Withdrawing or borrowing in any manner for any purpose from any retirement, profit-sharing, pension, death, or other employee benefit plan or employee savings plan or from any individual retirement account or Keogh account, except as specifically authorized by order of this order.

16.    Entering any safe-deposit box in the name of or subject to the control of Petitioner or Respondent, whether individually or jointly with others.

17.    Withdrawing or borrowing in any manner all or any part of the cash surrender value of life insurance policies on the life of Petitioner or Respondent, except as specifically authorized by order of this order.

18.    Changing or in any manner altering the beneficiary designation on any life insurance on the life of Petitioner or Respondent.

19.    Canceling, altering, failing to renew or pay premiums, or in any manner affecting the present level of coverage of any life, casualty, automobile, or health insurance policies insuring the parties' property or persons.

20.    Opening or diverting mail addressed to the other party.

017

21.     Signing or endorsing the other party's name on any negotiable instrument, check, or draft, such as tax refunds, insurance payments, and dividends, or attempting to negotiate any negotiable instrument payable to the other party without the personal signature of the other party.

22.     Taking any action to terminate or limit credit or charge cards in the name of the other party.

23.     Discontinuing or reducing the withholding for federal income taxes on each party's wages or salary while this case is pending.

24.     Destroying, disposing of, or altering any financial records of the parties, including but not limited to records from financial institutions (including canceled checks and deposit slips), all records of credit purchases or cash advances, tax returns, and financial statements.

25.     Destroying, disposing of, or altering any e-mail or other electronic data relevant to the subject matters of this case, whether stored on a hard drive or on a diskette or other electronic storage device.

26.     Terminating or in any manner affecting the service of water, electricity, gas, telephone, cable television, or other contractual services, such as security, pest control, landscaping, or yard maintenance or in any manner attempting to withdraw any deposits for service in connection with those services at the following residence: 1422 Nantucket Dr. Apt #A, Houston, Texas 77057.

27.     Excluding Petitioner from the use and enjoyment of the residence located at 1422 Nantucket Dr. Apt #A, Houston, Texas 77057.

28.     Excluding Respondent from the use and enjoyment of the residence located at 725 Croft Lane, Solvang, CA 93463.

29.     Entering, operating, or exercising control over the motor vehicle in the possession of the other party.

30.     Disturbing the peace the other party.

31.     Making disparaging remarks regarding the other party or the other party's family.

Petitioner requests that Petitioner and Respondent be authorized only as follows:

To make expenditures and incur indebtedness for reasonable and necessary living expenses for food, clothing, shelter, transportation, and medical care.

To make expenditures and incur indebtedness for reasonable attorney's fees and expenses in connection with this suit.

To make withdrawals from accounts in financial institutions only for the purposes authorized by the Court's order.

To engage in acts reasonable and necessary to conduct each party's usual business and occupation.

*13.    Request for Temporary Orders and Injunction*

Petitioner requests the Court, after notice and hearing, to dispense with the issuance of a bond, to make temporary orders and issue any appropriate temporary injunctions for the preservation of the property and protection of the parties as deemed necessary and equitable. Petitioner requests that the Court enjoin Petitioner and Respondent from the following:

1.    Communicating with the other party in person, by telephone, or in writing in vulgar, profane, obscene, or indecent language or in a coarse or offensive manner.

2.    Threatening the other party in person, by telephone, or in writing to take unlawful action against any person.

3.    Placing one or more telephone calls, anonymously, at any unreasonable hour, in an offensive and repetitious manner, or without a legitimate purpose of communication.

4.    Causing bodily injury to the other party.

5.    Threatening the other party with imminent bodily injury.

6.    Destroying, removing, concealing, encumbering, transferring, or otherwise harming or reducing the value of the property of one or both of the parties.

7.    Falsifying any writing or record relating to the property of either party.

8.    Misrepresenting or refusing to disclose to the other party or to the Court, on proper request, the existence, amount, or location of any property of one or both of the parties.

9.    Damaging or destroying the tangible property of one or both of the parties, including any document that represents or embodies anything of value.

10.    Tampering with the tangible property of one or both of the parties, including any document that represents or embodies anything of value, and causing pecuniary loss to the other party.

11.    Selling, transferring, assigning, mortgaging, encumbering, or in any other manner alienating any of the property of Petitioner or Respondent, whether personalty or realty, and whether separate or community, except as specifically authorized by order of this order.

12.    Incurring any indebtedness, other than legal expenses in connection with this suit, except as specifically authorized by order of this order.

13.    Making withdrawals from any checking or savings account in any financial institution for any purpose, except as specifically authorized by order of this order.

14.    Spending any sum of cash in each party's possession or subject to each party's control for any purpose, except as specifically authorized by order of this order.

15.    Withdrawing or borrowing in any manner for any purpose from any retirement, profit-sharing, pension, death, or other employee benefit plan or employee savings plan or from any individual retirement account or Keogh account, except as specifically authorized by order of this order.

16.    Entering any safe-deposit box in the name of or subject to the control of Petitioner or Respondent, whether individually or jointly with others.

17.    Withdrawing or borrowing in any manner all or any part of the cash surrender value of life insurance policies on the life of Petitioner or Respondent, except as specifically authorized by order of this order.

18.    Changing or in any manner altering the beneficiary designation on any life insurance on the life of Petitioner or Respondent.

19.    Canceling, altering, failing to renew or pay premiums, or in any manner affecting the present level of coverage of any life, casualty, automobile, or health insurance policies insuring the parties' property or persons.

20.    Opening or diverting mail addressed to the other party.

21.    Signing or endorsing the other party's name on any negotiable instrument, check, or draft, such as tax refunds, insurance payments, and dividends, or attempting to negotiate any negotiable instrument payable to the other party without the personal signature of the other party.

22.    Taking any action to terminate or limit credit or charge cards in the name of the other party.

23.    Discontinuing or reducing the withholding for federal income taxes on each party's wages or salary while this case is pending.

24.    Destroying, disposing of, or altering any financial records of the parties, including but not limited to records from financial institutions (including canceled checks and deposit slips), all records of credit purchases or cash advances, tax returns, and financial statements.

25.    Destroying, disposing of, or altering any e-mail or other electronic data relevant to the subject matters of this case, whether stored on a hard drive or on a diskette or other electronic storage device.

26.    Terminating or in any manner affecting the service of water, electricity, gas, telephone, cable television, or other contractual services, such as security, pest control, landscaping, or yard maintenance or in any manner attempting to withdraw any deposits for service in connection with those services at the following residence: 1422 Nantucket Dr. Apt #A, Houston, Texas 77057.

27.    Excluding Petitioner from the use and enjoyment of the residence located at 1422 Nantucket Dr. Apt #A, Houston, Texas 77057.

28.    Excluding Respondent from the use and enjoyment of the residence located at 725 Croft Lane, Solvang, CA 93463.

29.    Entering, operating, or exercising control over the motor vehicle in the possession of the other party.

30.    Disturbing the peace the other party.

31.    Making disparaging remarks regarding the other party or the other party's family.

Petitioner requests that Petitioner and Respondent be authorized only as follows:

To make expenditures and incur indebtedness for reasonable and necessary living expenses for food, clothing, shelter, transportation, and medical care.

To make expenditures and incur indebtedness for reasonable attorney's fees and expenses in connection with this suit.

To make withdrawals from accounts in financial institutions only for the purposes authorized by the Court's order.

To engage in acts reasonable and necessary to conduct each party's usual business and occupation.

*14.    Request for Temporary Orders Concerning Use of Property*

Petitioner requests the Court, after notice and hearing, for the preservation of the property and protection of the parties, to make temporary orders and issue any appropriate temporary injunctions respecting the temporary use of the parties' property as deemed necessary and equitable, including but not limited to the following:

Awarding Petitioner the residence located at 1422 Nantucket Dr. Apt #A, Houston, Texas 77057, as well as the furniture, furnishings, and other personal property at that residence, while this case is pending, and enjoining Respondent from entering or remaining on the premises of the residence and exercising possession or control of any of this personal property, except as authorized by order of this Court.

Awarding Respondent the residence located 725 Croft Lane, Solvang, CA 93463, as well as the furniture, furnishings, and other personal property at that residence, while this case is pending, and enjoining Respondent from entering or remaining on the premises of the residence and exercising possession or control of any of this personal property, except as authorized by order of this Court.

Awarding Petitioner exclusive use and control of the motor vehicle in his possession and enjoining Respondent from entering, operating, or exercising control over it.

Awarding Respondent exclusive use and control of the motor vehicle in her possession and enjoining Petitioner from entering, operating, or exercising control over it.

Awarding Petitioner temporary use and access of all financial accounts in his name during the pendency of this case.

Awarding Petitioner temporary use and access of all financial accounts in her name during the pendency of this case.

Awarding Petitioner temporary use and control of all income of the parties during the pendency of this case.

Awarding Petitioner the temporary use and access of the business known as Pace Universal located at 1 N Calle Cesar Chavez, Suite 102, Santa Barbara, CA 93103.

Awarding Petitioner the temporary exclusive control and management of the business known as CR Willingham & Associates located at 1422 Nantucket Dr., Apt# A, Houston, Texas 77057.

Awarding Petitioner the temporary exclusive control and management of the business known as Sabinal Energy, LLC. Located at 1780 Hughes Landing Blvd., Suite 1200, The Woodlands, Texas 77380.

*15.    Attorney's Fees, Expenses, Costs, and Interest*

It was necessary for Petitioner to secure the services of SARA RAZAVI ZAND, a licensed attorney, to prepare and prosecute this suit. To effect an equitable division of the estate of the parties and as a part of the division, judgment for attorney's fees, expenses, and costs through trial and appeal should be granted against Respondent and in favor of Petitioner for the use and benefit of Petitioner's attorney; or, in the alternative, Petitioner requests that reasonable attorney's fees, expenses, and costs through trial and appeal be taxed as costs and be ordered paid directly to Petitioner's attorney, who may enforce the order in the attorney's own name. Petitioner requests postjudgment interest as allowed by law.

*16.    Prayer*

Petitioner prays that citation and notice issue as required by law and that the Court grant a divorce and all other relief requested in this petition.

Petitioner prays that the Court immediately grant a temporary restraining order restraining Petitioner and Respondent, in conformity with the allegations of this petition, from the acts set forth above, and Petitioner prays that, after notice and hearing, this temporary restraining order be made a temporary injunction.

Petitioner prays that the Court, in addition to the temporary restraining order and temporary mutual injunction prayed for above, after notice and hearing, grant temporary orders in conformity with the allegations of this petition.

Petitioner prays for attorney's fees, expenses, costs, and interest as requested above.

Petitioner prays for general relief.

Respectfully submitted,

RAZAVI ZAND & ASSOCIATES, PLLC

By:_____

SARA RAZAVI ZAND, SBOT# 24051233
3100 Richmond Avenue, Suite 250
Houston, Texas 77098
Telephone: (713) 396-0227
Telecopier: (713) 391-8258
Email: sara@zandlegal.com
ATTORNEY FOR PETITIONER

# EXHIBIT "B"

3/9/2020 9:5
Marilyn Burgess - District Clerk Harris Co
Envelope No. 4148
By: Sandra Mc
Filed: 3/9/2020 9:5

### CAUSE NO. 2018-64132

| | | |
|---|---|---|
| **IN THE MATTER OF** | § | **IN THE DISTRICT COURT** |
| **THE MARRIAGE OF** | § | |
| | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **CHARLES RICHARD WILLINGHAM** | § | |
| **AND** | § | |
| **DEEPA BISWAS WILLINGHAM** | § | **245TH JUDICIAL DISTRICT** |

---

### SECOND AMENDED COUNTER-PETITION FOR DIVORCE

---

**1.**    _**Discovery Level**_

Discovery in this case is intended to be conducted under level 2 of rule 190 of the Texas Rules of Civil Procedure.

**2.**    _**Objection to Assignment of Case to Associate Judge**_

Counter-Petitioner/Respondent objects to the assignment of this matter to an associate judge for a trial on the merits or presiding at a jury trial.

**3.**    _**Parties**_

This suit is brought by **DEEPA BISWAS WILLINGHAM,** Counter-Petitioner/Respondent. The last three numbers of Counter-Petitioner/Respondent's driver's license number are 949. The last three numbers of Counter-Petitioner/Respondent's Social Security number are 358.

**CHARLES RICHARD WILLINGHAM** is Counter-Respondent.

**4.**    _**Domicile**_

Counter-Petitioner has been a domiciliary of Texas for the preceding six-month period and a resident of this county for the preceding ninety-day period.

**5.**    _**Service**_

No service on Counter-Respondent is necessary. Counter-Respondent has made a general appearance herein. A copy of this _First Amended Counter- Petition_ should be served on Counter-Respondent in accordance with Rule 21 of the Texas Rules of Civil Procedure by forwarding to his attorney of record.

Unofficial Copy of Marilyn Burgess District Clerk

6. **_Protective Order Statement_**

No protective order under title 4 of the Texas Family Code, protective order under chapter 7A of the Texas Code of Criminal Procedure, or order for emergency protection under article 17.292 of the Texas Code of Criminal Procedure is in effect in regard to a party to this suit or a child of a party to this suit, and no application for any such order is pending.

7. **_Dates of Marriage and Separation_**

The parties were married on or about April 23, 1983, and ceased to live together as spouses on or about September 7, 2018.

8. **_Grounds for Divorce_**

The marriage has become insupportable because of discord or conflict of personalities between Counter-Petitioner and Counter-Respondent that destroys the legitimate ends of the marriage relationship and prevents any reasonable expectation of reconciliation.

9. **_Child of the Marriage_**

There is no child born or adopted of this marriage, and none is expected.

10. **_Division of Community Property_**

Counter-Petitioner believes Counter-Petitioner and Counter-Respondent will enter into an agreement for the division of their estate. If such an agreement is made, Counter-Petitioner requests the Court to approve the agreement and divide their estate in a manner consistent with the agreement. If such an agreement is not made, Counter-Petitioner requests the Court to divide their estate in a manner that the Court deems just and right, as provided by law.

Counter-Petitioner should be awarded a disproportionate share of the parties' estate for the following reasons, including but not limited to:

   a.    fault in the breakup of the marriage;

   b.    benefits the innocent spouse may have derived from the continuation of the marriage;

   c.    disparity of earning power of the spouses and their ability to support themselves;

   d.    health of the spouses;

   e.    education and future employability of the spouses;

   f.    community indebtedness and liabilities;

   g.    tax consequences of the division of property;

h.  ages of the spouses;

i.  earning power, business opportunities, capacities, and abilities of the spouses;

j.  need for future support;

k.  nature of the property involved in the division;

l.  wasting of community assets by the spouses;

m.  credit for temporary support paid by a spouse;

n.  community funds used to purchase out-of-state property;

o.  gifts to or by a spouse during the marriage;

p.  increase in value of separate property through community efforts by time, talent, labor, and effort;

q.  excessive community-property gifts to the parties' child[ren];

r.  reimbursement;

s.  expected inheritance of a spouse;

t.  attorney's fees to be paid;

u.  creation of community property through the use of a spouse's separate estate;

v.  the size and nature of the separate estates of the spouses;

w.  creation of community property by the efforts or lack thereof of the spouses;

x.  actual fraud committed by a spouse;

y.  constructive fraud committed by a spouse.

## 11.    Breach of Fiduciary Duty and Fraud Against the Community

Petitioner, as Respondent's spouse, had a fiduciary relationship with and a fiduciary duty to Respondent. As a result of their fiduciary relationship, Respondent reposed a special confidence in Petitioner, and Petitioner had a duty in equity and good conscience to act in good faith and with due regard for Respondent's interests.

Petitioner, in violation of his duty to Respondent, has breached his duty to Respondent by unfairly conveying community property for the primary purpose of defrauding her, by committing fraud on the community, by wasting community assets by depriving the community of community

opportunities and by making capricious, excessive or arbitrary gifts of community property. Specifically, Respondent complains of the following acts by Respondent:

a.    Constructive Fraud

Petitioner has defrauded Respondent by breaching a legal and/or equitable duty owed Respondent as a result of their fiduciary relationship. That breach is fraudulent because, irrespective of Petitioner's moral guilt, the breach had a tendency to deceive Respondent and to violate Respondent's confidence or to injure the public interest. Petitioner's actions damaged Respondent as follows:

i.    Fraud on the Community

During Petitioner's marriage to Respondent, Petitioner was entrusted with the management, control, and disposition of substantially all community estate funds. Respondent trusted and believed that Petitioner would faithfully execute the duties as trustee in the management of such entrusted funds of the estates of the parties. In violation of this fiduciary relationship between Petitioner and Respondent, Petitioner has intentionally and in flagrant disregard of the duties as manager and trustee of the community funds failed to disclose the full extent of the existence and value of the community estate, all in fraud of Respondent's interest in the community. As a result, Respondent will incur significant costs and expenses, including attorney and accounting fees, to determine the existence and extent of these assets, all of which should be borne by Petitioner. Respondent requests the Court to order that Petitioner provide an accounting of community funds received by Petitioner and expended by him in violation of his fiduciary duty to her in accordance with *Mazique v. Mazique*, S.W.2d 805 (Tex. App.—Houston [1st Dist.] 1987). Respondent further requests that the value of all assets or funds that Petitioner fails to account for, be awarded to Petitioner as part of a just and right division of the marital estate. In the alternative and without waiving the foregoing, Respondent requests a money judgment against Petitioner for the value of all assets or funds for which Petitioner fails to account.

ii.    Excessive Gifts

Petitioner has squandered community assets by making gifts of community assets that were capricious, excessive or arbitrary to persons outside the community. Petitioner has spent community funds on these persons at a time when Petitioner knew or should have known that Respondent would have objected to these expenditures. These expenditures and gifts of property are in direct violation of Petitioner's duty as co-manager of the community estate. These gifts and disposition of community funds by Petitioner were also unfair to the rights of Respondent. Respondent requests an accounting of community funds received by Petitioner and expended by him in violation of his fiduciary duty to Respondent in the holding of these assets in accordance with *Mazique v. Mazique*, S.W.2d 805 (Tex. App.—Houston [1st Dist.] 1987). Respondent further requests that the value of all gifts of community assets that were capricious, excessive or arbitrary as well as all assets or funds that Petitioner fails to account for, be awarded to Petitioner as part of a just and right division of the marital estate. In the alternative and without waiving the foregoing, Respondent requests a money judgment against Petitioner for the value of all gifts of community assets that were capricious, excessive or arbitrary, as well as all assets or funds for which Petitioner

fails to account.

> iii.    Wasting of Community Assets and Depriving the Community of Community Opportunities.

In further violation of his duty as co-manager of the community estate, Petitioner has unfairly disposed of Respondent's interest in the community estate by his flagrant wasting of community assets. Such actions include but are not limited to transfers of money, unreasonable and unnecessary spending, and the escalation of attorney's fees, all of which have resulted in the dissipation of the community estate to the detriment of Respondent. Respondent requests an accounting of community funds received by Petitioner and expended by him in violation of his fiduciary duty to her in the hold of these assets in accordance with *Mazique v. Mazique*, S.W.2d 805 (Tex. App.—Houston [1st Dist.] 1987). Respondent further requests that the value of all assets wasted by Petitioner as well as all assets or funds that Petitioner fails to account for, be awarded to Petitioner as part of a just and right division of the marital estate. In the alternative and without waiving the foregoing, Respondent requests a money judgment against Petitioner for the value of all assets wasted by him, as well as all assets or funds for which Petitioner fails to account. In addition to Petitioner's waste of community assets, Petitioner has acted with willful disregard of the community and has deprived the community of community opportunities, which have resulted in damage to the Respondent.

## 12.    *Separate Property*

Counter-Petitioner owns certain separate property that is not part of the community estate of the parties, and Counter-Petitioner requests the Court to confirm that separate property as Petitioner's separate property and estate.

## 13.    *Postdivorce Maintenance*

Counter-Petitioner requests the Court to order that Counter-Petitioner be paid postdivorce maintenance for a reasonable period in accordance with chapter 8 of the Texas Family Code. Counter-Petitioner requests the Court to issue an order for withholding from Counter-Respondent's wages for this maintenance.

## 14.    *Request for Temporary Orders Concerning Use of Property*

Counter-Petitioner requests the Court, after notice and hearing, for the preservation of the property and protection of the parties, to make temporary orders and issue any appropriate temporary injunctions respecting the temporary use of the parties' property as deemed necessary and equitable, including but not limited to the following:

> Awarding Counter-Petitioner the exclusive use and possession of the residence located at 725 Croft Lane, Solvang, California 93463, as well as the furniture, furnishings, and other personal property at that residence, while this case is pending, and enjoining Counter-Respondent from entering or remaining on the premises of the residence and exercising possession or control of any of this personal property, except as authorized by order of this Court.

Awarding Counter-Petitioner exclusive use and control of any motor vehicle in the possession of Counter-Petitioner and enjoining Counter-Respondent from entering, operating, or exercising control over it.

**15.**    _**Request for Interim Attorney's Fees and Temporary Support**_

Counter-Petitioner requests the Court, after notice and hearing, for the preservation of the property and protection of the parties, to make temporary orders and issue any appropriate temporary injunctions regarding attorney's fees and support as deemed necessary and equitable, including but not limited to the following:

Counter-Petitioner requests that Counter-Respondent be ordered to pay reasonable interim attorney's fees and expenses, including but not limited to fees for appraisals, accountants, actuaries, and so forth. Counter-Petitioner is not in control of sufficient community assets to pay attorney's fees and anticipated expenses.

Counter-Petitioner has insufficient income for support, and Counter-Petitioner requests the Court to order Counter-Respondent to make payments for the support of Counter-Petitioner until a final decree is signed.

**16.**    _**Attorney's Fees, Expenses, Costs, and Interest**_

It was necessary for Counter-Petitioner to secure the services of SHERRI A. EVANS and TAYLOR T. IMEL, licensed attorneys with Koons Fuller, P.C., to prepare and prosecute this suit. To effect an equitable division of the estate of the parties and as a part of the division, judgment for attorney's fees, expenses, and costs through trial and appeal should be granted against Counter-Respondent and in favor of Counter-Petitioner for the use and benefit of Counter-Petitioner's attorney; or, in the alternative, Counter-Petitioner requests that reasonable attorney's fees, expenses, and costs through trial and appeal be taxed as costs and be ordered paid directly to Counter-Petitioner's attorney, who may enforce the order in the attorney's own name. Counter-Petitioner requests postjudgment interest as allowed by law.

**17.**    _**Prayer**_

Counter-Petitioner prays that citation and notice issue as required by law and that the Court grant a divorce and all other relief requested in this petition.

Counter-Petitioner prays for attorney's fees, expenses, costs, and interest as requested above.

Counter-Petitioner prays for general relief.

Respectfully submitted,

**KOONSFULLER HOUSTON**
109 North Post Oak Lane, Suite 425
Houston, Texas 77024
Telephone: (713) 789-5112
Facsimile:  (713) 789-5123
houstonservice@koonsfuller.com (for service only)

By:   *Taylor T. Imel*

**SHERRI A. EVANS**
State Bar No. 00785853
sevans@koonsfuller.com
**TAYLOR T. IMEL**
taylor@koonsfuller.com
State Bar No. 24073302
**Attorneys for Respondent,
DEEPA BISWAS WILLINGHAM**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the forgoing document has been delivered or forwarded to all counsel and unrepresented persons listed below, **[  ] by personal delivery or receipted delivery service**, or **[  ] by certified or registered mail**, return receipt requested, by depositing the same, postpaid, in an official deposit under the care and custody of the United States Postal Service, or **[  ] by facsimile** to the recipient's facsimile number identified below, or **[ X ] by e-service** to the recipient's email address identified below and the electronic transmission was reported as complete, on this **9th** day of **March 2020,** in accordance with the Rule 21a of the Texas Rules of Civil Procedure:

*Via E-Service: sara@zandlegal.com*
**SARA RAZAVI ZAND**
RAZAVI ZAND & ASSOCIATES, PLLC
4900 Fournace Place, Suite 550
Bellaire, Texas 77401
Telephone: (713) 396-0227
Facsimile:  (713) 391-8258
*Attorney for Petitioner*

*Taylor T. Imel*
**TAYLOR T. IMEL**

.

# EXHIBIT "C"

3/10/2020 4:0
Marilyn Burgess - District Clerk Harris Co
Envelope No. 4155
By: Ebonie F
Filed: 3/10/2020 4:0

## NO. 2018-64132

| | | |
|---|---|---|
| IN THE MATTER OF | § | IN THE DISTRICT COURT |
| THE MARRIAGE OF | § | |
| | § | 245ᵗʰ JUDICIAL DISTRICT |
| CHARLES RICHARD WILLINGHAM, | § | |
| AND | § | |
| DEEPA BISWAS WILLINGHAM | § | HARRIS COUNTY, TEXAS |

### Mediated Settlement Agreement

The undersigned parties to this settlement agreement for agree to compromise and settle the claims and controversies between them. The parties wish to avoid potentially protracted and costly litigation.

1.  Terms of the settlement for are set out on Exhibit A, B and C which are attached to this agreement.

2.  If any dispute arises with regard to the interpretation or performance of this agreement or any of its provisions, including the necessity and form of closing documents, the parties agree to try to resolve the dispute by phone conference with the mediator who facilitated this settlement. Any disputes regarding drafting shall be resolved whenever possible by reference to the *Texas Family Law Practice Manual* (3rd ed.).

3.  This agreement is made and performable in Harris County, Texas, and must be construed in accordance with Texas law.

4.  Each signatory to this settlement has entered into the settlement freely and without duress after having consulted with professionals of his or her choice. Each party has been advised by the mediator that the mediator is not the attorney for any party and that each party should have this agreement approved by that party's attorney before executing it.

5.  This stipulation is signed voluntarily and with the advice and consent of counsel on the dates set out below and subject to the court's approval, and its provisions are intended to be incorporated into an order.

6.  The parties agree to appear in court at the first available date to present evidence and secure rendition of judgment in accordance with this Mediated Settlement Agreement.

**EXHIBIT**

**A**

033



7.    All signatories herein by their signatures below agree to authorize JUDGE
SHERI Y. DEAN to serve as binding Arbitrator for any disputes that arise in the
drafting and execution of this agreement. The Arbitrator may decide what constitutes
substantial compliance with all terms and any omitted terms, of this agreement that
were discussed and agreed upon in the mediation. Judge Sheri Y. Dean may make
disposing decisions concerning the language of this Order and submit the draft
approved by him to the Court for signature and entry.

8.    Parties and counsel hereby agree to notify Judge Sheri Y. Dean, via email,
of their request for her services at least 10 days prior to a court entry date and each
party shall deposit $300 toward the cost of said services before any arbitration services
are rendered. Parties and counsel agree to meet with Judge Dean at a mutually agreed
upon place, upon request of Judge Dean, and to furnish Judge Dean with one hard
copy of each draft of language in dispute. Parties agree to pay any additional
arbitration fees directly to Judge Dean on or at the time of said meeting.



034    2

CRW

9.   <u>THIS AGREEMENT IS NOT SUBJECT TO REVOCATION.</u>   CRW
TT

**Charles Richard Willingham**

Signed on: _March 10, 2020_

**Sara Razavi Zand** – Attorney for Charles Richard Willingham

Signed on: _March 10, 2020_

**Deepa Biswas Willingham**

Signed on: _March 10, 2020_

**Taylor T. Amel** – Attorney for Deepa Biswas Willingham

Signed on: _March 10, 2020_

3

## Exhibit A

- **Parties agree to be divorced based irreconcilable differences**
- Property to be divided per Exhibit B (TBS =To be sold), save and accept Wife is also awarded as her separate property the antique clock located at the Houston property.
- California Property to sold terms and conditions per Exhibit C
- Sales proceeds on Exhibit B regarding Vineyard and Wine includes proceeds from the following:
- a. 50% net proceeds from bottles of wine made from today until sale of the property,
- b. 50% of net proceeds from 2020 harvest of the grapes in the vineyard, and
- c. 50% of net proceeds from wine in barrels
- Parties shall submit 3 names of persons/company to the other by and thru their attorneys of record by March 20, 2020. Parties may mutually agree to a person's/ company's name on the list to use for the sale of the Vineyard and Wine products indicated above. Failing such agreement such names shall be submitted to Sheri Y. Dean for arbitration and a decision as to the person/company that shall sell the above products for the parties less any reasonable commission for such sales.
- The tractor and two lawnmowers listed on exhibit B shall be sold when the property is sold by the above same method failing mutual agreement.
- Property listed as Husband's property currently in the possession of Wife in the California home shall be returned to Husband within 14 days written notice of Husband to wife. Husband shall pay the expense of shipping and transport for these items.
- Property listed as Wife's property currently in the possession of Husband in the Houston home shall be returned to Wife within 14 days written notice of Wife to Husband. Wife shall pay the expense of shipping and transport for these items.
- Wife shall receive Rental property income from property located on California property until the house is sold to pay for the expenses listed on Exhibit C



| Item # | Asset Description | Current/Face Value | Current Debt | Net Equity | Award Husband Community | Award Wife Community |
|---|---|---|---|---|---|---|
| 1 | **Real Property** | | | | | |
| 1.1 | 1422 Nantucket Drive, Apt. A, Houston, TX 77057 (mortgage as of 3/3/2020) | 547,393.00 | 275,512.00 | 271,881.00 | 271,881.00 | |
| 1.2 | 725 Croft Lane, Solvang, CA, 93463 (mortgage as of 3/3/2020) | X | X | X | X | |
| 2 | **Financial Accounts** | | | | | |
| 2.1 | Wells Fargo Checking x-0741 INO Petitioner and Respondent (as of 1/31/2020) | 3,058.73 | | 3,058.73 | 3,058.73 | |
| 2.2 | Wells Fargo Checking x-9056 INO Petitioner and Respondent (as of 1/31/2020) | 288.68 | | 288.68 | 288.68 | |
| 2.3 | Wells Fargo Checking x-8937 INO Petitioner and Respondent (as of 1/31/2020) | 691.85 | | 691.85 | | 691.8 |
| 2.4 | Wells Fargo Savings x-6521 INO Petitioner and Respondent (as of 1/31/2020) | 1,243.47 | | 1,243.47 | | 1,243.4 |
| 2.5 | Wells Fargo Checking x-5545 INO CRW Capital Enterprises, LLC (as of 2/18/2020) | 895.96 | | 895.96 | 895.96 | |
| 2.6 | Wells Fargo Checking x-2034 INO Petitioner (as of 2/18/2020) | 1,427.08 | | 427.00 | 427.00 | |
| 2.7 | Amerant Checking x-4606 INO Petitioner (as of 2/17/2020) | 861.67 | | 861.67 | 861.67 | |
| 2.8 | Amerant Checking x-5506 INO CR Willingham & Associates LLC (as of 2/29/20) | 5,719.56 | | 719.00 | 719.00 | |
| 2.9 | Amerant Checking x-5606 INO CR Willingham & Associates LLC (as of 2/29/20) | 227.71 | | 227.71 | 227.71 | |
| 2.10 | Amerant Line of Credit x-8255 INO Petitioner and Respondent (as of 2/18/2020) | | X | X | X | |
| 2.11 | Wells Fargo Line of Credit x-8715 INO Petitioner (as of 1/31/2020) | | X | X | X | |
| 3a | **Retirement Accounts - Defined Contribution Plan** | | | | | |
| 3.1 | Fidelity Investment Account x-1519 (INO Petitioner and Respondent) (as of 9/19/2019) | 847.85 | | 847.85 | 847.85 | |
| 3.2 | Fidelity Investment Account x-1651 (INO Petitioner) (as 3/9/2020) | 111,000.00 | | 111,000.00 | 55,500.00 | 55,500.0 |
| 3.3 | Merrill IRA x-11X65 (INO Explorametrics, Inc. FBO Petitioner) (as of 12/31/2019) | 5,257.20 | | 5,257.20 | 5,257.20 | |
| 3.4 | Fidelity Investment Account x-???? (INO Respondent) (as of 3/1/2020) | 6,400.00 | | 6,400.00 | | 6,400.0 |
| 3.5 | | | | | | |
| 3b | **Other Debts** | | | | | |
| 3.6 | Loan Care | 127,000.00 | | 127,000.00 | (127,000.00) | |
| 4 | **Motor Vehicles** | | | | | |
| 4.1 | Husband - 2011 Mercedes Benz E-350 (w/ $8k loan outstanding) | 8,660.00 | | 8,660.00 | 8,660.00 | |
| 4.2 | Wife - 2006 Mercedes Benz E-320 CDI | 5,000.00 | | 5,000.00 | | 5,000.0 |
| 4.3 | 1985 Mercedes Benz 300D | 7,500.00 | | 7,500.00 | 7,500.00 | |



| Item # | Asset Description | Current/Face Value | Current Debt | Net Equity | Award Husband Community | Award Wife Community |
|---|---|---|---|---|---|---|
| 4.4 | 2003 Ford F-250 | 3,900.00 | | 3,900.00 | | 3,900.0 |



| Item # | Asset Description | Current/Face Value | Current Debt | Net Equity | Award Husband Community | Award Wife Community |
|---|---|---|---|---|---|---|
| 4.5 | 1993 Mercedes Benz E-300 | 1,500.00 | | 1,500.00 | | 1,500.0 |
| 4.6 | John Deere 1400 Tractor | x | | x | x | |
| 4.7 | John Deere Riding Lawn Mower | x | | x | x | |
| 4.8 | Club Cadet Riding Lawn Mower | x | | x | x | |
| 4.9 | | | | | | |
| 5 | Credit Cards | | | | | |
| 5.1 | BoA AAA x-2784 INO Petitioner (as of 2/4/2020) | 23,760.94 *(handwritten)* x | | X | X | |
| 5.2 | Chase Southwest Airlines x-3218 INO Petitioner (as of 2/28/2020) | 22,917.37 *(handwritten)* x | | X | X | |
| 5.3 | Chase Southwest Airlines x-4799 INO Petitioner (as of 2/2/2020) | 34,523.27 *(handwritten)* x | | X | X | |
| 5.4 | Citi Advantage x-3860 INO Petitioner (as of 1/1/2020) | 17,211.19 *(handwritten)* x | | X | X | |
| 5.5 | Wells Fargo x-8894 INO Petitioner and Respondent (as of 2/12/2020) | 23,056.50 *(handwritten)* x | | X | | |
| 6 | Miscellaneous | | | | | |
| 6.1 | Wine Inventory | X | | X | X | |
| 6.2 | Wine Inventory Still In Barrel (approx. 256 cases) | X | X | X | X | |
| 6.3 | Naviant Student Loan INO Petitioner (on behalf of Reena) (as of 3/3/2020) | | X | X | | |
| 6.4 | Shefield Finance Lawn Tractor Loan INO Petitioner and Respondent (as of 3/3/2020) | | 466.00 | (466.00) | | (466.0 |
| 6.5 | Ally Bank Car Loan INO Petitioner (as of 3/3/2020) | | 8,000.00 | (8,000.00) | (8,000.00) | |
| 7 | Business Entities | | | | | |
| 7.1 | CR Willingham & Associates, LLC | | | | x | |
| 7.2 | CRW Capital Enterprises, LLC | | | | x | |
| 7.3 | Millennium Operating Company (16.66% each) | | | | x | |
| 7.4 | BBW Partners (16.66% each) | | | | x | |
| 7.5 | Lanita Oil and Gas - Failed | | | | x | |
| 8 | Outstanding Tax Liabilities | | | | | |
| 8.1 | 2019 Joint Tax Return (due 4/15/2020) | | X | X | X | |
| 8.2 | 2019 Property Tax on 725 Croft Lane, Solvang, CA (due 4/10/2020) | | X | X | X | |
| 9 | Attorney's Fees | | | | | |
| 9.1 | Husband - Attorney's Fees | | x | x | x | |
| 9.2 | Wife - Attorney's Fees | x | | x | | |
| 10 | Household Items and Items of Significant Value | | | | | |
| 10.1 | Husband - Household Furnishings | 1.00 | | 1.00 | 1.00 | |
| 10.2 | Wife - Household Furnishings | 1.00 | | 1.00 | 1.00 | 1.00 |
| 10.3 | Waterford Wine Decanter | 150.00 | | 150.00 | 150.00 | |
| 10.4 | Reena Painting (located in Houston, TX) | x | | x | x | |

| Item # | Asset Description | Current/Face Value | Current Debt | Net Equity | Award Husband Community | Award Wife Community |
|---|---|---|---|---|---|---|
| 10.5 | Indian Cows Painting (located in Houston, TX) | x | | x | | |
| 10.6 | Ranch Painting (located in Houston TX) | x | | x | x | |
| 10.7 | Gardening Tools | x | | x | | |
| 10.8 | Solar Panels (located in CA) | 1,000.00 | | 1,000.00 | | 1,000.0 |
| 10.9 | Stainless Steel Recirculating Pumps (located in CA) | 2,000.00 | | 2,000.00 | | 2,000.0 |
| 10.10 | Pablo Picasso Painting (located in CA) | 4,500.00 | | 4,500.00 | | 4,500.0 |
| 10.11 | Maple Wood Dining Room Set w/ 8 Chairs (located in CA) | 1,000.00 | | 1,000.00 | | 1,000.0 |
| | **Proposed Division of Property** | **Current Value** | **Current Debt** | **Net Equity** | **Total** | **Total** |
| | Total Community Property | 847,524.76 | 283,978.00 | 557,546.12 | 221,276.80 | 82,269.3 |
| | | | | *% Split* | *#REF!* | *#REF!* |
| 11 | **Separate Property of Charles Richard Willingham** | **Current Value** | **Current Debt** | **Net Equity** | | |
| 11.1 | 230 E. Ralston Avenue, San Bernardino, CA 92404 | 275,000.00 | | 275,000.00 | | |
| 11.2 | CRW Mother's Sterling Silver Set (located in CA) | 3,500.00 | | 3,500.00 | | |
| 11.3 | CRW Sterling Set (located in CA) | 3,500.00 | | 3,500.00 | | |
| 11.4 | JB Lansing SA600 Hi-Fi Amp (located in CA) | 1,800.00 | | 1,800.00 | | |
| 11.5 | 33 RPM Vinyl Records (located in CA) | x | | x | | |
| 11.6 | Baseball Card Collection (located in CA) | 500.00 | | 500.00 | | |
| 11.7 | Cassette Hi-Fi Player (located in CA) | 50.00 | | 50.00 | | |
| 11.8 | Briar Rabbit and Similar Out-of-Print Children's Books (located in CA) | x | | x | | |
| 11.9 | Miscellaneous tools and socket set (located in CA) | x | | x | | |
| 11.1 | Celestron C-8 Telescope, Mount, Parts and Eyepieces (located in CA) | 700.00 | | 700.00 | | |
| 11.11 | Astronomy Books (located in CA) | x | | x | | |
| 11.12 | Baby Pictures of Petitioner (located in CA) | x | | x | | |
| 11.13 | Coin Collection (located in CA - travel locker in barn) | x | | x | | |
| | | | | | | |

## Exhibit C - Final

Provisions Dealing with Sale of Residence

IT IS FURTHER ORDERED AND DECREED that the property and all improvements located according to the map, plat, or deed records of Santa Barbara County, California and more commonly known as 725 Croft Lane, Solvang, California 93463, shall be sold under the following terms and conditions:

1. On or before March 20, 2020, the Parties shall submit 3 names of agents to be real estate agent/broker for sale of the above property, by and through their respective attorneys of record.

2. Parties may mutually agree to one of the agents/brokers and failing such agreement shall submit the list to Sheri Y. Dean for arbitration on or before March 25, 2020, to decide the agent/broker for the property.

3. The residence shall be listed on the market, as is, on or before April 15, 2020. If CHARLES WILLINGHAM and DEEPA WILLINGHAM are unable to agree on a listing price on or before April 15, 2020, the parties shall place the residence on the market on or before April 15, 2020 for $2,000,000.00. If the property does not sell within the first 45 days from the listing, the price shall be reduced by a minimum of 2.5%. A reduction of 2.5% of the original listing price shall be automatically going into effect after every period of 45 days thereafter, during which a purchase offer on the residence is not pending. The real estate agent shall be instructed by the parties on the first day, of each 45 day period, to reduce the listing price of the residence by 2.5%.

3. The parties agree to cooperate in every reasonable way and to complete all paperwork necessary to list the property for sale and/or to change listing agents. The parties agree to execute and deliver any and all documents necessary to effectuate the listing and sale of the property within five (5) business days of presentment of such documents.

4. The parties agree to complete and execute any and all listing agreements and other necessary closing and title documents timely upon presentment, but in no event shall such execute occur later than five (5) days from the date of presentment.

5. The parties shall timely comply with all other acts required to complete the sale of the residence, including but not limited to attending all scheduled appointments by the realtor as requested, appearing at the time designated for closing of the sale, and provided all keys and access codes required for entry to the property.



6.      The parties agree that no substantial alterations/destruction shall be made to the property during the pendency of the sale.

7.      If either party believes any repairs necessary to sell the home, can pay the cost of the repairs.

8.      DEEPA WILLINGHAM shall each keep the home in show quality condition and shall have exclusive and private use of the home during the pendency of the sale.

9.      The net sales proceeds (defined as the gross sales price less cost of sale and full payment of any mortgage indebtedness, property taxes, or liens on the property) shall be distributed as follows:

   a) First, Payment of full amount of the Amerant Line of Credit in the name of DEEPA WILLINGHAM and CHARLES WILLINGHAM with account number ending in 8255.

   b) Second, Payment of full amount of the Wells Fargo Line of Credit in the name of CHARLES WILLINGHAM with account number ending in 8715.

   c) Third, IRS Taxes for 2019, if any amount paid in advance by one Party, that Party is reimbursed 100% of the amount paid in advance, along with any cost or penalties incurred to pay the taxes on time.

   d) Fourth, the Credit Cards all listed for both Parties on Exhibit B, 5.1-5.5 with balances as stated on Exhibit B. Any changes above those balances shall be paid by the Party that incurs such debt.

   e) Equalization Payment in the amount of $69,503.00 shall be paid to Wife in full from the net proceeds  from the sale of the California property and if the proceeds are short of satisfying the total payment due and owing by Husband, the security against the Houston residence shall not be released until Husband has paid in full the amount due and owing to Wife.

**Real Estate Lien:**

Note to be paid in 12 equal monthly installments, beginning with the 1st day of the 1st month following closing of the California residence and continuing thereafter on the 1st day of each month until fully satisfied.  Wife shall execute release when satisfied.

   f) Thereafter, the remaining balance of the net sales proceeds shall be distributed as follows: 50% to DEEPA WILLINGHAM and 50% to CHARLES WILLINGHAM.

Provisions Dealing with Use and Expenses of Residence Prior to Sale

1.    Beginning March 9, 2020, through the sale of the residence, CHARLES
      WILLINGHAM shall pay the monthly balance due, including payments of
      principal, interest, taxes, and escrow insurance, on the residence
      from the following accounts in the following order:

      a)  Amerant line of credit 8255.
      b)  Wells Fargo line of credit 8715.

2.    Beginning March 9, 2020, through the sale of the residence, DEEPA
      WILLINGHAM shall pay the following from her own personal accounts:

      a)      Utilities, including electricity, gas, cable and internet, water
      b)      Landscaping and lawn care services
      c)      Housekeeping services
      d)      Any other expenses that are associated with the maintenance and upkeep
              of the property including the vineyard and rental property.





# EXHIBIT "D"

6/19/2020 4:2
Marilyn Burgess - District Clerk Harris Co
Envelope No. 4390
By: Ebonie I
Filed: 6/19/2020 4:2

**NOTICE: THIS DOCUMENT CONTAINS SENSITIVE DATA**

## NO. <u>2018-64132</u>

| | | |
|---|---|---|
| IN THE MATTER OF | § | IN THE DISTRICT COURT |
| THE MARRIAGE OF | § | |
| | § | |
| CHARLES RICHARD WILLINGHAM | § | 245TH JUDICIAL DISTRICT |
| AND | § | |
| DEEPA BISWAS WILLINGHAM | § | HARRIS COUNTY, TEXAS |

## <u>FINAL DECREE OF DIVORCE</u>

On _____, the Court considered the agreement of the parties that was presented to the Court for approval.

*Appearances*

Petitioner, CHARLES RICHARD WILLINGHAM, appeared via affidavit duly executed and sworn, attached hereto as EXHIBIT "1" and fully incorporated herein for all purposes, stating that the parties reached an agreement as to all issues, as further evidenced by the signature of Petitioner and his attorney of record, SARA RAZAVI ZAND, appearing below.

Respondent, DEEPA BISWAS WILLINGHAM, has made a general appearance and assented to the entry of this judgment in accordance with Section 6.602 of the Texas Family Code by affixing her signature to the *Mediated Settlement Agreement* of March 10, 2020 upon which this Decree is based.

*Record*

The making of a record of testimony was waived by the parties with the consent of the Court.

*Jurisdiction and Domicile*

The Court finds that the pleadings of Petitioner are in due form and contain all the allegations, information, and prerequisites required by law. The Court, after receiving evidence, finds that it has jurisdiction of this case and of all the parties and that at least sixty days have elapsed since the date the suit was filed.

The Court further finds that, at the time this suit was filed, Petitioner had been a domiciliary of Texas for the preceding six-month period and a resident of the county in which this suit was filed for the preceding ninety-day period. All persons entitled to citation were properly cited.

045    **EXHIBIT**

*Jury*

A jury was waived, and questions of fact and of law were submitted to the Court.

*Agreement of Parties*

The Court finds that the parties have entered into a written agreement as contained in this decree by virtue of having approved the *Mediated Settlement Agreement* upon which this Decree is based. The Court approves the agreement of the parties as contained in this Final Decree of Divorce.

The agreements in this Final Decree of Divorce were reached in mediation with SHERI Y. DEAN. This Final Decree of Divorce is stipulated to represent a merger of a mediated settlement agreement dated March 10, 2020 between the parties. To the extent there exist any differences between the mediated settlement agreement and this Final Decree of Divorce, this Final Decree of Divorce shall control in all instances.

*Divorce*

IT IS ORDERED AND DECREED that CHARLES RICHARD WILLINGHAM, Petitioner, and DEEPA BISWAS WILLINGHAM, Respondent, are divorced and that the marriage between them is dissolved on the ground of insupportability.

*Child of the Marriage*

The Court finds that there is no child of the marriage of Petitioner and Respondent now under eighteen years of age or otherwise entitled to support and that none is expected.

*Division of Marital Estate*

The Court finds that the following is a just and right division of the parties' marital estate, having due regard for the rights of each party.

*Property to Husband*

IT IS ORDERED AND DECREED that Husband, CHARLES RICHARD WILLINGHAM, is awarded the following as his sole and separate property, and Wife, DEEPA BISWAS WILLINGHAM, is divested of all right, title, interest, and claim in and to that property:

H-1.    ***Subject to the terms and conditions set forth below in the provisions entitled, "Real Estate Lien",*** the following real property, including but not limited to any escrow funds, prepaid insurance, utility deposits, keys, house plans, home security access and code, garage door opener, warranties and service contracts, and title and closing documents:

<u>More formally being described as follows:</u>

A tract of land containing 4883 square feet of land, more or less, out of the easterly part of Lot 284, in Block 11 of Westhaven Estates, Sec. 2, an addition in Harris County, Texas according to the map or plat thereof recorded in Volume 30, Page 46 of the Map Records of Harris County, Texas; said tract of land being more particularly described by metes and bounds as follows;

BEGINNING at a 1-1/4 inch iron pipe at the southeast corner of Lot 284 and the northeast corner of Lot 285 on the west right of way line of Nantucket Drive, 60 feet wide;

Thence South 89 deg. 50 min. West, with the common line between said two lots, 69.72 feet to a point for corner;

Thence North 00 deg. 10 min. West, across the Lot 284 and in part along a common party wall of a two story townhouse building 70.00 feet to a point for corner on the north line of Lot 284 and the south line of Lot 283;

Thence North 89 deg. 50 min. East, with the common line between said two lots, 69.79 feet to a 1-1/4th iron pipe at their common east corner on said west right of way line;

Thence South 00 deg. 06 min. 30 sec. East, with the east line of Lot 284 and said west right of way line, 70.00 feet to the PLACE OF BEGINNING.

*NOTE: The Company is prohibited from insuring the area or quality of the land described herein. Any statement in the legal description contained in Schedule "A" as to the area or quantity of land is not a representation that such area or quantity is correct, but is made only for informal identification purposes and does not override Item 2 of Schedule "B" hereof.*

The real property is more commonly known as 1422 Nantucket Drive, Apt. A, Houston, Texas 77057.

H-2.    ___*Save and except for those items awarded to Wife in W-2 below,*___ all household furniture, furnishings, fixtures, goods, art objects, collectibles, appliances, and equipment in the possession of Husband or subject to Husband's sole control.

H-3.    The following furniture, furnishings, fixtures, goods, art objects, collectibles, appliances, and equipment:

a)    Waterford Wine Decanter;

b)    Painting by Reena Biswas Willingham, located in Houston, Texas;

c)    Ranch Painting, located in Houston, Texas;

H-4.    All clothing, jewelry, and other personal effects in the possession of Petitioner or subject to Petitioner's sole control.

H-5.   All funds on deposit, together with accrued but unpaid interest, in the following banks, savings institutions, or other financial institutions:

a)     Wells Fargo Checking Account, held in the name of Charles Richard Willingham and Deepa Biswas Willingham, account number ending in 0741;

b)     Wells Fargo Checking Account, held in the name of Charles Richard Willingham and Deepa Biswas Willingham, account number ending in 9056;

c)     Wells Fargo Checking Account, held in name of CRW Capital Enterprises, LLC, account number ending in 5545;

d)     Wells Fargo Checking Account, held in name of Charles Richard Willingham, account number ending in 2034;

e)     Amerant Checking Account, held in name of CR Willingham & Associates, LLC, account number ending in 5506;

f)     Amerant Checking Account, held in name of CR Willingham & Associates, LLC, account number ending in 5606; and

g)     Amerant Checking Account, held in name of Charles Richard Willingham, account number ending in 4606.

H-6.   The following individual retirement accounts and investment accounts:

a)     100% of the Fidelity Investment Account ending in 1519, held in the name of Charles Richard Willingham and Deepa Biswas Willingham;

b)     As of March 10, 2020, 50% of the stocks, bonds, mutual funds, securities, and other funds held in the Fidelity Investment Account ending in 1651, together with all gains, losses, dividends, splits, and other rights and privileges associated therewith since that date, held in the name of Charles Richard Willingham; and

c)     100% of the Merrill Investment Retirement Account ending in 11X65, held in the name of Explorametrics, Inc. for the benefit of Charles Richard Willingham.

H-7.   The following motor vehicles, together with all prepaid insurance, keys, and title documents:

a)     The 2011 Mercedes Benz E-350; and

b)     The 1985 Mercedes Benz 300D.

H-8.   100% of any interest in the business entity known as CR Willingham & Associates, LLC, including but not limited to all intellectual property, furniture, fixtures, machinery, equipment, inventory, cash, receivables, accounts, goods, supplies, income; all personal property used in connection with the operation of the business entity; and all rights and

048

privileges, past, present, or future, arising out of or in connection with the operation of the business entity.

H-9.    100% of any interest in the business entity known as CRW Capital Enterprises, LLC, including but not limited to all intellectual property, furniture, fixtures, machinery, equipment, inventory, cash, receivables, accounts, goods, supplies, income; all personal property used in connection with the operation of the business entity; and all rights and privileges, past, present, or future, arising out of or in connection with the operation of the business entity.

H-10. 100% of any interest in the business entity known as Lanita Oil and Gas, including but not limited to all intellectual property, furniture, fixtures, machinery, equipment, inventory, cash, receivables, accounts, goods, supplies, income; all personal property used in connection with the operation of the business entity; and all rights and privileges, past, present, or future, arising out of or in connection with the operation of the business entity. The parties specifically recognize that the community's interest in Lanita Oil and Gas was a failed enterprise.

H-11.    A 16.66% interest (representing 50% of the community estate's interest) in the business entity known as Millennium Operating Company, a proportional interest currently held in the name of Charles Richard Willingham, including but not limited to all intellectual property, furniture, fixtures, machinery, equipment, inventory, cash, receivables, accounts, goods, supplies, income; all personal property used in connection with the operation of the business entity; and all rights and privileges, past, present, or future, arising out of or in connection with the operation of the business entity.

H-12.    A 16.66% interest (representing 50% of the community estate's interest) in the business entity known as BBW Partners, a proportional interest currently held in the name of Charles Richard Willingham, including but not limited to all intellectual property, furniture, fixtures, machinery, equipment, inventory, cash, receivables, accounts, goods, supplies, income; all personal property used in connection with the operation of the business entity; and all rights and privileges, past, present, or future, arising out of or in connection with the operation of the business entity.

H-13.    *Subject to the terms and conditions set forth below in the provision entitled Provisions Dealing with Vineyard and Wine Sale*, 50% of the amount of DAnjali wine bottles in the possession of DEEPA BISWAS WILLINGHAM, located at 725 Croft Lane, Solvang, California 93463, and 50% of the remaining amount of bottles in the possession of Summerland Wine Brands (66 cases of Deepa Anjali Syrah Ballad Canyon 2015 and 220 cases of Deepa 2016 Ballard Canyon Syrah), located at 35 Industrial Way Buellton, California 93427.  By virtue of this Decree, Summerland Wine Brands is ORDERED to release the remaining inventory to the parties within 3 business days of written request by one or both parties.

H-14.    *Subject to the terms and conditions set forth below in the provision entitled Provisions Dealing with Vineyard and Wine Sale*, 50% of the wine barrel inventory in the possession of DEEPA BISWAS WILLINGHAM, located at 725 Croft Lane, Solvang, California 93463, and, 50% of the remaining wine in the wine barrels in the possession of Summerland Wine Brands, located at 35 Industrial Way Buellton, California 93427.  By virtue of this Decree,

049

Summerland Wine Brands is ORDERED to release the remaining inventory to the parties within 3 business days of written request by one or both parties.

*Property to Wife*

IT IS ORDERED AND DECREED that Wife, DEEPA BISWAS WILLINGHAM, is awarded the following as her sole and separate property, and Husband, CHARLES RICHARD WILLINGHAM, is divested of all right, title, interest, and claim in and to that property:

W-1.    *__Save and except for those items confirmed as Husband's separate property below,__* all household furniture, furnishings, fixtures, goods, art objects, collectibles, appliances, and equipment in the possession of Wife or subject to Wife's sole control unless specific provisions are made herein.

W-2.    The following furniture, furnishings, fixtures, goods, art objects, collectibles, appliances, and equipment:

a)    The Indian Cows Painting, located in Houston, Texas;

b)    Gardening Tools;

c)    Solar Panels, located in California;

d)    Stainless Steel Recirculating Pumps, located in California;

e)    Pablo Picasso Painting, located in California; and

f)    Maple Wood Dining Room Set with 8 chairs, located in California.

W-3.    All clothing, jewelry, and other personal effects in the possession of Wife or subject to Wife's sole control.

W-4.    All funds on deposit, together with accrued but unpaid interest, in the following banks, savings institutions, or other financial institutions:

a)    Wells Fargo Checking Account, held in the name of Charles Richard Willingham and Deepa Biswas Willingham, account number ending in 8937; and

b)    Wells Fargo Savings Account, held in the name of Charles Richard Willingham and Deepa Biswas Willingham, account number ending in 6521.

W-5.    The following individual retirement accounts and investment accounts:

a)    100% of the Fidelity Rollover IRA ending in *0315, held in the name of Deepa Biswas Willingham;

W-6.    As of March 10, 2020, 50% of the stocks, bonds, mutual funds, securities, and other funds held in the Fidelity Investment Account ending in 1651, together with all gains,

losses, dividends, splits, and other rights and privileges associated therewith since that date, held in the name of Charles Richard Willingham..

W-7.    The following motor vehicles, together with all prepaid insurance, keys, and title documents.

a)    The 2006 Mercedes Benz E-320 CDI;

b)    The 2003 Ford F-250; and

c)    The 1993 Mercedes Benz E-300.

W-8.    A 16.66 % interest (representing 50% of the community estate's interest) in the business entity known as Millennium Operating Company, a proportional interest currently held in the name of Deepa Biswas Willingham, including but not limited to all intellectual property, furniture, fixtures, machinery, equipment, inventory, cash, receivables, accounts, goods, supplies, income; all personal property used in connection with the operation of the business entity; and all rights and privileges, past, present, or future, arising out of or in connection with the operation of the business entity.

W-9.    A 16.66% interest (representing 50% of the community estate's interest) in the business entity known as BBW Partners, a proportional interest currently held in the name of Deepa Biswas Willingham, including but not limited to all intellectual property, furniture, fixtures, machinery, equipment, inventory, cash, receivables, accounts, goods, supplies, income; all personal property used in connection with the operation of the business entity; and all rights and privileges, past, present, or future, arising out of or in connection with the operation of the business entity.

W-10.    *__Subject to the terms and conditions set forth below in the provision entitled Provisions Dealing with Vineyard and Wine Sale,__* 50% of the amount of DAnjali wine bottles in the possession of DEEPA BISWAS WILLINGHAM, located at 725 Croft Lane, Solvang, California 93463, and 50% of the remaining amount of bottles in the possession of Summerland Wine Brands (66 cases of Deepa Anjali Syrah Ballad Canyon 2015 and 220 cases of Deepa 2016 Ballard Canyon Syrah), located at 35 Industrial Way Buellton, California 93427.  By virtue of this Decree, Summerland Wine Brands is ORDERED to release the remaining inventory to the parties within 3 business days of written request by one or both parties.

W-11.    *__Subject to the terms and conditions set forth below in the provision entitled Provisions Dealing with Vineyard and Wine Sale__*, 50% of the wine barrel inventory in the possession of DEEPA BISWAS WILLINGHAM, located at 725 Croft Lane, Solvang, California 93463, and, 50% of the remaining wine in the wine barrels in the possession of Summerland Wine Brands, located at 35 Industrial Way Buellton, California 93427.  By virtue of this Decree, Summerland Wine Brands is ORDERED to release the remaining inventory to the parties within 3 business days of written request by one or both parties.

7

051

*Debts to Husband*

IT IS ORDERED AND DECREED that Husband, CHARLES RICHARD WILLINGHAM, shall pay, as a part of the division of the estate of the parties, and shall indemnify and hold Wife, DEEPA BISWAS WILLINGHAM, and Wife's property harmless from any failure to so discharge, these items:

H-1.    100% of the balance due, including principal, interest, tax, and insurance escrow, on the promissory note executed by CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM, in the original principal sum of $354,000.00, dated September 14, 2009, payable to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS"), by and on behalf of BANK OF AMERICA, N.A. and secured by deed of trust on the real property at TR 284A, BLOCK 11, 1422 NANTUCKET T/H, WESTHAVEN ESTATES SEC 2, a lot in Harris County, Texas, according to the map and plat thereof, the Map Records of Harris County, Texas, more commonly known as 1422 Nantucket Drive, Apt. A, Houston, Texas 77057, awarded in this decree to CHARLES RICHARD WILLINGHAM.

H-2.    Any and all debts incurred solely in Husband's name, unless specific provisions are made herein.

H-3.    All encumbrances, ad valorem taxes, liens, assessments, premiums, or other charges due or to become due on the real and personal property awarded to Husband in this decree, unless express provision is made in this decree to the contrary.

H-4.    The following debts, charges, liabilities, and obligations:

a.    ***Subject to the terms and conditions below set forth in "Provisions Dealing with Sale of California Residence"***, 50% of the debt due and owing, including principal, interest, tax, and insurance escrow, on the promissory note executed by CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM, in the original principal sum of $149,282.00, dated June 23, 2018, payable to MERCANTIL BANK, N/A (now AMERANT Line of Credit Account ending *8255) and secured by deed of trust on the real property at TR 284A, BLOCK 11, 1422 NANTUCKET T/H, WESTHAVEN ESTATES SEC 2, a lot in Harris County, Texas, according to the map and plat thereof, the Map Records of Harris County, Texas, more commonly known as 1422 Nantucket Drive, Apt. A, Houston, Texas 77057.;

b.    ***Subject to the terms and conditions below set forth in "Provisions Dealing with Sale of California Residence"***, 50% of the debt owed to Wells Fargo Line of Credit, Account Number ending in xxx-8715, held in the name of Charles Richard Willingham, subject to additional provisions herein below;

c.    100% of the debt owed to First Federal Bank of California and/or LoanCare, Account number ending in xxx-0102J, held in the name of Charles Richard Willingham;

8

052

d. ***Subject to the terms and conditions below set forth in "Provisions Dealing with Sale of California Residence"***, 50% of the debt owed to Bank of America AAA Account number ending in xxx-2784 as of March 10, 2020, held in the name of Charles Richard Willingham, with a balance of $23,760.94. Any expenditures made on the credit card after March 10, 2020 shall be 100% the responsibility of the party incurring the expense and shall not be paid from the net proceeds of the sale of the California Residence;

e. ***Subject to the terms and conditions below set forth in "Provisions Dealing with Sale of California Residence"***, 50% of the debt owed to Chase Southwest Airlines Account number ending in xxx-3218 as of March 10, 2020, held in the name of Charles Richard Willingham, with a balance of $22,917.37. Any expenditures made on the credit card after March 10, 2020 shall be 100% the responsibility of the party incurring the expense and shall not be paid from the net proceeds of the sale of the California Residence;

f. ***Subject to the terms and conditions below set forth in "Provisions Dealing with Sale of California Residence"***, 50% of the debt owed to Chase Southwest Airlines, Account number ending in xxx-4799, held in the name of Charles Richard Willingham, with a balance of $34, 523.27. Any expenditures made on the credit card after March 10, 2020 shall be 100% of the responsibility of the party incurring the expense and shall not be paid from the net proceeds of the sale of the California residence;

g. ***Subject to the terms and conditions set forth below in "Provisions Dealing with Sale of California Residence***, 50% of the debt owed to Citi Advantage Account number ending in xxx-3860 as of March 10, 2020, held in the name of Charles Richard Willingham, with a balance of $17,211.19. Any expenditures made on the credit card after March 10, 2020 shall be 100% the responsibility of the party incurring the expense and shall not be paid from the net proceeds of the sale of the California Residence; and

H-5.   50% of the debt owed to Navient Student Loan, held in the name of Charles Richard Willingham, on behalf of Reena Biswas Willingham.

H-6.   100% of the Ally Bank Car Loan, Account number ending in xxx-2783, held in the name of Charles Richard Willingham.

H-7.   ***Subject to the terms and conditions below set forth in "Provisions Dealing with Sale of California Residence"***, 50% of the outstanding 2019 Joint Federal Income Tax Return Liability due on April 15, 2020, for the tax year 2019 with all penalties, interest and charges in the name of Charles Richard Willingham and Deepa Biswas Willingham.

H-8.   50% of the outstanding 2019 Property Tax Liability for 725 Croft Lane, Solvang, California due on April 10, 2020.

9

053

H-9.    100% of any and all sums due and owing to or become due or owing to Razavi Zand & Associates, LLC, for attorney's fees, expenses, and cost incurred by Charles Richard Willingham for representation in this matter.

*Debts to Wife*

IT IS ORDERED AND DECREED that Wife, DEEPA BISWAS WILLINGHAM, shall pay, as a part of the division of the estate of the parties, and shall indemnify and hold Husband, CHARLES RICHARD WILLINGHAM and Husband's property harmless from any failure to so discharge, these items:

W-1.    Any and all debts incurred solely in Deepa Biswas Willingham's name, unless specific provision is made herein.

W-2.    The balance due, including principal, interest, and all other charges, on any item of property awarded to Wife herein by virtue of this Decree.

W-3.    The following debts, charges, liabilities, and obligations:

a.    ***Subject to the terms and conditions below set forth in "Provisions Dealing with Sale of California Residence"***, 50% of the debt due and owing, including principal, interest, tax, and insurance escrow, on the promissory note executed by CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM, in the original principal sum of $149,282.00, dated June 23, 2018, payable to MERCANTIL BANK, N/A (now AMERANT Line of Credit Account ending *8255) and secured by deed of trust on the real property at TR 284A, BLOCK 11, 1422 NANTUCKET T/H, WESTHAVEN ESTATES SEC 2, a lot in Harris County, Texas, according to the map and plat thereof, the Map Records of Harris County, Texas, more commonly known as 1422 Nantucket Drive, Apt. A, Houston, Texas 77057.;

b.    ***Subject to the terms and conditions below set forth in "Provisions Dealing with Sale of California Residence"***, 50% of the debt owed to Wells Fargo Line of Credit, Account Number ending in xxx-8715, held in the name of Charles Richard Willingham.

d.    c.    ***Subject to the terms and conditions below set forth in "Provisions Dealing with Sale of California Residence"***, 100% of the debt owed to Wells Fargo Credit Card Account number ending in xxx-8894 as of March 10, 2020, held in the name of Charles Richard Willingham and Deepa Biswas Willingham, with a balance of $23,056.50. Any expenditures made on the credit card after March 10, 2020 shall be 100% the responsibility of the party incurring the expense and shall not be paid from the net proceeds of the sale of the California residence;

e. ***Subject to the terms and conditions below set forth in "Provisions Dealing with Sale of California Residence"***, 50% of the debt owed to Bank of America AAA Account number ending in xxx-2784 as of March 10, 2020, held in the name of Charles Richard Willingham, with a balance of $23,760.94. Any expenditures made on the credit card after March 10, 2020 shall be 100% the responsibility of the party incurring the expense and shall not be paid from the net proceeds of the sale of the California residence;

f. ***Subject to the terms and conditions below set forth in "Provisions Dealing with Sale of California Residence***, 50% of the debt owed to Chase Southwest Airlines Account number ending in xxx-3218 as of March 10, 2020, held in the name of Charles Richard Willingham, with a balance of $22,917.37. Any expenditures made on the credit card after March 10, 2020 shall be 100% of the responsibility of the party incurring the expense and shall not be paid from the net proceeds of the sale of the California Residence;

g. ***Subject to the terms and conditions below set forth in "Provisions Dealing with Sale of California Residence"***, 50% of the debt owed to Chase Southwest Airlines Account number ending in xxx-4799 as of March 10, 2020, held in the name of Charles Richard Willingham, with a balance of $34,523.27. Any expenditures made on the credit card after March 10, 2020 shall be 100% of the responsibility of the party incurring the expense and shall not be paid from the net proceeds of the sale of the California Residence;

h. ***Subject to the terms and conditions below set forth in "Provisions Dealing with Sale of California Residence"***, 50% of the debt owed to Citi Advantage, Account number ending in xxx-3860 as of March 10, 2020, held in the name of Charles Richard Willingham, with a balance of $17,211.19. Any expenditures made on the credit card after March 10, 2020 shall be 100% the responsibility of the party incurring the expense and shall not be paid from the net proceeds of the sale of the California Residence; and

W-4.    50% of the debt owed to Navient Student Loan, held in the name of Charles Richard Willingham, on behalf of Reena Biswas Willingham.

W-5.    100% of the debt owed to Shefield Finance Lawn Tractor Loan, held in the name of Charles Richard Willingham and Deepa Biswas Willingham.

W-6.    ***Subject to the terms and conditions below set forth in "Provisions Dealing with Sale of California Residence"***, 50% of the outstanding 2019 Joint Federal Income Tax Return Liability due on April 15, 2020, for the tax year 2019 with all penalties, interest and charges in the name of Charles Richard Willingham and Deepa Biswas Willingham.

W-7.    50% of the outstanding 2019 Property Tax Liability for 725 Croft Lane, Solvang, California due on April 10, 2020.

11

W-8.   100% of any and all sums due and owing to or to become due or owing to KoonsFuller Houston, for attorney's fees, expenses, and cost incurred by Deepa Biswas Willingham for representation in this matter.

*Notice*

IT IS AGREED AND THEREFORE ORDERED AND DECREED that each party shall send to the other party, within three days of its receipt, a copy of any correspondence from a creditor or taxing authority concerning any potential liability of the other party.

*No Alimony*

IT IS ORDERED AND DECREED that no provision of this decree shall be construed as alimony under the Internal Revenue Code, except as this decree expressly provides for payment of maintenance or alimony under the Internal Revenue Code.

*Confirmation of Separate Property of Charles Richard Willingham*

IT IS ORDERED AND DECREED that the following property is confirmed as separate property of CHARLES RICHARD WILLINGHAM:

HSP-1. The property located at 230 E. Ralston Avenue, San Bernardino, California 92404.

HSP-2. Charles Richard Willingham's Mother's Sterling Silver Set, located in California.

HSP-3. Charles Richard Willingham's Sterling Silver Set, located in California.

HSP-4. JB Lansing SA600 Hi-Amp, located in California.

HSP-5. 33 RMP Vinyl Records, located in California.

HSP-6. Baseball card collection, located in California.

HSP-7. Cassette Hi-Fi Player, located in California.

HSP-8. Briar Rabbit and Similar Out-of-Print Children's Book, located in California.

HSP-9. Miscellaneous tools and socket set, located in California.

HSP-10. Celestron C-8 Telescope, Mount, Parts and Eyepieces, located in California.

HSP-11. Astronomy Books, located in California.

HSP-12. Baby Pictures of Charles Richard Willingham, located in California.

HSP-13. Coin Collection, located in California, inside travel locker in barn.

12

IT IS ORDERED that the foregoing property identified in HSP-2 through HSP-13 shall be returned to CHARLES RICHARD WILLINGHAM within 14 days' written notice by CHARLES RICHARD WILLINGHAM to DEEPA BISWAS WILLINGHAM. IT IS FURTHER ORDERED that CHARLES RICHARD WILLINGHAM shall pay the expense of shipping and transport of the items awarded to him herein.

*Confirmation of Separate Property of Deepa Biswas Willingham*

IT IS AGREED AND THEREFORE ORDERED AND DECREED that the following property is confirmed as separate property of DEEPA BISWAS WILLINGHAM:

WSP-1.        The antique clock, located at the Houston, Texas

IT IS ORDERED that the foregoing property shall be returned to DEEPA BISWAS WILLINGHAM within 14 days written notice by DEEPA BISWAS WILLINGHAM to CHARLES RICHARD WILLINGHAM. IT IS FURTHER ORDERED that DEEPA BISWAS WILLINGHAM shall pay the expense of shipping and transport of the items awarded to her herein.

*Attorney's Fees*

To effect an equitable division of the estate of the parties and as a part of the division, and for services rendered and each party shall be responsible for his or her own attorney's fees, expenses, and costs incurred as a result of legal representation in this case.

*Undisclosed Assets and Liabilities*

IT IS ORDERED AND DECREED that any assets of the parties not awarded or divided by this Final Decree of Divorce are subject to future division as provided in the Texas Family Code.

IT IS FURTHER ORDERED AND DECREED, as a part of the division of the estate of the parties, that any liability not expressly assumed by a party under this decree is to be paid by the party incurring the liability, and the party incurring the liability shall indemnify and hold the other party and the other party's property harmless from any failure to so discharge the liability.

*Provisions Dealing with Sale of California Residence*

IT IS FURTHER ORDERED AND DECREED that the property and all improvements located according to the map, plat, or deed records of Santa Barbara County, California and more commonly known as 725 Croft Lane, Solvang, California 93463 (hereinafter sometimes referred to as "California Property" or "California Residence"), shall be sold under the following terms and conditions:

1. On or before March 20, 2020, the CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM shall each submit 3 names of agents to be real

13

estate agent/broker for sale of the above property, by and through their respective attorneys of record.

2. CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM may mutually agree to one of the agents/brokers and failing such agreement shall submit the list to Sheri Y. Dean for arbitration on or before March 25, 2020, to decide the agent/broker for the property.

3. CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM are ORDERED to list 725 Croft Lane, Solvang, California 93463 on the market, as-is, on or before April 15, 2020. If CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM are unable to agree on a listing price on or before April 15, 2020, CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM shall place the residence on the market on or before April 15, 2020 for $2,000,000.00. If the property does not sell within the first 45 days from the listing date, CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM are ORDERED to direct the real estate agent to reduce the list price of the property by a minimum of 2.5%. Further, CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM are ORDERED to direct the real estate agent to reduce the listing price of the residence by 2.5% of the original listing price every 45 days thereafter, during which a purchase offer on the residence is not pending. CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM shall instruct the real estate agent to reduce the listing price of the residence, as described above, on the first day of each 45-day period.

CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM are ORDERED to cooperate in every reasonable way and to complete, execute, and deliver all documents necessary to list the property for sale and/or to change listing agents. CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM are ORDERED to complete, execute and deliver any and all documents necessary to effectuate the listing and sale of the property within five (5) business days of presentment of such documents.

CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM are ORDERED to complete, execute, and deliver any and all listing agreements and other necessary closing and title documents timely upon presentment, but in no event shall such completion, execution and delivery of said documents occur later than five (5) days from the date of presentment.

IT IS ORDERED that CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM shall timely comply with all other acts required to complete the sale of the residence, including but not limited to attending all scheduled appointments by the realtor as requested, appearing at the time designated for closing of the sale, and provided all keys and access codes required for entry to the property.

IT IS ORDERED that no substantial alterations/destruction shall be made to the property during the pendency of the sale.

14

IT IS ORDERED that if either party believes any repairs necessary to sell the home, that party can pay the cost of the repairs.

IT IS ORDERED that DEEPA BISWAS WILLINGHAM shall keep the home in show quality condition and shall have the exclusive and private use of the home during the pendency of the sale.

IT IS ORDERED that the net sale proceeds (defined as the gross sales price less cost of the sale and full payment of any mortgage indebtedness, property taxes, or liens on the property) shall be distributed as follows:

a.  First, payment of full amount of the debt owed to Amerant Line of Credit, held in the name of CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM, with account number ending in xxx-8255;

b.  Second, payment of full amount of the debt owed to Wells Fargo Line of Credit, held in the name of CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM, with account number ending in xxx-8715;

c.  Third, IRS Taxes for 2019; if any amount paid in advance by one party, that party is reimbursed 100% of the amount paid in advance, along with any cost or penalties incurred to pay taxes on time.

d.  Fourth, the debt owed to credit card balances as listed herein above, awarded to each party. IT IS ORDERED that any charges above the balances listed herein above, shall be paid by the party that incurs such debt.

e.  Equalization payment in the amount of $69,503.00 shall be paid to DEEPA BISWAS WILLINGHAM in full from the net proceeds from the sale of the California Property and secured by a lien on the Houston Residence herein awarded to Husband, as further set forth below in the provision entitled, "Real Estate Line." If the proceeds are short or satisfying the total payment due and owing by CHARLES RICHARD WILLINGHAM, the security against the Houston Residenceshall not be released until CHARLES RICHARD WILLINGHAM has paid in full the amount due and owing to DEEPA BISWAS WILLINGHAM.

f.  Thereafter, the remaining balance of the net sale proceeds shall be distributed as follows: 50% to DEEPA BISWAS WILLINGHAM and 50% to CHARLES RICHARD WILLINGHAM.

*Real Estate Lien*

IT IS ORDERED that an encumbrance for owelty of partition is created against the property located at 1422 Nantucket Drive, Apt. A, Houston, Texas 77057 (sometimes referred to herein as "Houston Residence") and more particularly described in the legal description set forth

in H-1 above. The purpose of the encumbrance is to secure the payment of the promissory note of CHARLES RICHARD WILLINGHAM in favor of DEEPA BISWAS WILLINGHAM of SIXTY-NINE THOUSAND FIVE HUNDRED THREE AND NO/100 DOLLARS ($69,503.00) resulting from the additional payment due and owing to DEEPA BISWAS WILLINGHAM from the sale of the California Property to accomplish a just and right division.

IT IS ORDERED that CHARLES RICHARD WILLINGHAM shall sign a note payable to DEEPA BISWAS WILLINGHAM in the amount of the debt specified above and payable according to the terms specified below and in the Note. IT IS ORDERED that CHARLES RICHARD WILLINGHAM shall further sign a deed of trust to secure payment of the debt resulting from the owelty lien described above.

IT IS ORDERED that the note is to be paid in 12 equal monthly installments, beginning with the first (1st) day of the first (1st) month following the closing of the California residence and continuing thereafter on the first (1st) day of each month until fully satisfied. IT IS AGREED AND ORDERED that wife shall execute a release when the debt due and owing has been fully satisfied and return such release to SARA RAZAVI ZAND at 4900 Fournace Place, Suite 550, Bellaire, Texas 77401.

IT IS ORDERED that this debt is part of the division of the community property between the parties and shall not constitute or be interpreted to be any form of spousal support, alimony, or child support.

*Provisions Dealing with Use and Expenses of California Residence Prior to Sale*

IT IS ORDERED that the following provisions shall govern the use and payment of expenses on the California Residence Prior to Sale:

1. Beginning on March 9, 2020, through the sale of the California Residence, CHARLES RICHARD WILLINGHAM shall pay the monthly balance due, including payments of principal, interest, taxes, and escrow insurance, on the California Residence from the following accounts in the following order:

   a. Amerant Line of Credit, Account number ending in xxx-8255; and

   b. Wells Fargo Line of Credit, Account number ending in xxx-8715.

2. Beginning on March 9, 2020, through the sale of the California Residence, DEEPA BISWAS WILLINGHAM shall pay the following from her own personal accounts:

   a. Utilities of the California Residence, including electricity, gas, cable and internet, water;

   b. Landscaping and lawn care services;

   c. Housekeeping services; and

16

060

   d. Any other expenses that are associated with the maintenance and upkeep of
      the California property, including the vineyard and rental property.

IT IS ORDERED that DEEPA BISWAS WILLINGHAM shall have the exclusive use
and possession of the residence during the pendency of the sale and shall be entitled to receive
the rental property income from the property until the California Residence is sold.

*Provisions Dealing with Vineyard and Wine Sale*

IT IS ORDERED that the parties shall sell the Vineyard Wine Inventory and Wine
Inventory still in Barrels, approximately 256 cases. IT IS ORDERED that the net sales proceeds
shall be divided as follows:

   a. 50% of net proceeds from bottles of wine made from March 10, 2020 until the sale of
      the property shall go to each party;

   b. 50% of net proceeds from 2020 harvest of the grapes in the vineyard shall go to each
      party; and

   c. 50% of net proceeds from wine in barrels, shall go to each party.

IT IS ORDERED that the parties shall submit 3 names of potential sellers of the Wine
Inventory to the other by and through their attorneys of record by March 20, 2020. Parties may
mutually agree to a person's/company's name on the list to use for the sale of the Vineyard and
Wine products indicated above. Failing such agreement, it is ORDERED that such names shall
be submitted to Sheri Y. Dean for binding arbitration and a decision as to the person/company
that shall sell the above products for the parties less any reasonable commission for such sales.

*Provisions Dealing with Sale of Tractor and Lawnmowers*

IT IS AGREED AND ORDERED that the following tractors and two lawnmowers shall
be sold when the California Property is sold:
   1. John Deere 1400 Tractor;

   2. John Deere Riding Lawn Mower; and

   3. Club Cadet Riding Lawn Mower.

IT IS ORDERED that each party shall receive 50% of the net proceeds from the sale of
the foregoing items. IT IS FURTHER ORDERED that the parties shall submit 3 names of
potential sellers of the foregoing items to the other by and through their attorneys of record by
March 20, 2020. The parties may mutually agree to a person's/company's name on the list to use
for the sale of the items indicated above. Failing such agreement, it is ORDERED that such
names shall be submitted to Sheri Y. Dean for binding arbitration and a decision as to the
person/company that shall sell the above products for the parties less any reasonable commission
for such sales.

*Execution of Instruments to Transfer Property*

A.      By CHARLES RICHARD WILLINGHAM

***Unless otherwise executed and delivered to DEEPA BISWAS WILLINGHAM, by and through her attorney of record, Taylor T. Imel, in advance,*** CHARLES RICHARD WILLINGHAM shall appear in the offices of Sara Razavi Zand, 4900 Fournace Plce, Suite 550, Bellaire, Texas 77401, to execute and have acknowledged the following instruments:

1.      Deed of Trust to Secure Owelty of Partition to 1422 Nantucket Drive, Apt. A, Houston, Texas 77057, in the form attached hereto as **EXHIBIT "2"**.

2.      Real Estate Lien Note, in the form attached hereto as **EXHIBIT "3"**.

3.      Assignment of Interest to Financial Accounts, in the form attached hereto as **EXHIBIT "4"**.

4.      Power of Attorney to Transfer Motor Vehicle to the 2006 Mercedes Benz E-320 CDI, in the form attached hereto as **EXHIBIT "5"**.

5.      Power of Attorney to Transfer Motor Vehicle to the 2003 Ford F-250, in the form attached hereto as **EXHIBIT "6"**.

6.      Power of Attorney to Transfer Motor Vehicle to the 1993 Mercedes Benz E 300, in the form attached hereto as **EXHIBIT "7"**.

B.      By DEEPA BISWAS WILLINGHAM

***Unless otherwise executed and delivered to CHARLES RICHARD WILLINGHAM, by and through his attorney of record, Sara Razavi Zand, in advance,*** DEEPA BISWAS WILLINGHAM shall appear in the offices of Taylor T. Imel, 109 N. Post Oak Lane, Suite 425, Houston, Texas 77024, to execute and have acknowledged the following instruments:

1.    Special Warranty Deed with Encumbrance for Owelty of Partition to 1422 Nantucket Drive, Apt. A, Houston, Texas 77057, in the form attached hereto as **EXHIBIT "8"**.

2.    Assignment of Utility Deposits, in the form attached hereto as **EXHIBIT "9"**.

3.    Assignment of Interest to Financial Accounts, in the form attached hereto as **EXHIBIT "10"**.

4.    Power of Attorney to Transfer Motor Vehicle to the 2011 Mercedes Benz E-350, in the form attached hereto as **EXHIBIT "11"**.

5.    Power of Attorney to Transfer Motor Vehicle to the 1985 Mercedes Benz 300D, in the form attached hereto as **EXHIBIT "12"**.

C.    Miscellaneous Provisions

Except as otherwise provided herein, IT IS ORDERED that each party shall execute and deliver to the other party any other document(s) or tangible item(s) necessary to effectuate the transfer of property herein awarded to the other party within ten (10) days following receipt of said document(s) or written request from the other party.

*Court Costs*

IT IS ORDERED AND DECREED that costs of court are to be borne by the party who incurred them.

*Discharge from Discovery Retention Requirement*

IT IS ORDERED AND DECREED that the parties and their respective attorneys are discharged from the requirement of keeping and storing the documents produced in this case in accordance with rule 191.4(d) of the Texas Rules of Civil Procedure.

*Indemnification*

IT IS ORDERED that if any claim, action, or proceeding is hereafter initiated seeking to hold the party not assuming a debt, an obligation, a liability, an act, or an omission of the other party liable for such debt, obligation, liability, act, or omission of the other party, that other party will, at that other party's sole expense, defend the party not assuming the debt, obligation, liability, act, or omission of the other party against any such claim or demand, whether or not well founded, and will indemnify the party not assuming the debt, obligation, liability, act, or omission of the other party and hold him or her harmless from all damages resulting from the claim or demand.

Damages, as used in this provision, includes any reasonable loss, cost, expense, penalty, and other damage, including without limitation attorney's fees and other costs and expenses reasonably and necessarily incurred in enforcing this indemnity.

IT IS ORDERED that the indemnifying party will reimburse the indemnified party, on

demand, for any payment made by the indemnified party at any time after the entry of the divorce decree to satisfy any judgment of any court of competent jurisdiction or in accordance with a bona fide compromise or settlement of claims, demands, or actions for any damages to which this indemnity relates.

IT IS ORDERED that each party will give the other party prompt written notice of any litigation threatened or instituted against either party that might constitute the basis of a claim for indemnity under this decree.

*Clarifying Orders*

Without affecting the finality of this Final Decree of Divorce, this Court expressly reserves the right to make orders necessary to clarify and enforce this decree.

*Relief Not Granted*

IT IS ORDERED AND DECREED that all relief requested in this case and not expressly granted is denied. This is a final judgment, for which let execution and all writs and processes necessary to enforce this judgment issue. This judgment finally disposes of all claims and all parties and is appealable.

*Date of Judgment*

SIGNED on _____.


This divorce judicially PRONOUNCED AND RENDERED in court at Harris County, Texas, on _____ and further noted on the court's docket sheet on the same date, but signed on _____.



_____
JUDGE PRESIDING

APPROVED AS TO FORM ONLY:

RAZAVI ZAND & ASSOCIATES, PLLC



_____
SARA RAZAVI ZAND, SBOT # 24051233
4900 Fournace Place, Suite 550
Bellaire, TX 77401
Telephone: 713-396-0227
Telecopier: 713-391-8258
Email: sara@zandlegal.com
ATTORNEY FOR PETITIONER


_____
SHERRI A. EVANS, SBOT # 00785853
TAYLOR T. IMEL, SBOT #24073302
KOONSFULLER HOUSTON
109 North Post Oak Lane, Suite 425
Houston, TX 77024
Tel: (713) 789-5112
Fax: (713) 789-5123
ATTORNEY FOR RESPONDENT


APPROVED AND CONSENTED TO AS TO BOTH FORM AND SUBSTANCE:

_____
CHARLES RICHARD WILLINGHAM, Petitioner


_____
DEEPA BISWAS WILLINGHAM, Respondent

21

065

## Deed of Trust to Secure Owelty of Partition

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

### Basic Information

Date:_____

Grantor:    CHARLES RICHARD WILLINGHAM

Grantor's Mailing Address: 1422 Nantucket Drive, Apt. A, Houston, Texas 77057

Trustee:    Albert Davis Woodward

Trustee's Mailing Address: 24554 Indian Hill Lane, West Hills, CA 91307

Beneficiary:   DEEPA BISWAS WILLINGHAM

Beneficiary's Mailing Address: 725 Croft Lane, Solvang, California 93463

Note(s)

     Date:_____

Original Principal Amount:   SIXTY-NINE THOUSAND FIVE HUNDRED THREE AND NO/100 DOLLARS ($69,503.00)

    Maker:           CHARLES RICHARD WILLINGHAM

    Payee:           DEEPA BISWAS WILLINGHAM

    Maturity Date:    As Therein Specified

Property (including any improvements):

A tract of land containing 4883 square feet of land, more or less, out of the easterly part of Lot 284, in Block 11 of Westhaven Estates, Sec. 2, an addition in Harris County, Texas according to the map or plat thereof recorded in Volume 30, Page 46 of the Map Records of Harris County, Texas; said tract of land being more particularly described by metes and bounds as follows;

BEGINNING at a 1-1/4 inch iron pipe at the southeast corner of Lot 284 and the northeast corner of Lot 285 on the west right of way line of Nantucket Drive, 60 feet wide;

Thence South 89 deg. 50 min. West, with the common line between said two lots, 69.72

feet to a point for corner;

Thence North 00 deg. 10 min. West, across the Lot 284 and in part along a common party wall of a two story townhouse building 70.00 feet to a point for corner on the north line of Lot 284 and the south line of Lot 283;

Thence North 89 deg. 50 min. East, with the common line between said two lots, 69.79 feet to a 1-1/4th iron pipe at their common east corner on said west right of way line;

Thence South 00 deg. 06 min. 30 sec. East, with the east line of Lot 284 and said west right of way line, 70.00 feet to the PLACE OF BEGINNING.

*NOTE: The Company is prohibited from insuring the area or quality of the land described herein. Any statement in the legal description contained in Schedule "A" as to the area or quantity of land is not a representation that such area or quantity is correct, but is made only for informal identification purposes and does not override Item 2 of Schedule "B" hereof.*

The real property is more commonly known as 1422 Nantucket Drive, Apt. A, Houston, Texas 77057.

Prior Lien(s):

| | |
|---|---|
| Date: | September 14, 2009 |
| Original Principal Amount: | Three Hundred Fifty-Four Thousand and NO/100 Dollars ($354,000.00) |
| Maker and Grantor: | CHARLES RICHARD WILLINGHAM and DEEPA BISWAS WILLINGHAM |
| Payee and Beneficiary: | MERS (by and on behalf of Bank of America, N.A.) |

**Other Exceptions to Conveyance and Warranty:**

**A.    Granting Clause**

For value received and to secure payment of the note given pursuant to the owelty agreement between the parties as set forth in the Special Warranty Deed with Encumbrance for Owelty of Partition, Grantor conveys the property to Trustee in trust. Grantor warrants and agrees to defend the title to the property, subject to the other exceptions to conveyance and warranty. On payment of the note and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Beneficiary will release it at Grantor's expense.

**B.    Grantor's Obligations**

*B1.*    Grantor agrees to maintain all property and liability insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Beneficiary reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Beneficiary, and as to property loss, that are payable to Beneficiary under policies containing standard mortgagee clauses, and deliver evidence of the Required Insurance Coverages in a form acceptable to Beneficiary before execution of this deed of trust and

again at least ten days before the expiration of the Required Insurance Coverages.

*B2*    Grantor agrees to—

a.    keep the property in good repair and condition;

b.    pay all taxes and assessments on the property before delinquency, not authorize a taxing entity to transfer its tax lien on the property to anyone other than Beneficiary, and not request a deferral of the collection of taxes;

c.    defend title to the property subject to the other exceptions to conveyance and warranty and preserve the lien's priority as it is established in this deed of trust;

d.    obey all laws, ordinances, and restrictive covenants applicable to the property;

e.    keep any buildings occupied as required by the Required Insurance Coverages;

f.    maintain all insurance coverages with respect to the property, revenues generated by the property, and operations on the property that Beneficiary reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Beneficiary, and deliver evidence of the Required Insurance Coverages in a form acceptable to Beneficiary at least ten days before the expiration of the Required Insurance Coverages;

g.    if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments; and

h.    notify Beneficiary of any change of address.

## C.    Beneficiary's Rights

*C1.*    Beneficiary may appoint in writing a substitute trustee, succeeding to all rights and responsibilities of Trustee.

*C2*    If the proceeds of the note are used to pay any debt secured by prior liens, Beneficiary is subrogated to all the rights and liens of the holders of any debt so paid.

*C3.*    Beneficiary may apply any proceeds received under the property insurance policies covering the property either to reduce the note or to repair or replace damaged or destroyed improvements covered by the policy. If the property is Grantor's primary residence and Beneficiary reasonably determines that repairs to the improvements are economically feasible, Beneficiary will make the insurance proceeds available to Grantor for repairs.

*C4.*    Notwithstanding the terms of the note to the contrary, and unless applicable law prohibits, all payments received by Beneficiary from Grantor with respect to the note or this deed of trust may, at Beneficiary's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Beneficiary with respect to the note, to be applied to late charges, principal, or interest in the order Beneficiary in its discretion determines.

*C5.*   If Grantor fails to perform any of Grantor's obligations, Beneficiary may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

### *C6.*   COLLATERAL PROTECTION INSURANCE NOTICE

**In accordance with the provisions of section 307.052(a) of the Texas Finance Code, Beneficiary hereby notifies Grantor as follows:**

**(A) Grantor is required to:**

    **(i)   keep the collateral insured against damage in the amount Beneficiary specifies;**

    **(ii)   purchase the insurance from an insurer that is authorized to do business in the state of Texas or an eligible surplus lines insurer; and name Beneficiary as the person to be paid under the policy in the event of a loss;**

**(B)   Grantor must, if required by Beneficiary, deliver to Beneficiary a copy of the policy and proof of the payment of premiums; and**

**(C)   if Grantor fails to meet any requirement listed in Paragraph (A) or (B), Beneficiary may obtain collateral protection insurance on behalf of Grantor at Grantor's expense.**

*C7.*   If a default exists in payment of the note or performance of Grantor's obligations and the default continues after any required notice of the default and the time allowed to cure, Beneficiary may—

    a.   declare the unpaid principal balance and earned interest on the note immediately due;

    b.   exercise Beneficiary's rights with respect to rent under the Texas Property Code, as then in effect;

    c.   direct Trustee to foreclose this lien, in which case Beneficiary or Beneficiary's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

    d.   purchase the property at any foreclosure sale by offering the highest bid and then have the bid credited on the note.

*C8.*   Beneficiary may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

## D. Trustee's Rights and Duties

If directed by Beneficiary to foreclose this lien, Trustee will—

*D1.* either personally or by agent give notice of the foreclosure sale as required by the laws of the State of Texas as then in effect;

*D2.* sell and convey all or part of the property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to prior liens and to the other exceptions to conveyance and warranty and without representation or warranty, express or implied, by Trustee;

*D3.* from the proceeds of the sale, pay, in this order—

a. expenses of foreclosure, including a reasonable commission to Trustee;

b. to Beneficiary, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

c. any amounts required by law to be paid before payment to Grantor; and

d. to Grantor, any balance; and

*D4.* be indemnified, held harmless, and defended by Beneficiary against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

## E. General Provisions

*E1.* If any of the property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

*E2.* Recitals in any trustee's deed conveying the property will be presumed to be true.

*E3.* Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

*E4.* This lien will remain superior to liens later created even if the time of payment of all or part of the note is extended or part of the property is released.

*E5.* If any portion of the note cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

*E6.* Grantor assigns to Beneficiary all amounts payable to or received by Grantor from condemnation of all or part of the property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the property. After deducting any expenses incurred, including attorney's fees and court and other costs, Beneficiary will either release any remaining amounts to Grantor or apply such amounts to reduce the note. Beneficiary will not be liable for failure to collect or to exercise diligence in collecting any such amounts.

Grantor will immediately give Beneficiary notice of any actual or threatened proceedings for condemnation of all or part of the property.

*E7.* Grantor collaterally assigns to Beneficiary all present and future rent from the property and its proceeds. Grantor warrants the validity and enforceability of the assignment. Grantor will apply all rent to payment of the note and performance of this deed of trust, but if the rent exceeds the amount due with respect to the note and the deed of trust, Grantor may retain the excess. If a default exists in payment of the note or performance of this deed of trust, Beneficiary may exercise Beneficiary's rights with respect to rent under the Texas Property Code as then in effect. Beneficiary neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the property. Beneficiary may exercise Beneficiary's rights and remedies under this paragraph without taking possession of the property. Beneficiary will apply all rent collected under this paragraph as required by the Texas Property Code as then in effect. Beneficiary is not required to act under this paragraph, and acting under this paragraph does not waive any of Beneficiary's other rights or remedies.

*E8.* Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

*E9.* In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

*E10.* If Grantor transfers any part of the property without Beneficiary's prior written consent, Beneficiary may declare the note immediately payable and invoke any remedies provided in this deed of trust for default. If the property is residential real property containing fewer than five dwelling units or a residential manufactured home, this provision does not apply to (a) a subordinate lien or encumbrance that does not transfer rights of occupancy of the property; (b) creation of a purchase-money security interest for household appliances; (c) grant of a leasehold interest of three years or less without an option to purchase; (d) transfer to a spouse or children of Grantor; (e) transfer to a relative of Grantor on Grantor's death; (f) a transfer resulting from a decree of a dissolution of marriage, a legal separation agreement, or an incidental property settlement agreement by which the spouse of Grantor becomes an owner of the property; or (g) transfer to an inter vivos trust in which Grantor is and remains a beneficiary and occupant of the property.

*E11.* When the context requires, singular nouns and pronouns include the plural.

*E12.* The term *note* includes all extensions, modifications, and renewals of the note and all amounts secured by this deed of trust.

*E13.* This deed of trust binds, benefits, and may be enforced by successors in interest of all parties.

*E14.*   If Grantor and Maker are not the same person, the term *Grantor* includes Maker.

*E15.*   Grantor and each surety, endorser, and guarantor of the note waive, to the extent permitted by law, all (a) demand for payment, (b) presentation for payment, (c) notice of intention to accelerate maturity, (d) notice of acceleration of maturity, (e) protest, (f) notice of protest, and (g) rights under sections 51.003, 51.004, and 51.005 of the Texas Property Code.

*E16.*   Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Beneficiary's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

*E17.*   If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

*E18.*   Grantor hereby grants Beneficiary a right of first refusal with respect to Grantor's power to authorize any third party (other than Beneficiary pursuant to its right as set forth in this instrument) to pay ad valorem taxes on the property and authorize a taxing entity to transfer its tax lien on the property to that third party. Grantor's authorization to any third party (other than Beneficiary) to pay the ad valorem taxes and receive transfer of a taxing entity's lien for ad valorem taxes shall be null and void and of no force and effect unless Beneficiary, within ten days after receiving written notice from Grantor, fails to pay the ad valorem taxes pursuant to Beneficiary's right as set forth in this instrument.

*E19.*   Grantor represents that this deed of trust and the note are given for the following purposes:

This deed of trust is given to impose an owelty of partition against the entirety of the property in order to comply with the *Final Decree of Divorce* entered in Cause No. 2018-64132 styled "In the Matter of the Marriage of Charles Richard Willingham and Deepa Biswas Willingham."

_____
CHARLES RICHARD WILLINGHAM

*This instrument was prepared based on information furnished by the parties, and no independent title search has been made.*

STATE OF TEXAS )

COUNTY OF HARRIS )

    This instrument was acknowledged before me on_____by CHARLES RICHARD WILLINGHAM.

                                   _____
                                   Notary Public, State of Texas

| Prepared in the offices of: | After recording return to: |
| --- | --- |
| **KoonsFuller Houston**<br>**109 N. Post Oak Lane, Suite 425**<br>**Houston, Texas 77024**<br>**(713) 789-5112** | **KoonsFuller Houston**<br>**109 N. Post Oak Lane, Suite 425**<br>**Houston, Texas 77024**<br>**(713) 789-5112** |

# REAL ESTATE LIEN NOTE

Date: _____

Maker: **CHARLES RICHARD WILLINGHAM**

Maker's Mailing Address: 1422 Nantucket Drive, Apt. A, Houston, Texas 77057

Payee: **DEEPA BISWAS WILLINGHAM**

Place for Payment: 725 Croft Lane, Solvang, California 93463

Principal Amount: SIXTY-NINE THOUSAND FIVE HUNDRED THREE AND NO/100 DOLLARS ($69,503.00)

Annual Interest Rate: Zero percent (0.0%), if paid as outlined

Maturity Date: 12 Months from the date of Closing on the Sale of 725 Croft Lane

Annual Interest Rate on Matured, Unpaid Amounts: Three percent (3.0%)

Terms of Payment: Payable in 12 equal monthly installments, beginning on the 1st day of the 1st month following the closing of 725 Croft Lane, Solvang, California 93463, in accordance with the terms and conditions set forth in the *Final Decree of Divorce* rendered in Cause No. 2018-64132 styled " In the Matter of the Marriage of Charles Richard Willingham and Deepa Biswas Willingham."

## Security for Payment

This note is secured by a security interest created in a *Deed of Trust* by Maker as the debtor in favor of Payee as the secured party which is executed contemporaneously with this *Real Estate Lien Note* and that covers the following real property:

A tract of land containing 4883 square feet of land, more or less, out of the easterly part of Lot 284, in Block 11 of Westhaven Estates, Sec. 2, an addition in Harris County, Texas according to the map or plat thereof recorded in Volume 30, Page 46 of the Map Records of Harris County, Texas; said tract of land being more particularly described by metes and bounds as follows;

BEGINNING at a 1-1/4 inch iron pipe at the southeast corner of Lot 284 and the northeast corner of Lot 285 on the west right of way line of Nantucket Drive, 60 feet wide;

Thence South 89 deg. 50 min. West, with the common line between said two lots, 69.72 feet to a point for corner;

Thence North 00 deg. 10 min. West, across the Lot 284 and in part along a common party wall of a two story townhouse building 70.00 feet to a point for corner on the

north line of Lot 284 and the south line of Lot 283;

Thence North 89 deg. 50 min. East, with the common line between said two lots, 69.79 feet to a 1-1/4th iron pipe at their common east corner on said west right of way line;

Thence South 00 deg. 06 min. 30 sec. East, with the east line of Lot 284 and said west right of way line, 70.00 feet to the PLACE OF BEGINNING.

*NOTE: The Company is prohibited from insuring the area or quality of the land described herein. Any statement in the legal description contained in Schedule "A" as to the area or quantity of land is not a representation that such area or quantity is correct, but is made only for informal identification purposes and does not override Item 2 of Schedule "B" hereof.*

The real property is more commonly known as 1422 Nantucket Drive, Apt. A, Houston, Texas 77057.

## Promise to Pay

Maker promises to pay to the order of Payee the principal amount plus interest at the annual interest rate. This note is payable at the place for payment and according to the terms of payment. All unpaid amounts are due by the maturity date. If any amount is not paid either when due under the terms of payment or on acceleration of maturity, Maker promises to pay any unpaid amount plus interest from the date the payment was due to the date of payment at the annual interest rate on matured, unpaid amounts.

## Prepayment Clause

Maker may prepay this note in any amount at any time before the maturity date without penalty or premium. Prepayments will be applied to installments on the last maturing principal, and interest on that prepaid principal will immediately cease to accrue.

## Defaults and Remedies

If Maker defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to this note, Payee may declare the unpaid principal balance, earned interest, and any other amounts owed on the note immediately due.

## Waivers

Maker and each surety, endorser, and guarantor waive, to the extent permitted by law, all (1) demand for payment, (2) presentation for payment, (3) notice of intention to accelerate maturity, (4) notice of acceleration of maturity, (5) protest, and (6) notice of protest.

## Attorney's Fees

Maker also promises to pay reasonable attorney's fees and court and other costs if this note is placed in the hands of an attorney to collect or enforce the note. These expenses will bear interest from the date of advance at the annual interest rate on matured, unpaid amounts. Maker will pay Payee these expenses and interest on demand at the place for payment. These expenses and interest

will become part of the debt evidenced by the note and will be secured by any security for payment.

## Usury Savings

Interest on the debt evidenced by this note will not exceed the maximum rate or amount of non-usurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal amount or, if the principal amount has been paid, refunded. On any acceleration or required or permitted prepayment, any excess interest will be canceled automatically as of the acceleration or prepayment or, if the excess interest has already been paid, credited on the principal amount or, if the principal amount has been paid, refunded. This provision overrides any conflicting provisions in this note and all other instruments concerning the debt.

## Other Clauses

Each Maker is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

As the obligation set forth above is satisfied, **CHARLES RICHARD WILLINGHAM** shall be entitled to a Release of Lien on the real property secured by the Deed of Trust to ensure that the security does not exceed the remainder of the obligation. Said release shall be delivered in accordance with the terms and conditions set forth in the *Final Decree of Divorce*.

This note is given to evidence the indebtedness imposed on Maker by the *Final Decree of Divorce* entered in Cause No. 2018-64132 styled "In the Matter of the Marriage of Charles Richard Willingham and Deepa Biswas Willingham."

**CHARLES RICHARD WILLINGHAM,** Maker

*This instrument was prepared based on information furnished by the parties, and no independent title search has been made.*

Real Estate Lien Note ........................................................................................................................Page 3 of 4

076

| | |
|---|---|
| **Prepared in the offices of:** | **After recording return to:** |
| **KoonsFuller Houston** | **KoonsFuller Houston** |
| **109 N. Post Oak Lane, Suite 425** | **109 N. Post Oak Lane, Suite 425** |
| **Houston, Texas 77024** | **Houston, Texas 77024** |
| **(713) 789-5112** | **(713) 789-5112** |

Real Estate Lien Note .............................................................................................................. Page 4 of 4

# Assignment of Interest to Financial Accounts

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

In accordance with the terms of the *Final Decree of Divorce* rendered in in Cause No. 2018-64132 styled "In the Matter of the Marriage of Charles Richard Willingham and Deepa Biswas Willingham." in the 245th Judicial District Court of Harris County, Texas, I, **CHARLES RICHARD WILLINGHAM**, TRANSFER, CONVEY, and ASSIGN to **DEEPA BISWAS WILLINGHAM** any and all right, title, and interest I may now own or have any future claim of ownership in and to:

    1.    The following accounts held at the following banks, savings institutions, or other financial institutions:

    a.  Name of Financial Institution:    Wells Fargo
        Name(s) on Account:    Charles Willingham and Deepa Willingham
        Type of Account:    Checking
        Account Number:    Ending *8937
        Percentage Awarded:    100%

    b.  Name of Financial Institution:    Wells Fargo
        Name(s) on Account:    Charles Willingham and Deepa Willingham
        Type of Account:    Savings
        Account Number:    Ending *6521
        Percentage Awarded:    100%

    c.  Name of Financial Institution:    Fidelity
        Name(s) on Account:    Charles Willingham and Deepa Willingham
        Type of Account:    Investment/Brokerage Account
        Account Number:    Ending *1651
        Percentage Awarded:    50%, together with all equity positions, cash and cash equivalents, on deposit therein as of March 10, 2020 and thereafter, together with any gains, losses, dividends, splits, interest or other rights therewith.

I further authorize and direct **DEEPA BISWAS WILLINGHAM** to take whatever actions and steps are necessary to effectively change the name on the above-enumerated accounts in subsections a and b from my name to the name of **DEEPA BISWAS WILLINGHAM** and to effectively transfer her proportional award from the account listed in subsection c.

I further authorize that a photocopy of this instrument may be used as an original.

SIGNED on _____.

**CHARLES RICHARD WILLINGHAM**

STATE OF TEXAS                                    )

COUNTY OF HARRIS                                  )

     This instrument was acknowledged before me on _____ by **CHARLES RICHARD WILLINGHAM**.

Notary Public, State of Texas

## Power of Attorney to Transfer Motor Vehicle

STATE OF TEXAS                              §

COUNTY OF HARRIS                        §

    I, **CHARLES RICHARD WILLINGHAM**, of the state and county named above, for good and valuable consideration constitute and appoint **DEEPA BISWAS WILLINGHAM** of Santa Barbara County, California, my agent and attorney in fact, in my name, place, and stead, to convey and transfer all of my right, title, and interest in one 2006 Mercedes Benz E-320, vehicle identification number _____to whomever she may desire and to execute, in my name as my attorney in fact, any and all instruments necessary for the conveyance and transfer.

SIGNED on _____.

                                                    _____
                                                    **CHARLES RICHARD WILLINGHAM**

STATE OF TEXAS                              §

COUNTY OF HARRIS                        §

    This instrument was acknowledged before me on _____ by **CHARLES RICHARD WILLINGHAM**.

                                                  _____
                                                Notary Public, State of Texas

## Power of Attorney to Transfer Motor Vehicle

STATE OF TEXAS                              §

COUNTY OF HARRIS                            §

    I, **CHARLES RICHARD WILLINGHAM,** of the state and county named above, for good and valuable consideration constitute and appoint **DEEPA BISWAS WILLINGHAM** of Santa Barbara County, California, my agent and attorney in fact, in my name, place, and stead, to convey and transfer all of my right, title, and interest in one 2003 Ford F-250, vehicle identification number _____to whomever she may desire and to execute, in my name as my attorney in fact, any and all instruments necessary for the conveyance and transfer.

SIGNED on _____.

 

                                                _____
                                                **CHARLES RICHARD WILLINGHAM**

 

STATE OF TEXAS                              §

COUNTY OF HARRIS                            §

    This instrument was acknowledged before me on _____ by **CHARLES RICHARD WILLINGHAM.**

                                                _____
                                              Notary Public, State of Texas

# Power of Attorney to Transfer Motor Vehicle

STATE OF TEXAS                            §

COUNTY OF HARRIS                          §

     I, **CHARLES RICHARD WILLINGHAM**, of the state and county named above, for good and valuable consideration constitute and appoint **DEEPA BISWAS WILLINGHAM** of Santa Barbara County, California, my agent and attorney in fact, in my name, place, and stead, to convey and transfer all of my right, title, and interest in one 1993 Mercedes Benz E 300, vehicle identification number _____to whomever she may desire and to execute, in my name as my attorney in fact, any and all instruments necessary for the conveyance and transfer.

SIGNED on _____.

                                         **CHARLES RICHARD WILLINGHAM**


STATE OF TEXAS                            §

COUNTY OF HARRIS                          §

     This instrument was acknowledged before me on _____ by **CHARLES RICHARD WILLINGHAM**.

                                Notary Public, State of Texas

## Special Warranty Deed with Encumbrance for Owelty of Partition

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

Date: _____, 2020

Grantor:    DEEPA BISWAS WILLINGHAM

Grantor's Mailing Address:   725 Croft Lane, Solvang, California 93463

Grantee:    CHARLES RICHARD WILLINGHAM

Grantee's Mailing Address:    1422 Nantucket Drive, Apt. A, Houston, Texas 77057

Consideration:

The division of property in in Cause No. 2018-64132 styled "In the Matter of the Marriage of Charles Richard Willingham and Deepa Biswas Willingham" entered in the 245th District Court of Harris County, Texas, and ten dollars and other good and valuable consideration paid by Grantee to Grantor, receipt and sufficiency of which are hereby acknowledged and:

    a.  Grantee's assumption of and agreement to pay the unpaid principal and interest on that one certain promissory note, executed by Grantor and Grantee, in the original principal sum of $354,000.00 payable to the order of MERS (on behalf of Bank of America, N.A.), dated September 14, 2009, and secured by operation of a deed of trust executed by Grantor and Grantee, which encumbers the property herein conveyed; and

    b.  Grantee's agreement to indemnify and hold Grantor harmless from the payment of the note described above and Grantee's assumption of the performance of Grantor's obligations required or specified in the deed of trust described above and any instruments securing payment of the note; and

    c.  The execution and delivery by Grantee to Grantor of one certain Real Estate Lien Note in the principal sum of SIXTY-NINE THOUSAND FIVE HUNDRED THREE AND NO/100 DOLLARS ($69,503.00), dated _____, and secured by a deed of trust for owelty of partition executed by Grantee herein to Albert Davis Woodward, Trustee.

Property:

A tract of land containing 4883 square feet of land, more or less, out of the easterly part of Lot 284, in Block 11 of Westhaven Estates, Sec. 2, an addition in Harris County, Texas according to the map or plat thereof recorded in Volume 30, Page

46 of the Map Records of Harris County, Texas; said tract of land being more particularly described by metes and bounds as follows;

BEGINNING at a 1-1/4 inch iron pipe at the southeast corner of Lot 284 and the northeast corner of Lot 285 on the west right of way line of Nantucket Drive, 60 feet wide;

Thence South 89 deg. 50 min. West, with the common line between said two lots, 69.72 feet to a point for corner;

Thence North 00 deg. 10 min. West, across the Lot 284 and in part along a common party wall of a two story townhouse building 70.00 feet to a point for corner on the north line of Lot 284 and the south line of Lot 283;

Thence North 89 deg. 50 min. East, with the common line between said two lots, 69.79 feet to a 1-1/4th iron pipe at their common east corner on said west right of way line;

Thence South 00 deg. 06 min. 30 sec. East, with the east line of Lot 284 and said west right of way line, 70.00 feet to the PLACE OF BEGINNING.

*NOTE: The Company is prohibited from insuring the area or quality of the land described herein. Any statement in the legal description contained in Schedule "A" as to the area or quantity of land is not a representation that such area or quantity is correct, but is made only for informal identification purposes and does not override Item 2 of Schedule "B" hereof.*

The real property is more commonly known as 1422 Nantucket Drive, Apt. A, Houston, Texas 77057.

Reservations from Conveyance and Exceptions to Conveyance and Warranty:

Grantor reserves no oil, gas, and other minerals in an under that may be produced from the property.

Grantor reserves the vendor's lien and a lien for owelty and superior title to the property until the Promissory Note payable to Grantor has been paid in full. This deed is subject to all easements, restrictions, conditions, covenants, and other instruments of record.

Grantor, for the consideration and subject to the reservations from conveyance and exceptions to conveyance and warranty, grants, sells, and conveys to Grantee Grantor's undivided interest in the property, together with all and singular the rights and appurtenances thereto in any way belonging, to have and to hold it to Grantee and Grantee's heirs, successors, and assigns forever. Grantor binds Grantor and Grantor's heirs and successors to warrant and forever defend all and singular the property to Grantee and Grantee's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof when the claim is by, through, or under Grantor but not otherwise, except as to the reservations from conveyance

Special Warranty Deed With Encumbrance for Owelty of Partition

and exceptions to conveyance and warranty.

When the context requires, singular nouns and pronouns include the plural.

Grantor assigns to Grantee the casualty insurance policy on the property, all utility deposits for utility service at the property, and all funds held in escrow for payment of taxes and insurance premiums.

Grantee assumes all ad valorem taxes due on the property for the current year.

Grantor and Grantee are joint owners of the property by virtue of a deed recorded at Instrument No. 589890127 of Harris County, Texas. The property is the family homestead of Grantor and Grantee, who are parties in a suit for divorce, Cause No. 2018-64132 styled "In the Matter of the Marriage of Charles Richard Willingham and Deepa Biswas Willingham" in the 245th District Court of Harris County, Texas. As an incident to the divorce proceeding, Grantor and Grantee have agreed that Grantee will acquire the full fee simple title in and to the parties' homestead and that a debt in the amount of $69,503.00 will be created in favor of Grantor and a lien or owelty of partition will be fixed on the entirety of the homestead to secure the debt and amount due and owing to Grantor from the sale of 725 Croft Lane, Solvang, California 93463. Grantee specifically acknowledges that the lien or owelty of partition is on the entirety of the property and is superior to Grantee's rights of use and occupancy of the property as Grantee's homestead or otherwise.

Grantee joins in the execution of this deed for the purpose of accepting delivery thereof and acknowledging this agreement and the validity of the deed of trust lien, vendor's lien, and lien for owelty created herein on the property and the priority and superiority of the liens to any right of use, occupancy, and homestead that he may have, hold, or claim in and to the entirety of the property.


_____
DEEPA BISWAS WILLINGHAM, Grantor


_____
CHARLES    RICHARD    WILLINGHAM,
Grantee

*This instrument was prepared based on information furnished by the parties, and no independent title search has been made.*

STATE OF CALIFORNIA          )

COUNTY OF SANTA BARBARA  )

    This instrument was acknowledged before me on _____ by DEEPA BISWAS WILLINGHAM.

_____
Notary Public, State of California

STATE OF TEXAS          )

COUNTY OF HARRIS       )

    This instrument was acknowledged before me on _____ by CHARLES RICHARD WILLINGHAM.

_____
Notary Public, State of Texas

| Prepared in the offices of: | After recording return to: |
|---|---|
| **KoonsFuller Houston**<br>**109 N. Post Oak Lane, Suite 425**<br>**Houston, Texas 77024**<br>**(713) 789-5112** | **Sara Razavi Zand**<br>**4900 Fournace Place, Ste. 550**<br>**Bellaire, Texas 77401**<br>**(713) 396-0227** |

## Assignment of Utility Deposits

In accordance with the terms of the *Final Decree of Divorce* rendered in C Cause No. 2018-64132 styled "In the Matter of the Marriage of Charles Richard Willingham and Deepa Biswas Willingham", entered in the 245th District Court of Harris County, Texas, I, **DEEPA BISWAS WILLINGHAM**, TRANSFER, CONVEY, and ASSIGN any and all utility deposits for utility service at 1422 Nantucket Drive, Apt. A, Houston, Texas 77057, to **CHARLES RICHARD WILLINGHAM.**

I further authorize **CHARLES RICHARD WILLINGHAM** to take whatever actions and steps are necessary to effectively change the name on any and all utility accounts for services at the above address from my name to the name of **CHARLES RICHARD WILLINGHAM**

I further authorize that a photocopy of this instrument may be used as an original.

SIGNED on _____.

_____
**DEEPA BISWAS WILLINGHAM**

STATE OF CALIFORNIA                    )

COUNTY OF SANTA BARBARA                )

This instrument was acknowledged before me on _____ by **DEEPA BISWAS WILLINGHAM.**

_____
Notary Public, State of California

Assignment of Utility Deposits

_____, 2020

MERS/Bank of America, N.A.

Re: Loan number: _____
    Name:      DEEPA BISWAS WILLINGHAM and CHARLES RICHARD
WILLINGHAM
    Address:    1422 Nantucket Drive, Apt. A, Houston, Texas 77057

Dear Sir or Madam,

        The above-referenced property securing the payment of the above-captioned loan has been transferred by deed dated _____ to CHARLES RICHARD WILLINGHAM, who has assumed and agreed to pay the loan as part of the consideration for the conveyance.

        I hereby release any and all claims in and to escrow deposits and any benefits accruing therefrom and transfer and assign all interest in them to the grantee.

        For your records, I enclose a copy of the deed, which was duly recorded in the Deed Records of Harris County, Texas, on _____.

                        Sincerely yours,

                        _____
                        DEEPA BISWAS WILLINGHAM

Enc.

# Power of Attorney to Transfer Motor Vehicle

STATE OF CALIFORNIA                              §

COUNTY OF SANTA BARBARA                  §

     I, **DEEPA BISWAS WILLINGHAM,** of the state and county named above, for good and valuable consideration constitute and appoint **CHARLES RICHARD WILLINGHAM** of Harris County, Texas, my agent and attorney in fact, in my name, place, and stead, to convey and transfer all of my right, title, and interest in one 2011 Mercedes Benz E 350, vehicle identification number _____to whomever he may desire and to execute, in my name as my attorney in fact, any and all instruments necessary for the conveyance and transfer.

SIGNED on _____.

                                      _____
                                        **DEEPA BISWAS WILLINGHAM**

STATE OF TEXAS                              §

COUNTY OF HARRIS                           §

     This instrument was acknowledged before me on _____ by **DEEPA BISWAS WILLINGHAM**.

                                        _____
                                        Notary Public, State of Texas

## Power of Attorney to Transfer Motor Vehicle

STATE OF CALIFORNIA                §

COUNTY OF SANTA BARBARA            §

    I, **DEEPA BISWAS WILLINGHAM**, of the state and county named above, for good and valuable consideration constitute and appoint **CHARLES RICHARD WILLINGHAM** of Harris County, Texas, my agent and attorney in fact, in my name, place, and stead, to convey and transfer all of my right, title, and interest in one 1985 Mercedes Benz 300D, vehicle identification number _____ to whomever he may desire and to execute, in my name as my attorney in fact, any and all instruments necessary for the conveyance and transfer.

SIGNED on _____.

                                                _____
                                                **DEEPA BISWAS WILLINGHAM**

STATE OF TEXAS                    §

COUNTY OF HARRIS                  §

    This instrument was acknowledged before me on _____ by **DEEPA BISWAS WILLINGHAM**.

                                                _____
                                              Notary Public, State of Texas

# EXHIBIT "E"

6/19/2020 4:2
Marilyn Burgess - District Clerk Harris C
Envelope No. 4390
By: Ebonie I
Filed: 6/19/2020 4:2

**NOTICE: THIS DOCUMENT
CONTAINS SENSITIVE DATA**

## NO. <u>2018-64132</u>

| | | |
|---|---|---|
| **IN THE MATTER OF** | § | **IN THE DISTRICT COURT OF** |
| **THE MARRIAGE OF** | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **CHARLES RICHARD WILLINGHAM** | § | |
| **AND** | § | |
| **DEEPA BISWAS WILLINGHAM** | § | **245TH JUDICIAL DISTRICT** |

---

**AFFIDAVIT OF DEEPA WILLINGHAM REVOKING CONSENT TO MEDIATED
SETTLEMENT AGREEMENT**

---

Unofficial Copy Office of Marilyn Burgess District Clerk

092

Cover Page to Respondent's Affidavit .................................................................................Page 1 of 1

## AFFIDAVIT OF DEEPA BISWAS WILLINGHAM

BEFORE ME, the undersigned authority, on this day appeared Deepa Biswas Willingham, who proved her identity to me, and first being duly sworn according to law, upon her oath deposed and said:

1. My name is Deepa Biswas Willingham, the defendant in the Matter of the Marriage of Charles Richard Willingham and Deepa Biswas Willingham, No. 2018-64132 in the District Court for the 245th Judicial District, Harris County , Texas. The following statements are, to my best knowledge and/or recollection, true and correct.

2. My first encounter with this divorce action was a notice from the Texas Court. It demanded that I respond to the notice of a divorce action, for if I did not, I would be in contempt of court which scared me to death. Being law-abiding, I did what was demanded of me by the Texas courts even though, as I understand it now, I did have other options. But I do not recall that the notice apprised me of rights that I might have in contesting the forum. Ours was a marriage formed in California by two California domiciliaries. The center of gravity of our marriage was California. I believe the notice was incomplete and unfair.

3. My husband's counsel has taken my deposition in this action, but my former counsel failed to take his deposition on my behalf. I am at a disadvantage. I believe that my husband has concealed assets. I believe that I should have had more time to conduct his deposition. Moreover, my first attorney shared with me none of the discovery that she had received from my husband. Her counsel was, to my mind, ineffective.

4. I am entirely unconvinced that the real estate market of Houston is any paradigm for the real estate market in Santa Barbara. The oil and gas market may have crashed in Houston, but the agricultural market in Santa Barbara has not. The values here are trending steadily upward. I do not recall any explanation why the sale of 725 Croft Lane had to be set, by one valuation, $800,000 less than its current value. Selling at $2 million is a catastrophe for me. It appears to me to be unfounded and capricious.

5. I declared to all present at the mediation conference that, summing the two days up, it appeared that I had had only one option presented, namely, to sign the agreement. My attorney corrected this, saying that I had options, but that going to trial would be very costly with no outcome guaranteed. My point is twofold: First, everyone present thereby knew that I was in straitened circumstances. Second, I would have obligations put on me as to the house at Croft Lane that I could not afford. The presiding judge for the mediation knew that I was in dire straits

6. The mediation agreement sets a date for listing the property at Croft Lane for sale. That date has passed, because I have been severely ill with tachycardia brought on by the stress of this proceeding. Why is it stressful? My husband of nearly 40 years is abandoning me and my daughter. He has shunned the girl he watched grow up, the girl who is the sole beneficiary of our living trust. These are key reasons why I am seeking a psychiatric report to support my contention that I was in in no state, physically, or mentally, to sign the mediation agreement.

7. I am now informed that I could have exercised the option at the mediation conference to decline to sign the agreement. My obvious option would have been to get counsel that I could afford, i.e. from the legal aid society, and file what I want to file now, namely a counterclaim for divorce on the grounds of adultery. I was presented with Hobson's choice.

8. I see nothing in the decree that compels my husband to apportion half of his earnings up to the date of our divorce. I need that apportionment.

9. I am equally nonplused that the divorce decree has no provision for spousal support. My husband and I have been married for nearly 40 years. I have depended on him. Now it appears that he, with the Court's acquiescence, would leave me impoverished.

10. It is difficult to understand the reasoning behind some decisions in the mediation agreement. I would think that written findings of facts and the underlying reasoning would have accompanied the spread sheet. I think my right to due process supports this expectation.

11. In sum, I revoke my earlier written statement that I signed the mediation agreement voluntarily. I want my day in court, and I want my grounds for suing my husband for divorce to be adultery.

FURTHER AFFIANT SAITH NOT.

DEEPA BISWAS WILLINGHAM

SUBSRIBED TO AND SWORN TO before me, ion the ____ day of June 2020, to certify which witness my hand and seal of office.

_see Attached_

NOTARY PUBLIC IN AND FOR THE STATE OF CALIFORNIA

# EXHIBIT "F"

**Andrew Goodman**

| | |
|---|---|
| **From:** | Fastcase <support@fastcase.com> |
| **Sent:** | Tuesday, August 04, 2020 5:01 PM |
| **To:** | Andrew Goodman |
| **Subject:** | Fastcase Document - Tex. Family Code Sec. 153.0071 |



This document has been sent to you by a user in the Fastcase Research Platform.

You can find a permanent public version of the document here:
https://go.fastcase.com/e/427522/v4BxfPc2fFV3JSt2bDyU1nnz2b64TC/6mlb95/971480430?h=3nm-mVVLaFngnFeA0HCFsEIWIoGFwgy0dy0WVmqJ80o

Please find the full text of the document below:

Sec. 153.0071 Alternate Dispute Resolution Procedures.

Sec. 153.0071. ALTERNATE DISPUTE RESOLUTION PROCEDURES. (a) On written agreement of the parties, the court may refer a suit affecting the parent-child relationship to arbitration. The agreement must state whether the arbitration is binding or non-binding.

(b) If the parties agree to binding arbitration, the court shall render an order reflecting the arbitrator's award unless the court determines at a non-jury hearing that the award is not in the best interest of the child. The burden of proof at a hearing under this subsection is on the party seeking to avoid rendition of an order based on the arbitrator's award.

(c) On the written agreement of the parties or on the court's own motion, the court may refer a suit affecting the parent-child relationship to mediation.

(d) A mediated settlement agreement is binding on the parties if the agreement:

(1) provides, in a prominently displayed statement that is in boldfaced type or capital letters or underlined, that the agreement is not subject to revocation;

(2) is signed by each party to the agreement; and

(3) is signed by the party's attorney, if any, who is present at the time the agreement is signed.

(e) If a mediated settlement agreement meets the requirements of Subsection (d), a party is entitled to judgment on the mediated settlement agreement notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law.

(e-1) Notwithstanding Subsections (d) and (e), a court may decline to enter a judgment on a mediated settlement agreement if the court finds:

(1) that:

(A) a party to the agreement was a victim of family violence, and that circumstance impaired the party's ability to make decisions; or

(B) the agreement would permit a person who is subject to registration under Chapter 62, Code of Criminal Procedure, on the basis of an offense committed by the person when the person was 17 years of age or older or who otherwise has a history or pattern of past or present physical or sexual abuse directed against any person to:

(i) reside in the same household as the child; or

(ii) otherwise have unsupervised access to the child; and

(2) that the agreement is not in the child's best interest.

(f) A party may at any time prior to the final mediation order file a written objection to the referral of a suit affecting the parent-child relationship to mediation on the basis of family violence having been committed by another party against the objecting party or a child who is the subject of the suit. After an objection is filed, the suit may not be referred to mediation unless, on the request of a party, a hearing is held and the court finds that a preponderance of the evidence does not support the objection. If the suit is referred to mediation, the court shall order appropriate measures be taken to ensure the physical and emotional safety of the party who filed the objection. The order shall provide that the parties not be required to have face-to-face contact and that the parties be placed in separate rooms during mediation. This subsection does not apply to suits filed under Chapter 262.

(g) The provisions for confidentiality of alternative dispute resolution procedures under Chapter 154, Civil Practice and Remedies Code, apply equally to the work of a parenting coordinator, as defined by Section 153.601, and to the parties and any other person who participates in the parenting coordination. This subsection does not affect the duty of a person to report abuse or neglect under Section 261.101.

Added by Acts 1995, 74th Leg., ch. 751, Sec. 27, eff. Sept. 1, 1995. Amended by Acts 1997, 75th Leg., ch. 937, Sec. 3, eff. Sept. 1, 1997; Acts 1999, 76th Leg., ch. 178, Sec. 7, eff. Aug. 30, 1999; Acts 1999, 76th Leg., ch. 1351, Sec. 2, eff. Sept. 1, 1999.

Amended by:

Acts 2005, 79th Leg., Ch. 916 (H.B. 260), Sec. 7, eff. June 18, 2005.

Acts 2007, 80th Leg., R.S., Ch. 1181 (H.B. 555), Sec. 2, eff. September 1, 2007.

Acts 2017, 85th Leg., R.S., Ch. 99 (S.B. 495), Sec. 2, eff. September 1, 2017.

---

You are receiving this email because it was requested from the Fastcase Research Platform.

Fastcase Inc.
711 D Street NW
Washington, DC 20004

e: support@fastcase.com

097

Tex. Family Code § 6.602, Mediation Procedures (West's Statutes (2019 Edition))

Sec. 6.602. MEDIATION PROCEDURES. (a) On the written agreement of the parties or on the court's own motion, the court may refer a suit for dissolution of a marriage to mediation.

(b) A mediated settlement agreement is binding on the parties if the agreement:

(1) provides, in a prominently displayed statement that is in boldfaced type or capital letters or underlined, that the agreement is not subject to revocation;

(2) is signed by each party to the agreement; and

(3) is signed by the party's attorney, if any, who is present at the time the agreement is signed.

(c) If a mediated settlement agreement meets the requirements of this section, a party is entitled to judgment on the mediated settlement agreement notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law.

(d) A party may at any time prior to the final mediation order file a written objection to the referral of a suit for dissolution of a marriage to mediation on the basis of family violence having been committed against the objecting party by the other party. After an objection is filed, the suit may not be referred to mediation unless, on the request of the other party, a hearing is held and the court finds that a preponderance of the evidence does not support the objection. If the suit is referred to mediation, the court shall order appropriate measures be taken to ensure the physical and emotional safety of the party who filed the objection. The order shall provide that the parties not be required to have face-to-face contact and that the parties be placed in separate rooms during mediation.

Added by Acts 1997, 75th Leg., ch. 7, Sec. 1, eff. April 17, 1997. Amended by Acts 1999, 76th Leg., ch. 178, Sec. 2, eff. Aug. 30, 1999; Acts 1999, 76th Leg., ch. 1351, Sec. 1, eff. Sept. 1, 1999.

fastcase    You are viewing a free copy of this document through Fastcase Public Links.

543 S.W.3d 446

IN RE Gladys N. MINIX, Relator

NO. 14–17–00417–CV

Court of Appeals of Texas, Houston
(14th Dist.).

Opinions filed February 27, 2018

Jared R. Woodfill, Stephanie J. Proffitt, Houston, TX, Dennis M. Slate, Deer Park, TX, Terrence Allison, Beaumont, TX, for Relator.

Philip Placzek, Houston, TX, for Real Party In Interest.

Panel consists of Chief Justice Frost and Justices Jamison and Busby (Frost, C.J., dissenting; Busby, J., concurring).

**MAJORITY OPINION**

Martha Hill Jamison, Justice

In this original proceeding, we are asked to decide whether Section 153.0071 of the Texas Family Code permits the parties to a mediated settlement agreement in a suit affecting the parent-child relationship ("MSA") to agree to set aside the MSA. Here, there is evidence that the parties agreed to set aside the MSA. The trial court, however, never ruled that the MSA

[543 S.W.3d 449]

was set aside. Subsequently, relator Gladys N. Minix moved to enter judgment on the MSA, and the trial court denied her motion.

Gladys brings this mandamus proceeding, asking this court to compel the Honorable David Farr, presiding judge of the 312th District Court of Harris County, to enter a judgment consistent with the terms of the MSA. *See* Tex. Gov't Code Ann. § 22.221 (West Supp. 2017); *see also* Tex. R. App. P. 52. We conclude that the plain language of

section 153.0071 does not permit the parties to the MSA to consent to revoking it, and we conditionally grant the petition for writ of mandamus.

**I. BACKGROUND**

Gladys and real party in interest Michael Sterling Alexander have a three-year-old child. Michael filed an original petition in a suit affecting the parent-child relationship. After Michael filed his petition, he and Gladys and their respective attorneys signed an MSA and filed it with the trial court on December 1, 2015. Under the MSA, Gladys and Michael were joint managing conservators, and Michael's possession of the child was unsupervised and similar to a standard possession order. Michael was to pay $1,300 per month in child support. The parties did not request the trial court to enter judgment on the MSA at that time. The court was not asked to enter temporary orders.

In January 2016, Michael filed a motion to enforce the MSA, and subsequently filed first and second amended motions to enforce the MSA, alleging that Gladys had failed to comply with the MSA by denying Michael possession of or access to the child. On March 28, 2016, Michael filed a motion to enter temporary orders consistent with the MSA.

On May 24, 2016, Gladys filed a motion for a temporary restraining order and an emergency motion to modify, requesting the trial court to (1) appoint her sole managing conservator; and (2) deny Michael possession of or access to the child. Gladys alleged that the child had welts across his back, and the child said Michael had hit him with a belt. On May 27, 2016, the trial court signed a temporary restraining order, prohibiting Michael from having possession of or access to the child and setting a date for a temporary orders hearing.

On June 7, 2016, Michael filed a petition to set aside the MSA and request for temporary



-1-

orders, alleging that Gladys had failed to cooperate in obtaining a final order based on the MSA and Gladys had repeatedly violated the MSA. The parties' attorneys appeared before Judge Farr that same day and advised him that the parties had agreed to set aside the MSA. Gladys does not recall being at the June 7, 2016 hearing, and there is neither a record of the June 7, 2016 hearing nor a docket entry reflecting that the MSA was set aside. The parties never signed any document stating that they were setting aside the MSA.

The following day, on June 8, 2016, at a hearing on temporary orders before Associate Judge Eileen Gaffney, Gladys's attorney at that time, Stephanie Proffitt, advised Judge Gaffney that the parties had stipulated to set aside the MSA:

> MS. PROFFITT: I think yesterday when we were down here, it was stipulated on the record that the mediated settlement agreement that the parties entered into back in November or December is set aside.

> THE COURT: Does that sound correct?

> MR. PLACZEK: Yes, Your Honor.

> THE COURT: And I think y'all did that in front of Judge Farr?

> MR. PLACZEK: Yes, Your Honor.

[543 S.W.3d 450]

At that hearing, the trial court entered "Band–Aid" temporary orders. On June 29, 2016, Gladys filed a motion to modify the Band–Aid orders based on newly discovered evidence, requesting that she be appointed sole managing conservator and Michael and his wife be denied possession of and access to the child.

On August 19, 2016, Judge Farr signed an agreed order for psychological examinations of Gladys and Michael to assist in his determination of which parent should have the exclusive right to determine the primary residence of the child. On November 22, 2016, Judge Farr signed agreed temporary orders, appointing Gladys and Michael temporary joint managing conservators and awarding Gladys the exclusive right to designate the primary residence of the child. The terms of the temporary orders were similar to those in the MSA, except that Michael's child support obligation was increased to $1,422.05 per month.

Gladys hired her current counsel on March 7, 2017, and counsel filed a motion for entry of judgment based on the MSA and also requested that all subsequent temporary orders, rule 11 agreements, and other court orders be vacated. On March 21, 2017, the trial court held a hearing on Gladys's motion for entry of judgment. At the hearing, Michael's counsel stipulated the MSA is valid and binding and "under normal circumstances [Gladys] would have an absolute right to enforce it," but contended that the parties had agreed to set aside the MSA.

Gladys testified at the hearing that she initially believed that the MSA was a final settlement of all issues, but came to believe it was no longer a final agreement because "we continued to come to court and it was continued [sic] to be litigated." Gladys stated that she did not recall being in front of Judge Farr on June 7, 2016, but she remembered being in front of Judge Gaffney the next day. Gladys stated that she did not agree to set aside the MSA, nor did she recall Proffitt informing Judge Gaffney that the MSA had been set aside the previous day. Proffitt testified that Gladys was in court on June 7, 2016, and that Judge Farr set aside the MSA.[1]



*In re Minix*, 543 S.W.3d 446 (Tex. App. 2018)

The trial court took Gladys's motion for entry of judgment on the MSA under advisement and, on April 27, 2017, signed an order denying the motion. Gladys filed her petition for writ of mandamus, asking this court to (1) set aside the April 27, 2017 order denying her motion for judgment on the MSA; and (2) direct the trial court to render judgment consistent with the terms of the MSA.

## II. MANDAMUS STANDARD OF REVIEW

Generally, to be entitled to mandamus relief, a relator must demonstrate (1) the trial court clearly abused its discretion; and (2) the relator has no adequate remedy by appeal. *In re Nat'l Lloyds Ins. Co.* , 507 S.W.3d 219, 226 (Tex. 2016) (orig. proceeding) (per curiam). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law, or if it clearly fails to analyze the law correctly or apply the law correctly to the facts. *In re H.E.B. Grocery Co.* , 492 S.W.3d 300, 302 (Tex. 2016) (orig. proceeding) (per curiam); *In re Cerberus Capital Mgmt., L.P.* , 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding) (per curiam). Mandamus relief is available when the trial court erroneously refuses to enter judgment

[543 S.W.3d 451]

on a MSA. *In re Lee* , 411 S.W.3d 445, 450 n.7 (Tex. 2013) (orig. proceeding).

## III. ANALYSIS

### A. The MSA meets the requirements of Section 153.0071(d).

Gladys's sole issue presented is whether the trial court abused its discretion and violated the Family Code by refusing to render judgment on the parties' MSA, which complied with the Code's requirements. An MSA is binding on the parties if it meets all the requirements of Section 153.0071(d) of

the Texas Family Code. *See* Tex. Fam. Code Ann. § 153.0071(d) (West 2014). An MSA is binding if it (1) states in boldfaced type or capital letters or underlined letters that the agreement is not subject to revocation; (2) is signed by each party to the agreement; and (3) is signed by the party's attorney, if any, who is present at the time the agreement is signed. *Id.* If an MSA meets the requirements of section 153.0071(d), then a party is entitled to judgment on the MSA "notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law." *Id.* § 153.0071(e).

The MSA between Gladys and Michael provides that it is not subject to revocation:

**AGREEMENT NOT SUBJECT TO REVOCATION**

**BY THEIR SIGNATURES BELOW, THE PARTIES HEREBY ACKNOWLEDGE THAT THE AGREEMENT REACHED IN THIS MEDIATION IS BINDING ON THE PARTIES AND IS NOT SUBJECT TO REVOCATION.**

**THIS AGREEMENT MEETS THE REQUIREMENTS OF SECTION 153.0071(d), TEXAS FAMILY CODE.**

**EACH PARTY UNDERSTANDS AND AGREES THAT THIS AGREEMENT IS NOT REVOCABLE AND THAT EACH INTENDS AND AGREES THAT EITHER PARTY SHALL BE ENTITLED TO JUDGMENT ON THIS AGREEMENT UNDER THE PROVISION OF THE LAW PURSUANT TO SECTIONS 153.0071 AND 6.602 TEXAS FAMILY**



-3-

**CODE.**

**A PARTY TO THIS AGREEMENT IS ENTITLED TO JUDGMENT ON THE MEDIATED SETTLEMENT AGREEMENT.**

The statement is in boldfaced type and capital letters and is underlined, and the parties and their attorneys signed the MSA. *See* Tex. Fam. Code Ann. § 153.0071(d). The MSA satisfies the requirements of section 153.0071(d) to constitute a binding MSA.

**B. Section 153.0071 does not permit the parties to agree to set aside an MSA.**

Michael contends that, even if an MSA complies with 153.0071, the parties, nonetheless, may agree to set aside the MSA. Resolution of this issue requires that we construe section 153.0071.

Questions of statutory construction are reviewed de novo. *Levinson Alcoser Assocs. v. El Pistolon II, Ltd.* , 513 S.W.3d 487, 493 (Tex. 2017). Our goal is to determine and give effect to the Legislature's intent. *Pedernal Energy, LLC v. Bruington Eng'g, Ltd.* , 536 S.W.3d 487, 491–93, 2017 WL 1737920, at *4 (Tex. 2017). "When statutory text is clear, we do not resort to rules of construction or extrinsic aids to construe the text because the truest measure of what the Legislature intended is what it enacted." *Melden & Hunt, Inc. v. E. Rio Hondo Water Supply Corp.* , 520 S.W.3d 887, 893 (Tex. 2017). Words in the statute are given their ordinary

[543 S.W.3d 452]

and plain meaning. *Marino v. Lenoir* , 526 S.W.3d 403, 409 (Tex. 2017).

We construes statute so that no part is surplusage, but so that each word has meaning. *Pedernal Energy, LLC* , 536 S.W.3d at 491–93, 2017 WL 1737920, at *4. There is a

presumption that "the Legislature included each word in the statute for a purpose and that words not included were purposefully omitted." *ExxonMobil Pipeline Co. v. Coleman* , 512 S.W.3d 895, 899 (Tex. 2017) (per curiam) (internal quotations and citations omitted). "We also take statutes as we find them and refrain from rewriting text chosen by the Legislature." *Pedernal Energy, LLC* , 536 S.W.3d at 492, 2017 WL 1737920, at *4.

An MSA "is binding on the parties" if it satisfies the three enumerated requirements found in section 153.0071(d), and a party is entitled to judgment on the MSA. Tex. Fam. Code Ann. § 153.0071(d), (e). The version of section 153.0071(e–1) in effect at the time the trial court denied Gladys's motion on entry of judgment provided that the trial court could deny judgment on an MSA only if (1) a party to the MSA was a victim of family violence, and that circumstance impaired the party's ability to make decisions; and (2) the MSA is not in the child's best interest.[2] The Legislature has since amended section 153.0071(e–1) to allow the trial court to deny entry of judgment on an MSA where the MSA permits a person subject to the sex-offender registration statute or who has a history of past or present physical abuse directed at any person to reside in the same household as the child or have unsupervised access to the child and the MSA is not in the child's best interest.

The Legislature has provided no other circumstances under which the trial court may refuse to enter judgment on the MSA. If the Legislature had intended to permit the parties to agree to set aside an MSA, which meets all requirements that make the MSA binding, the Legislature could have included such an exception in section 153.0071, but chose not to do so. *See ExxonMobil Pipeline Co.* , 512 S.W.3d at 899 (presuming that the Legislature included each word in the statute for a purpose and that words not included were purposefully omitted). To allow the parties to agree to set aside an irrevocable



-4-

MSA would render meaningless subsection (e), which provides that "a party is entitled to judgment on the mediated settlement agreement not withstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law." *See Pedernal Energy, LLC* , 536 S.W.3d at 491–93, 2017 WL 1737920, at *4 (stating that the courts must construe statutes so that no part is surplusage, but so that each word has meaning).

We conclude that section 153.0071 does not allow the parties to agree to set aside the MSA.

**C. Assuming disputed issues of material fact regarding whether the parties agreed or the judge pronounced from the bench that the MSA was set aside, the statute does not permit the parties to agree or the judge to set aside the MSA.**

Michael asserts that there is at least a fact issue regarding whether the parties agreed to set aside the MSA, which this court cannot address in a mandamus proceeding. *See In re Angelini* , 186 S.W.3d 558 (Tex. 2006) (orig. proceeding) (stating that an appellate court may not decide

[543 S.W.3d 453]

disputed fact issues in an original mandamus proceeding. At the March 21, 2017 hearing, Gladys testified that she did not agree to set aside the MSA. Michael presented an excerpt of the reporter's record of the June 8, 2016 hearing conducted by Judge Gaffney where Gladys's former attorney, Stephanie Proffitt, advised Judge Gaffney the parties had agreed to set aside the MSA and that Judge Farr had, in fact, set it aside.

At the March 21, 2017 hearing and after hearing testimony and argument about whether the MSA had been set aside in 2016, Judge Farr stated,

... maybe this is what was said on June 7th, but nobody knows. If the parties came in front of me and said, I want to set aside our MSA, I don't know that I would go, hunky-dunky. I would just kind of go, well, I don't have anything to say about that, you guys either ask for judgment on your MSA or you don't ask for judgment. And if you don't ask for judgment and we kick that can down the road, I'm going to continue as a judge to respond to the affirmative relief that you're asking me for in any other capacity, including temporary orders.

We need not decide disputed issues of material fact in this mandamus proceeding. Even if Michael and Gladys agreed or the judge pronounced from the bench that the MSA was set aside, as discussed above, the express language of the statute provides that a party is entitled to judgment on an otherwise statutorily compliant MSA "notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law." Tex. Fam. Code Ann. § 153.0071(e). Therefore, the statute does not allow the parties to agree to revoke an MSA that satisfies the requirements of section 153.0071(d), nor does it allow a judge to set aside an MSA in accordance with the parties' agreement.

**D. Gladys did not invite the trial court to make a ruling which she complains about in this original proceeding.**

Michael argues that Gladys is precluded from asking the trial court to make a specific ruling and then complaining about the ruling to the appellate court. Under the invited error doctrine, a party is estopped from challenging a trial court's ruling on appeal if the complaining party requested the specific action taken by the trial court. *Tittizer v. Union Gas Corp.* , 171 S.W.3d 857, 862 (Tex.



2005) ; *see also Gordon v. Gordon* , 14–10–01031–CV, 2011 WL 5926723, at *7 (Tex. App.–Houston [14th Dist.] Nov. 29, 2011, no pet.).

Michael contends that the invited error doctrine applies because before Gladys asked the trial court to enforce the MSA, she agreed to set it aside in June 2016. He also argues that Gladys invited error when she filed a motion for a temporary restraining order and an emergency motion to modify, alleging changed circumstances and asking the trial court to (1) appoint her sole managing conservator; and (2) deny Michael possession of and access to the child. On May 27, 2016, the trial court issued the temporary restraining order. Therefore, Michael posits that Gladys was seeking relief inconsistent with the terms of the MSA, but now she seeks a judgment consistent with the MSA, which would provide Michael with unsupervised possession of and access to the child.

We reject these arguments because Gladys does not complain about the court's setting aside the MSA or granting the temporary restraining order in 2016. Instead, Gladys complains about the trial court's April 27, 2017 denial of her motion for entry of judgment.

The dissent argues that the invited error doctrine is to be construed

[543 S.W.3d 454]

broadly, but cites no cases applying the doctrine to a ruling other than the ruling complained of by the appellant on appeal. Thus, Gladys did not invite error by asking the trial court to enter judgment on the MSA; indeed, as explained above, the court lacked the power to do otherwise. The invited error doctrine is not applicable to this case.[3]

**E. *In re Lee* does not permit the parties to agree to set aside an MSA.**

Michael argues that the Texas Supreme court in *In re Lee* left open the possibility that a trial court may properly refuse to enter judgment on an MSA that complies with section 153.0071. In *Lee* , the court observed that several courts of appeals had addressed the issue of whether section 153.0071 mandates entry of judgment on a statutorily compliant MSA "under any and all circumstances," including where the MSA was "illegal," or was "procured by fraud, duress, coercion, or other dishonest means." 411 S.W.3d at 455 n.10. The court, however, declined to address that issue because it was not presented there. Therefore, we do not read *Lee* as leaving the door open to refuse to enter judgment on a statutorily compliant MSA. As in *Lee* , there are no allegations here of illegality or of facts that would preclude the formation of an agreement. *Cf. In re Kasschau* , 11 S.W.3d 305, 314 (Tex. App.–Houston [14th Dist.] 1999, orig. proceeding) (holding trial court did not abuse its discretion by refusing to render judgment on MSA requiring illegal destruction of evidence). Therefore, *Lee* does not support Michael's position.[4]

**IV. CONCLUSION**

Having determined that section 153.0071 does not permit the parties to an otherwise binding MSA to agree to set it aside, we conclude that the trial court abused its discretion by denying Gladys's motion to enter judgment on the MSA. Because the refusal to grant judgment on a mediated settlement is the proper subject of a mandamus proceeding, we conditionally grant Gladys's petition for writ of mandamus. We direct the trial court to vacate its April 27, 2017 order denying Gladys's motion for entry of judgment, and enter judgment in accordance with the MSA. The writ will issue only if the trial court fails to act in accordance with this opinion. We also lift our stay entered on June 2, 2017.



Kem Thompson Frost, Chief Justice, Dissenting

## DISSENTING OPINION

The relator comes to this court seeking a writ of mandamus to compel the trial judge to enforce a mediated settlement agreement the trial judge set aside at the relator's urging, after the relator reaped the benefits of the ruling. The doctrines of

[543 S.W.3d 455]

quasi-estoppel and invited error demand that this court deny the relator's petition for extraordinary relief. Because the majority instead conditionally grants it, I respectfully dissent.

## INDEPENDENT GROUNDS FOR DENYING MANDAMUS RELIEF

This court need not reach the merits of relator Gladys Minix's petition for extraordinary relief or address whether section 153.0071(d) of the Texas Family Code permits Minix and real party in interest Michael Sterling Alexander to agree to set aside their mediated settlement agreement. Nor does this court need consider whether that statutory provision applies to today's case. The quasi–estoppel and invited-error doctrines provide independent grounds for denying mandamus relief. So, even if the parties could not do what they did under the law, and even if the trial court's ruling did not comport with the statute, Minix still would not be entitled to mandamus relief.

## EQUITABLE PRINCIPLES AS A BASIS FOR DENYING MANDAMUS RELIEF

Appellate courts do not issue the extraordinary remedy of mandamus as a matter of right but rather grant this relief at their discretion.[1] Although mandamus is a common-law remedy, a court determines whether to grant mandamus relief by drawing on equitable principles.[2] In deciding whether to order mandamus relief, an appellate court may consider equitable matters that go beyond the mere legal right of the relator.[3] The doctrines of quasi-estoppel and invited error—both species of estoppel—operate in equity to bar Minix from speaking against her own actions, statements, and litigation positions in seeking mandamus relief in this court.

## Minix's Actions, Statements, and Litigation Positions

Minix and Alexander agreed that their meditated settlement agreement governing custody of their three-year-old child should be set aside. While represented by counsel, each parent stipulated to this position in open court. Then, the two asked the trial court to set aside their mediated settlement agreement. And, the trial court did. Minix wanted more rights to the child than the mediated settlement agreement provided, so she asked the trial court to give her more rights. And, the trial court did. Minix did not want Alexander to have what the mediated settlement agreement gave him, so Minix asked the trial court to give him less. And, the trial court did.

## Minix's Acceptance of Benefits

Minix enjoyed the rights the trial court gave her (and the elimination of the rights Alexander would have had under the mediated settlement agreement) for more than nine months as the parties litigated over conservatorship and possession of their child. During that time Minix did not mention the mediated settlement agreement, even though it addressed those issues. Minix did not make any of the arguments she now makes in this court. Instead, she accepted the benefits of the temporary orders the trial court granted at her urging—relief that gave her greater rights and Alexander lesser rights, relief that was not consistent with the parties' mediated


105

settlement agreement, and relief the trial judge surely would not have granted

[543 S.W.3d 456]

if the trial judge had not set aside the mediated settlement agreement at the parties' request and let them litigate instead.

On November 22, 2016, almost a year after the parties signed the mediated settlement agreement, Associate Judge Eileen Gaffney signed temporary orders. Even presuming that the provisions of these temporary orders mirrored the terms of the mediated settlement agreement, the provisions of the temporary orders do not determine what the final order will be, and according to Alexander's live pleading, Alexander expects to prove at trial that he should get sole managing conservatorship of the child and that Minix should pay child support. In addition, by the time the associate judge issued the temporary orders, the parties had engaged in substantial litigation and had spent lots of time and money—resources the parties would not have expended had they not agreed to set aside aside the mediated settlement agreement.

**Trial Court's Action in Response to Minix's Specific Request**

Though the record contains no written order or statements of the trial court setting aside the mediated settlement agreement, Minix's own lawyer testified under oath that the trial court did just that. The record reflects that, on June 7, 2016, the respondent, The Honorable David Farr, held a hearing on Minix's emergency motion to modify (in which Minix sought relief inconsistent with the mediated settlement agreement) and on Alexander's petition to set aside the mediated settlement agreement and request for temporary orders. At that hearing, Minix and Alexander stipulated in open court that the mediated settlement agreement was set aside. Minix's counsel, recounting what occurred at the June 7, 2016 hearing, testified under oath on March 21, 2017, that (1) Judge Farr pronounced from the bench that he was setting aside the mediated settlement agreement; (2) Minix was present in the courtroom when the judge made the pronouncement; and (3) Minix's counsel at the time (Stephanie Proffitt) understood that Judge Farr had set aside the mediated settlement agreement on June 7, 2016. The sworn testimony of Minix's own lawyer raises a fact issue as to whether the trial court, from the bench, set aside the mediated settlement agreement that day, and this court is to presume that the trial court credited this testimony.[4]

After Judge Farr set aside the mediated settlement agreement in open court, at the parties' urging and in keeping with their stipulation, Judge Farr took actions inconsistent with the mediated settlement agreement still being in effect. Chief among these was sending the parties to Associate Judge Gaffney for temporary orders, which, of course, would not have been necessary had the parties sought to enforce the mediated settlement agreement that covered the conservatorship and possession issues that were to be the subject of the temporary orders.

At the temporary-orders hearing the next day (June 8, 2016), Judge Gaffney asked the parties if they had any agreement as to conservatorship. Under the mediated settlement agreement, the parties had agreed that each parent would be a joint managing conservator. Nonetheless, each party's lawyer responded to Judge Gaffney's inquiry by saying that each parent was seeking to be appointed sole managing conservator, effectively communicating that they had no agreement as to

[543 S.W.3d 457]

conservatorship. Minix sought sole managing conservatorship and urged Judge Gaffney to



-8-

In re Minix, 543 S.W.3d 446 (Tex. App. 2016)

order that Alexander's possession be supervised. The parties then went forward with temporary orders. This evidence shows that the parties' actions were in accord with the parties' stipulation and with the trial court having set aside the mediated settlement agreement, just as Minix's then-lawyer (Proffitt) testified.

Consistent with the setting aside of the mediated settlement agreement, the trial court then allowed litigation to continue. The parties' conduct strongly suggests that the trial court, in fact, set aside the mediated settlement agreement. Nothing else would explain what followed.

> • If the trial court did not set aside the mediated settlement agreement, why did the parties appear before Judge Gaffney for a temporary-orders hearing and tell the court that the parties had no agreement as to conservatorship?

> • Why did the parties need temporary orders if they had an agreement that resolved everything?

> • If the trial court did not set aside the mediated settlement agreement, why would the parties have been litigating matters that the mediated settlement agreement covered?

> • If the trial court did not set aside the mediated settlement agreement, why did the parties not seek its enforcement and thus put an end to the dispute?

> • If the mediated settlement agreement resolved the conservatorship and possession issues and was in effect, why did the parties, the lawyers, and the

trial judge spend ten months litigating those issues?

## Minix's U–Turn at the End of the Road

The parties spent fifteen months in litigation, fighting over issues addressed in the mediated settlement agreement. At the end of the road, Minix made a u-turn, completely changing her position. She no longer wanted to set aside the mediated settlement agreement. Even though the parties had stipulated to it—and even though the trial court had done what Minix asked and ruled in accordance with her stipulation—Minix asked the trial court to undo the ruling and to render judgment on the mediated settlement agreement, a request that clashed with her pleadings, her arguments, her claims, and her actions up to that point.

## No Abuse of Discretion in Refusing to Undo the Granting of Minix's Requested Relief

Having set aside the mediated settlement agreement at the parties' urging almost a year before and having granted Minix relief inconsistent with it, the trial court did not abuse its discretion on April 27, 2017, when the trial court denied Minix's request for rendition of judgment based on the mediated settlement agreement. Minix now seeks mandamus relief from this court compelling the trial judge to render a judgment consistent with the terms of the mediated settlement agreement.

## Mandamus Relief Unwarranted Even in the Face of a Compliant Mediated Settlement Agreement

The majority does not look to equitable principles in deciding today's case. Instead, the majority focuses on whether the mediated settlement agreement satisfies the statutory requirements for enforcement. In doing so, the majority misses the mark.



-9-

[543 S.W.3d 458]

On today's facts, equity outruns statutory compliance.

The majority bases today's holding on the mediated settlement agreement's compliance with section 153.0071.[5] But, compliance with the statute is not the only issue. A statute's mandate alone does not determine the course. Other forces of law and equity are at work. For example, this court would not reverse a trial court judgment and render judgment enforcing a compliant mediated settlement agreement if we lacked jurisdiction over a case because of a late-filed notice of appeal.[6] Nor would this court reverse a trial court for failing to render judgment on a mediated settlement agreement if its proponent did not first ask the trial court to do so.[7] And, this court should not grant mandamus relief today because equitable principles preclude the granting of relief.

*Quasi–Estoppel*

The doctrine of quasi-estoppel bars a party from asserting, to another's disadvantage, a right inconsistent with a position earlier taken.[8] Quasi-estoppel applies if it would be unconscionable to allow a person to assert, to another's disadvantage, a right at odds with a position to which the person earlier had acquiesced, or from which the person had accepted a benefit.[9] Under supreme-court authority, Texas courts may invoke estoppel to deny mandamus relief in cases like this one, in which the petitioner seeks to avoid an agreement with the opposing party after the proceedings turn adverse.[10]

Texas cases present the following familiar fact pattern that shows how equity steps in to bar relief that the remedy of mandamus might otherwise afford:

> • The relator and the real party in interest agree to handle a matter contrary to the law.

> • Then, after losing, the relator seeks mandamus relief to compel the result the law would demand, a result that goes against the parties' agreement.

> • The appellate court refuses to grant mandamus relief, holding that the equitable doctrine of estoppel bars it.[11]

[543 S.W.3d 459]

Today's case falls squarely within the estoppel-bars-mandamus-relief mold. True to it, after losing in the trial court in her belated attempt to enforce the mediated settlement agreement, Minix now seeks to compel the result she claims the law demands— enforcement of the mediated settlement agreement. This court should stay true to the governing case law and hold that equitable principles of estoppel bar mandamus relief.[12]

The parties filed the mediated settlement agreement with the trial court in December 2015. Three months later, in March 2016, Alexander filed a motion seeking temporary orders governing possession and conservatorship of the parties' child. The orders Alexander sought were consistent with the mediated settlement agreement. Minix objected. She did not want what the mediated settlement agreement gave her, nor did she want Alexander to have what the mediated settlement agreement gave him. So, in May 2016, Minix sought a temporary restraining order and filed an emergency motion to modify,[13] requesting the trial court to (1) appoint her sole managing conservator; and (2) deny Alexander possession of or access to the child—relief at odds with the parties' mediated settlement agreement. When Minix filed this motion, no court had signed an order as to conservatorship of the parties' child. Indeed, the respondent judge had not even signed temporary orders in this original suit affecting the parent-child relationship. In



108



response to Minix's motion to modify, the trial court signed a temporary restraining order prohibiting Alexander's possession and access to the child. With this ruling, Minix got what she requested—and what she got conflicted with what she would have gotten under the mediated settlement agreement. (The mediated settlement agreement would have given Alexander possession and access to the child.) Minix did not object to the trial court going outside the mediated settlement agreement, nor did Minix ask the trial court to enforce the mediated settlement agreement. Instead, Minix sought and received relief that clashed with the mediated settlement agreement.

After Minix signed the mediated settlement agreement and both parties filed it with the trial court in December 2015, Minix did not seek rendition of judgment on the agreement for more than fifteen months. During the interim she enjoyed the benefits of temporary orders that (1) gave her rights the mediated settlement agreement did not give her and (2) took away rights the mediated settlement agreement gave Alexander.

Now, Minix asserts the trial court abused its discretion in refusing to grant the relief she requested in March 2017, yet by the time Minix asked the trial court to take the enforce-the-mediated-settlement-agreement path, she had been leading the trial court in the opposite direction for ten months, getting just what she asked for when she asked for it. Through counsel, the parties agreed in open court that the mediated settlement agreement should be

[543 S.W.3d 460]

set aside, and the trial court determined in open court that the agreement would be set aside. Building on that relief, Minix then sought and received what she could not have gotten under the mediated settlement agreement. Minix even agreed that trial on the merits of her petition seeking relief

inconsistent with the mediated settlement agreement should be continued until April 2017, and in December 2016, the trial court granted this relief, too.

In seeking mandamus relief, Minix argues that the mediated settlement agreement cannot be set aside even if she and Alexander agreed to set it aside, yet in June 2016, she induced the trial court to set aside the mediated settlement agreement by arguing the opposite. The trial judge set aside the mediated settlement agreement in reliance upon the parties' stipulation. The trial court let them litigate the issues. Only after Minix became unhappy with the results of that litigation—and apparently preferred to return to the terms of the mediated settlement agreement—did she request the trial court to enforce it.

Our mandamus record contains evidence of the crucial touchstones of quasi-estoppel— Minix's unconscionable assertion, to Alexander's disadvantage, of a right inconsistent with a position to which Minix earlier had acquiesced, and from which Minix had accepted benefits.[14] After stipulating that the mediated settlement agreement should be set aside and obtaining a ruling to this effect from the trial court, Minix litigated for ten months about conservatorship and possession—issues covered by the mediated settlement agreement, never once seeking to enforce the contract she asked the trial court to set aside, and all the while seeking and accepting conservatorship and possession rights in temporary orders she never could have obtained without walking away from the mediated settlement agreement she now asks this court to enforce via mandamus. Having accepted those benefits, Minix cannot now avoid her stipulation with Alexander to set aside the mediated settlement agreement.[15]

The majority asserts that the record does not show that enforcing the mediated settlement agreement at this juncture "would be to [Alexander's] disadvantage."[16] The record



-11-



amply shows the hardship. As Minix's lawyer accurately pointed out at the March 21, 2017 hearing, between the execution of the mediated settlement agreement in December 2015 and Minix's filing of her "Motion for Entry of Judgment" in March 2017, "there were several orders and lots of court proceedings and an amicus appointed, and [a] psychological evaluation conducted, a lot of other things, a lot of money, time[,] and expense on this case." Wasting all of the time and money Alexander invested in this litigation would be to Alexander's disadvantage. The majority points to nothing that would show otherwise.

The majority also asserts that since November 22, 2016, almost a year after the parties signed the mediated settlement agreement, the terms of the temporary orders resemble the terms of the mediated settlement agreement.[17] But, these terms do not fix the terms of the final order. Trial determines that. And, according to Alexander's live pleading, Alexander expects to prove at trial that he is entitled to sole managing conservatorship of his son and to child support from Minix.

[543 S.W.3d 461]

Under these circumstances, it would be unconscionable to allow Minix to assert, to Alexander's disadvantage, that the parties could not validly have agreed to set aside the mediated settlement agreement, a position at odds with Minix's prior position, from which Minix accepted benefits.[18] The doctrine of quasi-estoppel forecloses mandamus relief.[19]

*Invited Error*

Another species of estoppel—the invited-error doctrine—provides an alternative basis for denying Minix mandamus relief. Minix complains that the trial judge erred in refusing to undo an action the parties asked the trial judge to take, and so invited the error of which she now complains.[20] The invited-error doctrine applies to situations in which a party asks the court to make a specific ruling or take a specific action, and then complains of that ruling or action on appeal.[21] The concept is a simple one: If a party induces trial court action, that party cannot later run to the court of appeals complaining of that action.

Texas courts apply the invited-error doctrine across a wide array of scenarios to preclude parties from complaining in the court of appeals about the very things they brought about in the trial court.[22] For example, a party invites error by persuading a trial judge to adopt a jury charge that the party later alleges supports an improper theory of recovery.[23] The doctrine encompasses scenarios just like the one in today's case, where a party seeks a particular action in the trial court and then after getting it, denounces it as error in the court of appeals.[24]

The majority narrowly frames the invited-error doctrine,[25] holding that Minix did not invite error because she is not complaining of a specific ruling she asked the trial court to make.[26] Citing *Tizzier v. Union Gas Corp.*,[27] the majority notes that "under the doctrine of invited error, a party is estopped from challenging a trial court's ruling on appeal if the complaining

[543 S.W.3d 462]

party requested the specific action taken by the trial court."[28] Texas jurisprudence shows that the invited-error doctrine is broader than the majority suggests.[29] Texas courts have phrased the invited-error requirements in various ways, at times more broadly than in *Tizzier*.[30] In *Hodges*, for example, the Supreme Court of Texas explained the principle in expansive terms: "[a] litigant cannot ask something of a court and then complain that the court committed error in giving it to him."[31] There is no denying that Minix asked the trial court for specific relief that the trial court granted and now, in the



-12-

court of appeals, she faults the trial court for granting it.

The premise of Minix's request for relief is that the trial court erred in not enforcing the mediated settlement agreement she asked the trial court to set aside. The case law is clear: If a party asks the trial court to take an action, the party will not be permitted to challenge that action in the court of appeals.[32] If the invited-error doctrine were as narrow as the majority suggests, a party could dodge the consequences of inviting error simply by asking the trial court to rule on an issue, obtaining the requested ruling, filing a motion to reconsider, and then appealing the denial of the motion to reconsider. Under this hypothetical, the trial court properly would have denied the motion to reconsider because the motion was inconsistent with relief the party already had requested, but an appellate court operating under the majority's view, might conclude that the party had not invited error "on a specific ruling" and reverse the trial court.[33] The supreme court has looked to the purposes and principles of the invited-error doctrine, recognizing the conduct and harm it is intended to thwart, and evaluating the substance of the party's actions rather than slicing the doctrine narrowly, viewing it technically, or applying it rigidly.

The invited-error doctrine recognizes the unfairness—to both the trial court and to the opposing party—of allowing a party to change positions upon arrival in the court of appeals, especially after that party has reaped the benefits of an opposite trial-court position and consumed judicial resources inducing the trial court to do the thing now sought to be undone.

The order Minix appeals is like a motion to reconsider in that Minix stipulated as part of a joint stipulation to set aside the mediated settlement agreement, the trial judge did set it aside, and then Minix later sought to enforce the set-aside agreement. Even though Minix asked the trial court to set aside the mediated

settlement agreement, she made a U-turn when she later deemed it more advantageous to return to the mediated settlement agreement.

Grounded in even justice and dictated by common sense,[34] the invited-error doctrine promotes the sound administration of law.[35] Properly applied, it prevents gamesmanship, unfairness, and surprise and deters waste of time, money, and judicial

[543 S.W.3d 463]

resources. Minix has engaged in the very gamesmanship the invited-error doctrine is designed to stop. Having invited the alleged error, Minix should not now be heard to complain of it.

## CONCLUSION

This court need not reach the merits of Minix's petition for extraordinary relief because principles of quasi-estoppel demand this court deny mandamus relief. Alternatively, Minix invited the error she asks this court to correct by mandamus. The record shows the parties' stipulation and the trial court's responsive action. And, the parties' post-stipulation actions conformed not only to the stipulation but also to Minix's lawyer's testimony and to the trial court's reported ruling from the bench. That, too, raises a fact issue that should preclude the granting of any mandamus relief. The majority does not explain why it concludes otherwise.

Courts grant mandamus relief to remedy wrongs, not to promote them.[36] In granting mandamus relief the majority sanctions the very conduct the quasi-estoppel and invited-error doctrines are supposed to thwart. Because principles of estoppel embodied in both doctrines bar mandamus relief in this context, this court need not analyze section 153.0071(d) of the Family Code or its potential application to today's case.[37] This



111

court instead should hold that estoppel principles foreclose mandamus relief.

J. Brett Busby, Justice, Concurring

**CONCURRING OPINION**

Under the statute enacted by the Legislature, this is a straightforward case. Section 153.0071(d) of the Family Code provides that in a suit affecting the parent-child relationship, a mediated settlement agreement (MSA) meeting certain formal requirements is binding on the parties.[1] With specifically enumerated exceptions not applicable here, a party "is entitled to judgment on" such an agreement "notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law." Tex. Fam. Code Ann. § 153.0071(e) (West 2014).

The majority opinion, which I join, holds that a trial court may not create a new exception to this statute by refusing to render judgment on a statutorily compliant MSA on the ground that the parties later agreed to set it aside. Civil Rule 11 addresses the enforceability of agreements between attorneys or parties. Thus, by the plain terms of section 153.0071(e), a party is entitled to judgment on an MSA notwithstanding any agreement he or she may have made to the contrary. *See In re Lee* , 411 S.W.3d 445, 454 (Tex. 2013) (orig. proceeding); *In Interest of C.C.E.* , 530 S.W.3d 314, 321 (Tex. App.–Houston [14th Dist.] 2017, no pet.). "[W]e take statutes as we find them and refrain from rewriting the Legislature's text." *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n* , 518 S.W.3d 318, 326 (Tex. 2017).

Our dissenting colleague contends that principles of equity—including a doctrine not pleaded in the trial court or briefed by any party to this proceeding—allow the parties and the court to override the statute by agreement. I write separately to explain why this approach is incompatible

[543 S.W.3d 464]

with the statute, principles of equity, the facts of this case, and our adversary system of justice.

According to the dissent, we miss the mark by starting our analysis with the governing law. But that law is precisely the issue raised by Gladys in her mandamus petition, which asks: "Did the district court abuse its discretion and violate the Texas Family Code by refusing to enter judgment on the parties' mediated settlement agreement—an agreement that complies with each of the three requirements in section 153.0071(d) of the Texas Family Code ?" Under our rules, we must "address[ ] every issue raised and necessary to final disposition" of the case. Tex. R. App. P. 47.1. The dissent correctly notes that addressing issues on the merits sometimes is not necessary, such as when there is a jurisdictional defect or an issue was not properly preserved in the trial court. *See post* , at 457–58. Yet there is no question of jurisdiction here, and it is one of the defensive doctrines on which the dissent relies—not the issue briefed by Gladys—that was not properly preserved.

The dissent posits that equity can also "outrun[ ] statutory compliance." *Id.* This assertion fails to account for the mandatory nature of the statute at issue. Once the parties have entered into a compliant MSA, the statute requires the trial court to grant a party's motion for judgment even if the parties agreed not to seek such relief. *See* Tex. Fam. Code Ann. § 153.0071(e). "We generally adhere to the maxim that 'equity follows the law,' which requires equitable doctrines to conform to ... statutory mandates, not the other way around." *Fortis Benefits v. Cantu* , 234 S.W.3d 642, 648 (Tex. 2007).[2]

Let there be no mistake about the rule the dissent proposes: the trial court is equitably absolved of its statutory obligation to render judgment on a binding MSA when the parties



later manifest—by words or conduct—an intent not to be bound by that agreement anymore. If the parties do not seek judgment on the MSA immediately, they run the risk that further proceedings will be viewed as inconsistent with the agreement, and neither of them will be able to complain by mandamus or in an eventual appeal if the trial court declines to render judgment on the agreement.3 Given the lengths to which the Legislature went to make MSAs binding and (in all but a few defined situations) enforceable, it makes no sense to allow such agreements to be easily cast aside. At bottom, the dissent's position is that equity frees the trial court to violate a statute if the parties agree, even though the statute expressly says that an agreement cannot have such an effect. *See post* , at 458–59 & n.11. That's not equity—it's a recipe for anarchy.

Even if we could look to equitable doctrines to trump the Legislature's judgment that parties cannot undo binding MSAs by agreement, those doctrines do not support such a result here. The dissent begins its analysis with quasi-estoppel. That doctrine operates as an affirmative defense, so the party seeking to invoke it has the burden

[543 S.W.3d 465]

of pleading and proof. *Malone v. Patel* , 397 S.W.3d 658, 681–82 (Tex. App.–Houston [1st Dist.] 2012, pet. denied). So far as our record reveals, Michael did not plead quasi-estoppel, raise it in a response to Gladys's motion for entry of judgment, or mention it as a ground in his motion to set aside the MSA.4 The parties also do not mention the doctrine of quasi-estoppel in their briefing before this Court. Just as we generally do not reverse a trial court for failing to take an action that a party did not request (*see post* , at 457–58 & n.7), we should not deny mandamus relief based on a defense that a party did not properly raise.

Were we to raise this non-jurisdictional issue ourselves and develop arguments for or against its application, we would become advocates for a party rather than impartial decisionmakers—a role fundamentally at odds with our adversary system of justice. That system "depends on the parties to frame the issues for decision and assigns to courts the role of neutral arbiter of the matters that the parties present." *Ward v. Lamar Univ.* , 484 S.W.3d 440, 453 (Tex. App.–Houston [14th Dist.] 2016, no pet.). We should stay in our lane.

The doctrine of invited error, which the parties do address, is inapplicable to the facts of this case. Michael argues that Gladys invited error in two ways: (1) by agreeing that the trial court could set aside the MSA, which counsel testified the court did; and (2) by filing a motion to modify that sought relief inconsistent with the MSA, which the trial court temporarily granted. As the majority opinion explains, the doctrine of invited error does not apply because Gladys does not challenge either of those rulings in her petition. Rather, she challenges the trial court's denial of her subsequent motion for judgment on the MSA.

Our dissenting colleague criticizes our framing of the invited error doctrine as unduly narrow. Although I disagree, I conclude there are further reasons to reject the doctrine's application here. First, an undocumented oral agreement by Gladys's counsel to set aside the MSA is not enforceable. "[N]o agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed ... [or] made in open court and entered of record." Tex. R. Civ. P. 11. Here, there is no written agreement to set aside the MSA, and no reporter's record was taken of the hearing in which (according to later testimony by Gladys's counsel) an oral agreement was made. An oral agreement made in open court may also be enforced if it is described in a subsequent judgment or



-15-

order,⁵ but our record likewise contains no order setting aside the MSA. Recognizing that oral agreements by counsel are apt to be misconstrued and beget controversy, Rule 11 bars their enforcement. *See Padilla v. LaFrance* , 907 S.W.2d 454, 460 (Tex. 1995). Because any oral agreement by

[543 S.W.3d 466]

Gladys's counsel is not enforceable, it should not be held against Gladys in an invited error analysis.

Second, a motion to modify conservatorship, possession, or access based on a material and substantial change in circumstances is not necessarily inconsistent with the terms of a previous MSA. As this Court recently explained, a trial court does not run afoul of section 153.0071 if it alters the terms of an order incorporating an MSA based on subsequent events that meet the statutory requirements for modification. *See* Tex. Fam. Code Ann. § 156.101 ; *In re Harrison* , No. 14-15-00430-CV, ––– S.W.3d ––––, ––––, 2018 WL 894442, at \*30 (Tex. App.–Houston [14th Dist.] Feb. 15, 2018, no pet. h.). A modification may be temporary, or it may leave portions of the MSA undisturbed. When circumstances substantially change, we should hesitate to discourage a parent from acting to protect the safety and welfare of a child by forcing that parent to make an all-or-nothing choice between seeking a modification and preserving the bargain struck in the MSA.

In this case, the modification was partial and temporary. Because the modification had ended before Gladys filed her motion for entry of judgment on the MSA, she did not invite the trial court to err in denying that motion. For these additional reasons, I conclude that Gladys is entitled to mandamus relief.

--------

Notes:

1 Proffitt testified on March 21, 2107, in part:

Q: On June 7th do you believe that Judge Farr had set aside the                    [MSA]?

A: That was his pronouncement from the bench.

2 Act of June 18, 2005, 79th Leg., R.S., ch. 916, § 7, 2005 Tex. Gen. Laws 3148, 3150, *amended by* Act of May 23, 2017, 85th Leg., R.S., ch. 99, § 2, 2017 Tex. Sess. Law Serv. 821, 821 (West).

3 The dissent also argues the doctrine of quasi-estoppel bars Gladys's request for mandamus relief. The doctrine of quasi-estoppel bars a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. *Samson Expl. LLC v. T.S. Reed Props., Inc.* , 521 S.W.3d 766, 778 (Tex. 2017) ; *see post* , at 458–59 (Frost, C.J., dissenting). Even if this un-briefed argument were before us, Michael has not shown that enforcing the MSA would be to his disadvantage. The terms of the MSA were similar to those of the November 22, 2016 temporary orders, and Michael's child support obligation was less in the MSA. The dissent may believe the May 2016 temporary restraining order that Gladys sought was unfavorable to Michael, but Gladys does not challenge that order in her petition.

4 Michael further argues that prohibiting presumably fit parents from agreeing to revoke a statutorily compliant MSA would be unconstitutional. Michael did not raise this issue in the trial court, and we do not address it here.

1 *Rivercenter Assocs. v. Rivera* , 858 S.W.2d 366, 367 (Tex. 1993).

2 *See id* .


fastcase

-16-

114

3 *Moore v. Rock Creek Oil Corp.* , 59 S.W.2d 815, 817 (Tex. Comm'n App. 1933, judgm't adopted).

4 At the hearing on March 21, 2017, Judge Farr indicated that he had no personal recollection as to what happened at the hearing on June 7, 2016.

5 *See* Tex. Fam. Code Ann. § 153.0071(d) (West, Westlaw through 2017 1st C. S.).

6 *See Fleming & Assocs. v. Kirklin* , No. 14-16-00752-CV, 2016 WL 6885967, at *1–2 (Tex. App.–Houston [14th Dist.] Nov. 22, 2016, pet. denied) (mem. op., per curiam).

7 *See* Tex. R. App. P. 33.1(a) ; *First Nat. Bank of Beeville v. Fojtik* , 775 S.W.2d 632, 633 (Tex. 1989).

8 *Curry v. Pickett* , No. 14-09-00188-CV, 2010 WL 3353952, at *4 (Tex. App.–Houston [14th Dist.] Aug. 26, 2010, no pet.) (mem. op.).

9 *See id.*

10 *See Pendleton v. Pace* , 9 S.W.2d 437, 440 (Tex. Civ. App.–Texarkana 1928, writ ref'd) (holding that candidate who entered into agreement with rival candidate to set aside result of first primary and resubmit nomination was estopped to claim nomination under first primary, after result of second proved adverse). In cases decided after June 14, 1927, the Supreme Court of Texas's notation of "writ refused" or "petition refused" denotes that the court of appeals's opinion is the same as a precedent of the Supreme Court of Texas. *See Yancy v. United Surgical Partners Int'l, Inc.* , 236 S.W.3d 778, 786 n. 6 (Tex. 2007).

11 *See Pendleton* , 9 S.W.2d at 440 (holding that candidate who entered into agreement with rival candidate to set aside result of first primary and resubmit nomination (an action not provided for by applicable law) was estopped to claim nomination under first primary, after result of second proved adverse); *Robinson v. Plano Board of Educ.* , 514 S.W.2d 135, 136–38 (Tex. Civ. App.–Dallas 1974, orig. proceeding) (holding that relator, a candidate who entered into agreement with rival candidate to have a recount conducted (an action relator alleged was contrary to an applicable statute), was estopped to claim he had won election, after the result of the recount proved adverse).

12 *See Rivercenter Assocs.* , 858 S.W.2d at 367 ; *Pendleton* , 9 S.W.2d at 440 ; *Robinson* , 514 S.W.2d at 136–38.

13 Though Minix did not state in her emergency motion what she sought to modify, the only document governing the parties' conservatorship and possession of the child was the mediated settlement agreement, and it is obvious from Minix's motion that she did not want the court to order the conservatorship-and-possession terms the parties set out in their mediated settlement agreement.

14 *See Curry* , 2010 WL 3353952, at *4.

15 *See Pendleton* , 9 S.W.2d at 440 ; *Robinson* , 514 S.W.2d at 136–38.

16 *Ante* at 455, n.3.

17 *See ante* at 455, n.3.

18 *See Curry* , 2010 WL 3353952, at *4.

19 *See Rivercenter Assocs.* , 858 S.W.2d at 367 ; *Pendleton* , 9 S.W.2d at 440 ; *Curry* , 2010 WL 3353952, at *4 ; *Robinson* , 514 S.W.2d at 136–38.

20 *See Kupersmith v. Weitz* , No. 14-05-00167-CV, 2006 WL 3407832, at *3 n.2 (Tex. App.–Houston [14th Dist.] Nov. 28, 2006, no pet.) (mem. op) (noting that reversal would conflict with invited-error doctrine because court rendered judgment in reliance on stipulation that the parties sought to enforce rather than rescind settlement agreement).





[21] *See In re Dep't of Family & Protective Servs.* , 273 S.W.3d 637, 646 (Tex. 2009) ; *Houston Laureate Assocs., Ltd. v. Russell* , 504 S.W.3d 550, 567 (Tex. App.–Houston [14th Dist.] 2016, no pet.) (holding that under invited-error doctrine, a party that requests a specific action in trial court cannot complain on appeal that trial court erred in granting that request); *Gordon v. Gordon* , No. 14-10-01031-CV, 2011 WL 5926723, at *7 (Tex. App.–Houston [14th Dist.] Nov. 29, 2011, no pet.) (mem. op.).

[22] *See Spence v. State Nat. Bank of El Paso* , 5 S.W.2d 754, 756 (Tex. 1928)

[23] *See United Scaffolding, Inc. v. Levine* , No. 15-0921, 537 S.W.3d 463, 481–82, 2017 WL 2839842, at *12 (Tex. June 30, 2017) ; *Del Lago Partners v. Smith* , 307 S.W.3d 762, 775 (Tex. 2010).

[24] *See Del Lago Partners* , 307 S.W.3d at 775 (holding that petitioner was barred from obtaining reversal on appeal on the ground that the jury should have decided the case under a liability theory that petitioner itself persuaded the trial court not to submit to the jury); *Houston Laureate Assocs.* , 504 S.W.3d at 567 ; *Gordon* , 2011 WL 5926723, at *7.

[25] *See ante* at 459–60.

[26] *See id.*

[27] 171 S.W.3d 857 (Tex. 2005).

[28] *See ante* at 460.

[29] *See Kupersmith* , 2006 WL 3407832, at *3 n.2.

[30] *Compare People's State Bank of Tyler v. Monsey Oil Co.* , 11 S.W.2d 507, 511 (Tex. Comm'n App. 1928, judgm't approved)*with Tittizer* , 171 S.W.3d at 862.

[31] *Northeast Tex. Motor Lines v. Hodges* , 138 Tex. 280, 158 S.W.2d 487, 488 (1942).

[32] *Houston Laureate Assocs.* , 504 S.W.3d at 567 ; *Gordon* , 2011 WL 5926723, at *7.

[33] *See ante* at 459–60.

[34] *Northeast Tex. Motor Lines* , 158 S.W.2d at 488.

[35] *Spence* , 5 S.W.2d at 756.

[36] *Moore* , 59 S.W.2d at 818.

[37] *See Rivercenter Assocs.* , 858 S.W.2d at 367 ; *Pendleton* , 9 S.W.2d at 440 ; *Houston Laureate Assocs.* , 504 S.W.3d at 567–68 ; *Gordon* , 2011 WL 5926723, at *7 ; *Curry* , 2010 WL 3353952, at *4 ; *Robinson* , 514 S.W.2d at 136–38.

[1] The parties have stipulated that the MSA at issue is binding.

[2] We need not decide in this case whether there are some circumstances in which a party could waive its "entitle[ment] to judgment on" a binding MSA. Tex. Fam. Code Ann. § 153.0071(e). The statute makes clear that the parties cannot waive that entitlement by subsequent agreement.

[3] Although the dissent presents the doctrines of quasi-estoppel and invited error as equitable bases for denying mandamus relief, they would apply equally on appeal. *E.g., Tittizer v. Union Gas Corp.* , 171 S.W.3d 857, 862 (Tex. 2005) (invited error); *Davis–Lynch, Inc. v. Asgard Techs., LLC* , 472 S.W.3d 50, 67–68 (Tex. App.–Houston [14th Dist.] 2015, no pet.) (quasi-estoppel).

[4] Michael's counsel did use the word "estoppel" once in a hearing, but he did not explain the type of estoppel to which he referred. Counsel's statement that "you can't ask for two things at the same time," and his later argument that his client detrimentally relied on "the assumption that [the MSA] had been set aside," would not suggest to the trial court that he was addressing quasi-estoppel. *See Lopez v. Munoz, Hockema & Reed, L.L.P.* , 22 S.W.3d 857, 864 (Tex. 2000) ("Quasi-



estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position *previously* taken." (emphasis added) ); *Freezia v. IS Storage Venture, LLC* , 474 S.W.3d 379, 387 (Tex. App.–Houston [14th Dist.] 2015, no pet.) ("A party need not show ... detrimental reliance in order to prove the affirmative defense of quasi-estoppel.").

[5] *See City of Houston v. Clear Creek Basin Auth.* , 589 S.W.2d 671, 677 (Tex. 1979).

--------



**411 S.W.3d 445**
**56 Tex. Sup. Ct. J. 1247**

**In re Stephanie LEE, Relator.**

**No. 11–0732.**

**Supreme Court of Texas.**

**Argued Feb. 28, 2012.**
**Delivered Sept. 27, 2013.**

**Summaries:**

**Source: Justia**

Stephanie Lee and Benjamin Redus were the parents and joint managing conservators of their minor daughter. A 2007 order adjudicating parentage gave Stephanie the exclusive right to designate the child's primary residence. Benjamin sought to modify that order. The parties executed a mediated settlement agreement (MSA) modifying the 2007 order. Stephanie moved to enter judgment on the MSA, but Benjamin withdrew his consent to the MSA, arguing that it was not in the best interest of the child. The district court refused to enter judgment on the MSA, concluding that it was not in the best interest of the child. Stephanie unsuccessfully petitioned the court of appeals for a writ of mandamus ordering the trial court to enter judgment on the MSA. The Supreme Court conditionally granted the writ of mandamus, holding (1) a trial court may not deny a motion to enter judgment on a properly executed MSA on the grounds that the MSA was not in a child's best interest; and (2) because the MSA in this case met the Family Code's requirements for a binding agreement, the trial court abused its discretion by denying the motion to enter judgment on the MSA.

[411 S.W.3d 446]

Marcela Halmagean, M. Halmagean PLLC, Scott Rothenberg, Law Offices of Scott Rothenberg, Houston, TX, for Stephanie Lee.

John A. Ramirez, Office of The Attorney General, Houston, TX, Rande K. Herrell, Office of the Attorney General of Texas, Austin, TX, for Real Party in Interest State of Texas.

Clinton Fancher Lawson, Law Offices of Clinton F. Lawson, San Antonio, TX, for Real Party in Interest Benjamin Jay Redus.

Georganna L. Simpson, Georganna L. Simpson, P.C., Steven Randall Morris, Attorney at Law, Dallas, TX, Richard R. Orsinger, McCurley Orsinger, McCurley Nelson & Downing LLP, San Antonio, TX, Thomas L. Ausley, Ausley Algert Robertson & Flores LLP, Austin, TX, for Amicus Curiae State Bar of Texas Family Law Council.

[411 S.W.3d 447]

Bill Davis, Jonathan F. Mitchell, Solicitor, Office of the Attorney General, Austin, TX, for Amicus Curiae Office of the Solicitor General of                                                        Texas.

**Justice LEHRMANN announced the Court's decision and delivered the opinion of the Court with respect to Parts I, II, III, V, and VII, in which Justice JOHNSON, Justice WILLETT, Justice GUZMAN, and Justice BOYD joined, and delivered an opinion with respect to Parts IV and VI, in which Justice JOHNSON, Justice WILLETT, and Justice BOYD joined.**

"If a mediated settlement agreement meets [certain requirements], a party is *entitled to judgment* on the mediated settlement agreement notwithstanding ...



In re Lee, 411 S.W.3d 445, 56 Tex. Sup. Ct. J. 1247 (Tex. 2013)

another rule of law." Tex. Fam.Code § 153.0071(e) (emphasis added). We are called upon today to determine whether a trial court abuses its discretion in refusing to enter judgment on a statutorily compliant mediated settlement agreement (MSA) based on an inquiry into whether the MSA was in a child's best interest. We hold that this language means what it says: a trial court may not deny a motion to enter judgment on a properly executed MSA on such grounds. Accordingly, we conditionally grant the writ of mandamus.

## I. Background

Relator Stephanie Lee and Real Party in Interest Benjamin Redus are the parents and joint managing conservators of their minor daughter. Stephanie has the exclusive right to designate the child's primary residence under a 2007 order adjudicating parentage. Benjamin petitioned the court of continuing jurisdiction to modify that order, alleging that the circumstances had materially and substantially changed because Stephanie had relinquished primary care and possession of the child to him for at least six months. *See*Tex. Fam.Code § 156.101. Benjamin sought the exclusive right to determine the child's primary residence and requested modification of the terms and conditions of Stephanie's access to and possession of the child, alleging that Stephanie's "poor parenting decisions" had placed the child in danger. He also sought an order requiring that Stephanie's periods of access be supervised on the basis that she "has a history or pattern of child neglect directed against" the child. Additionally, Benjamin sought an order enjoining Stephanie from allowing the child within twenty miles of Stephanie's husband, Scott Lee, a registered sex offender, and requiring Stephanie to provide Benjamin with information on her whereabouts during her periods of access so that Benjamin could verify her compliance with the twenty-mile restriction.

Before proceeding to trial, the parties attended mediation at which they were both represented by counsel. The mediation ended successfully with the parties executing a mediated settlement agreement modifying the 2007 order. The MSA gives Benjamin the exclusive right to establish the child's primary residence, and it gives Stephanie periodic access to and possession of the child. Among the terms and conditions of Stephanie's access and possession, the MSA contains the following restriction concerning Scott:

At all times[,] Scott Lee is enjoined from being within 5 miles of [the child]. During [Stephanie]'s periods of possession with [the child,] Scott Lee shall notify [Benjamin] through Stephanie Lee by e-mail or other mail where he will be staying ... [a]nd the make and model of the vehicle he will be driving. This shall be done at least 5 days prior to any visits. [Benjamin] shall have the right to have an agent or himself monitor Mr. Lee's location by either calling

[411 S.W.3d 448]

or driving by the location at reasonable times.

The introductory paragraph of the MSA explains that "[t]he parties wish to avoid potentially protracted and costly litigation, and agree and stipulate that they have carefully considered the needs of the child[ ] ... and the best interest of the child." The MSA also contains the following language in boldfaced, capitalized, and underlined letters:

**THE PARTIES ALSO AGREE THAT THIS MEDIATION AGREEMENT IS BINDING ON BOTH OF THEM AND IS NOT SUBJECT TO REVOCATION BY EITHER OF THEM.**

The MSA was signed by both Stephanie and Benjamin, as well as their attorneys.



In re Lee, 411 S.W.3d 445, 56 Tex. Sup. Ct. J. 1374 (2013)

Benjamin appeared before an associate judge to present and prove up the MSA. During Benjamin's testimony in support of the MSA, the associate judge inquired about the injunction regarding Scott. Benjamin informed the judge that Scott was a registered sex offender, and he testified that Scott "violated conditions of his probation with [Benjamin's] daughter in th[e] house" and that he "sle [pt] naked in bed with [Benjamin's] daughter between [Scott and Stephanie]." Stephanie did not attend the hearing and therefore was not able to respond to these allegations.[1] Based on this testimony, the associate judge refused to enter judgment on the MSA.

Stephanie filed a motion to enter judgment on the MSA, and Benjamin filed a written objection withdrawing his consent to the MSA, arguing that it was not in the best interest of the child. At the hearing on Stephanie's motion, the district judge heard brief testimony on the MSA from Benjamin and Stephanie, including testimony regarding whether the MSA was in the child's best interest. Stephanie testified that she believed the MSA was in the child's best interest, and Benjamin also admitted on cross-examination that, at the time of execution, he thought the MSA was in the child's best interest. Both Stephanie and Benjamin testified that Benjamin was not a victim of family violence.

The judge also heard testimony on Scott's status as a registered sex offender. Stephanie testified that, in 2009, Scott was served with a violation of his deferred adjudication because of his contact with the child.[2] Stephanie admitted that, although Scott was placed on additional probation conditions in 2011, she allowed Scott to have contact with the child and to reside in the same house with her and the child in violation of those conditions. Stephanie specifically denied that she ever allowed Scott to take care of the child without her supervision. Notably, although Benjamin testified that he knew about Scott's status as a registered sex offender, he did not repeat the

allegation that Scott had slept naked with the child.

The district court concluded that entry of the MSA was not in the best interest of the child and denied Stephanie's motion to enter judgment. The court advised the parties that they were free to reach a new agreement on their own, but the court declined to send the parties back to mediation and instead set the case for trial.

[411 S.W.3d 449]

Stephanie petitioned the court of appeals for a writ of mandamus ordering the trial court to enter judgment on the MSA. Stephanie argued that the trial court lacked discretion to refuse judgment based on the best interest determination. No. 14–11–00714–CV, 2011 WL 4036610, at *1. The court of appeals held "that the trial court [did] not commit[ ] a clear abuse of discretion in refusing to enter judgment on a mediated settlement agreement that is not in the child's best interest." *Id.* at *2. Stephanie then timely petitioned this Court for a writ of mandamus.

## II. The Need For Mediation in High–Conflict Custody Disputes

Encouragement of mediation as an alternative form of dispute resolution is critically important to the emotional and psychological well-being of children involved in high-conflict custody disputes. Indeed, the Texas Legislature has recognized that it is "the policy of this state to encourage the peaceable resolution of disputes, *with special consideration given to disputes involving the parent-child relationship, including the mediation of issues involving conservatorship, possession, and support of children,* and the early settlement of pending litigation through voluntary settlement procedures." Tex. Civ. Prac. & Rem.Code § 154.002 (emphasis added). This policy is well-supported by, *inter alia,* literature discussing the enormous emotional and



-3-

120

In re Lee, 411 S.W.3d 445, 56 Tex. Sup. Ct. J. 1247 (2013)

financial costs of high-conflict custody litigation, including its harmful effect on children.[3] Children involved in these disputes—tellingly, referred to as "custody battles"—can face perpetual emotional turmoil, alienation from one or both parents, and increased risk of developing psychological problems.[4] All the while, most of these families have two adequate parents who merely act out of fear of losing their child. For the children themselves, the conflict associated with the litigation itself is often much greater than the conflict that led to a divorce or custody dispute. [5] The Legislature has thus recognized that, because children suffer needlessly from traditional litigation, the amicable resolution of child-

[411 S.W.3d 450]

related disputes should be promoted forcefully. With the Legislature's stated policy in mind, we turn to the statute in question.

### III. Statutory Interpretation

The sole issue before us today is whether a trial court presented with a request for entry of judgment on a validly executed MSA may deny a motion to enter judgment based on a best interest inquiry.[6] While Texas trial courts have numerous tools at their disposal to safeguard children's welfare, the Legislature has clearly directed that, subject to a very narrow exception involving family violence, denial of a motion to enter judgment on an MSA based on a best interest determination, where that MSA meets the statutory requirements of section 153.0071(d) of the Texas Family Code, is not one of those tools. Accordingly, the trial court in this case abused its discretion by denying entry of judgment on the MSA and setting the matter for trial.[7]

### A. Standard of Review

"We review questions of statutory construction de novo."

[411 S.W.3d 451]

*Molinet v. Kimbrell,* 356 S.W.3d 407, 411 (Tex.2011). Our fundamental objective in interpreting a statute is "to determine and give effect to the Legislature's intent." *Am. Zurich Ins. Co. v. Samudio,* 370 S.W.3d 363, 368 (Tex.2012); *accord Molinet,* 356 S.W.3d at 411. In turn, "[t]he plain language of a statute is the surest guide to the Legislature's intent." *Prairie View A & M Univ. v. Chatha,* 381 S.W.3d 500, 507 (Tex.2012). "We take the Legislature at its word, and the truest measure of what it intended is what it enacted." *In re Office of Attorney Gen.,* 422S.W.3d 623, ––––, 2013 WL 854785 (Tex.2013). "[U]nambiguous text equals determinative text," and " '[a]t this point, the judge's inquiry is at an end.' " *Id.* (quoting *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644, 652 (Tex.2006)).

It is inappropriate to resort to rules of construction or extratextual information to construe a statute when its language is clear and unambiguous. *Id.* "This text-based approach requires us to study the language of the specific section at issue, as well as the statute as a whole." *Id.* When construing the statute as a whole, we are mindful that "[i]f a general provision conflicts with a special or local provision, the provisions shall be construed, if possible, so that effect is given to both." Tex. Gov't Code § 311.026(a). However, in the event that any such conflict is irreconcilable, the more specific provision will generally prevail. *Id.* § 311.026(b); *see also In re Allcat Claims Serv., L.P., L.P.,* 356 S.W.3d 455, 470–71 (Tex.2011). Further, in the event of an irreconcilable conflict between two statutes, generally "the statute latest in date of enactment prevails." Tex. Gov't Code § 311.025(a).

### B. Section 153.0071

Consistent with the legislative policy discussed above regarding the encouragement of the peaceable resolution of disputes



-4-

121

In re Lee, 411 S.W.3d 445, 56 Tex. Sup. Ct. J. 1247 (Tex. 2013)

involving the parent-child relationship, the Legislature enacted section 153.0071 of the Family Code, which provides in pertinent part as follows:

(a) On written agreement of the parties, the court may refer a suit affecting the parent-child relationship to arbitration. The agreement must state whether the arbitration is binding or non-binding.

(b) If the parties agree to binding arbitration, the court shall render an order reflecting the arbitrator's award unless the court determines at a non-jury hearing that the award is not in the best interest of the child. The burden of proof at a hearing under this subsection is on the party seeking to avoid rendition of an order based on the arbitrator's award.

(c) On the written agreement of the parties or on the court's own motion, the court may refer a suit affecting the parent-child relationship to mediation.

(d) A mediated settlement agreement is binding on the parties if the agreement:

(1) provides, in a prominently displayed statement that is in boldfaced type or capital letters or underlined,

[411 S.W.3d 452]

that the agreement is not subject to revocation;

(2) is signed by each party to the agreement; and

(3) is signed by the party's attorney, if any, who is present at the time the agreement is signed.

(e) If a mediated settlement agreement meets the requirements of Subsection (d), a party is entitled to judgment on the mediated settlement agreement notwithstanding Rule

11, Texas Rules of Civil Procedure, or another rule of law.

(e–1) Notwithstanding Subsections (d) and (e), a court may decline to enter a judgment on a mediated settlement agreement if the court finds that:

(1) a party to the agreement was a victim of family violence, and that circumstance impaired the party's ability to make decisions; and

(2) the agreement is not in the child's best interest.

Tex. Fam.Code § 153.0071(a)–(e–1). Subsection (d) provides that an MSA is binding on the parties if it is signed by each party and by the parties' attorneys who are present at the mediation and states prominently and in emphasized type that it is not subject to revocation. *Id.* § 153.0071(d). Subsection (e) goes even further, providing that a party to an MSA is "entitled to judgment" on the MSA if it meets subsection (d)'s requirements. *Id.* § 153.0071(e). Finally, subsection (e–1), added in 2005, provides a narrow exception to subsection (e)'s mandate, allowing a court to decline to enter judgment on even a statutorily compliant MSA if a party to the agreement was a victim of family violence, the violence impaired the party's ability to make decisions, *and* the agreement is not in the best interest of the child. Act of June 18, 2005, 79th Leg., R.S., ch. 916, § 7, 2005 Tex. Gen. Laws 3148, 3150.

### C. The Parties' Arguments

Stephanie argues that the trial court abused its discretion by refusing to enter judgment on the MSA and setting the case for trial. She contends that, under section 153.0071, she was "entitled to judgment on the [MSA]" because it complied with the statutory requirements. *See*Tex. Fam.Code § 153.0071(d)–(e). She further argues that a



court may refuse to enter judgment on a properly executed MSA only when the family violence exception is met and the court finds that the MSA is not in the child's best interest. *See id.* § 153.0071(e–1). Because there was no family violence at issue in this case, she argues, this narrow exception does not apply.

In response, Benjamin first argues that the MSA does not meet the statutory requirements for a binding agreement because it was not signed by the Office of the Attorney General. Additionally, he argues that entry of judgment on an MSA that is not in the best interest of the child violates public policy and is unenforceable. His argument is based on the Family Code's mandate that "[t]he best interest of the child shall always be the primary consideration of the court in determining issues of conservatorship and possession." *Id.* § 153.002. He argues that trial courts therefore have the discretion to void all or part of an MSA that is not in the child's best interest.

In response to our request that the Office of the Solicitor General provide the position of the State of Texas, the State submitted a brief in favor of the trial court's and court of appeals' disposition, arguing that the "overarching purpose of Texas Family Code chapter 153 is to ensure trial courts' ability to act in the best interests of minor children—even when their parents do not." The State urges

[411 S.W.3d 453]

that we must not look at section 153.0071 in isolation; rather, we must construe it within the broader context of the Legislature's concern for the best interest of children as expressed in the Family Code. *See id.* §§ 153.001, .002. The State argues that, in light of this overarching state policy, the trial court did not abuse its discretion by refusing to enter judgment on the MSA.

Finally, the State Bar of Texas Family Law Council (the Council) submitted an amicus curiae brief in support of Stephanie's petition. The Council argues that a strict interpretation of section 153.0071 fulfills the state policy favoring amicable resolution of disputes and suggests that holding as the courts below did could lead to a loss in confidence in mediation and an increase in litigation over the best interest of the child. The Council argues that rules of statutory construction make clear that the Legislature intended to remove the best interest determination in the context of an MSA, instead deferring to parents to determine the best interest of the child, except where family violence is involved. *See id.* § 153.0071(e–1). The Council urges that to hold otherwise would "gut the legislative intent favoring alternative dispute resolution of family law matters by mediation," increasing both the cost of the proceedings and the stress on families forced to resolve "their disputes in the adversarial venue of the courts, rather than the cooperative environment of mediation." The Council contends that "[t]his result is certainly not in a child's best interest."

### D. Analysis of Section 153.0071

Section 153.0071(e) unambiguously states that a party is "entitled to judgment" on an MSA that meets the statutory requirements "notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law." *Id.* § 153.0071(e). Subsection (e–1) provides a narrow exception, allowing a trial court to decline to enter judgment on an MSA when three requirements are all met: (1) a party to the agreement was a victim of family violence, *and* (2) the court finds the family violence impaired the party's ability to make decisions, *and* (3) the agreement is not in the child's best interest. *Id.* § 153.0071(e–1). By its plain language, section 153.0071 authorizes a court to refuse to enter judgment on a statutorily compliant MSA on best interest grounds *only* when the court also



finds the family violence elements are met. Stated another way, "[t]he statute does not authorize the trial court to substitute its judgment for the mediated settlement agreement entered by the parties unless the requirements of subsection 153.0071(e–1) are met." *Barina v. Barina,* No. 03–08–00341–CV, 2008 WL 4951224, at *4 (Tex.App.–Austin Nov. 21, 2008, no pet.) (mem. op.). Subsection (e–1), enacted after subsection (e), makes it absolutely clear that the Legislature limited the consideration of best interest in the context of entry of judgment on an MSA to cases involving family violence. Allowing a court to decline to enter judgment on a valid MSA on best interest grounds without family violence findings would impermissibly render the family violence language in subsection (e–1) superfluous. *See In re Caballero,* 272 S.W.3d 595, 599 (Tex.2008) (reaffirming rule that courts must give effect to all words in a statute without treating any statutory language as mere surplusage).

Section 153.0071(b), governing arbitration of child-related disputes, is also instructive. In stark contrast with subsection (e), subsection (b) explicitly gives trial courts authority to decline an arbitrator's award when it is not in the best interest of the child. *Compare*Tex. Fam.Code § 153.0071(b), *with id.* § 153.0071(e). This

[411 S.W.3d 454]

distinction between arbitration and mediation makes sense because the two processes are very different. Mediation encourages parents to work together to settle their child-related disputes, and shields the child from many of the adverse effects of traditional litigation. On the other hand, arbitration simply moves the fight from the courtroom to the arbitration room. If the Legislature had intended to authorize courts to inquire into the child's best interest when determining whether to render judgment on validly executed MSAs, as it did in section 153.0071(b) with respect to judgments on

arbitration awards, it certainly knew how to do so.

Benjamin argues that, despite section 153.0071's plain language, "[n]othing precludes the court from considering the best interests of the child, including a request for entry on a mediated settlement agreement." Benjamin and the State are correct that the Family Code provides that "[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." *Id.*§ 153.002. However, section 153.0071(e) reflects the Legislature's determination that it is appropriate for parents to determine what is best for their children within the context of the parents' collaborative effort to reach and properly execute an MSA. This makes sense not only because parents are in a position to know what is best for their children, but also because successful mediation of child-custody disputes, conducted within statutory parameters, furthers a child's best interest by putting a halt to potentially lengthy and destructive custody litigation. However, as discussed further below, a trial judge with cause to believe that a child's welfare is at risk due to suspected abuse or neglect is required to report such abuse or neglect to an appropriate agency, as is any other individual with this type of knowledge. *Id.* §§ 261.101–.103. In this sense, parents who enter into MSAs are no different from the myriad of parents in intact families who are presumed to act in their children's best interests every day. *See Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (observing that "the interest of parents in the care, custody, and control of their children[ ]is perhaps the oldest of the fundamental liberty interests recognized by this Court").

To the extent the two statutes do conflict, applicable rules of construction require us to hold that section 153.0071 prevails. First, section 153.0071(e) mandates entry of judgment "notwithstanding Rule 11, Texas



Rules of Civil Procedure, or another rule of law." Tex. Fam.Code § 153.0071(e). The use of the word "notwithstanding" indicates that the Legislature intended section 153.0071 to be controlling. *Molinet,* 356 S.W.3d at 413–14 (holding that a "notwithstanding any other law" provision evidenced clear legislative intent to resolve any interpretation conflicts in favor of the statute containing the provision); *see also Tex. Lottery Comm'n v. First State Bank of DeQueen,* 325 S.W.3d 628, 639 (Tex.2010) (holding that a statute "manifest[ing] clear legislative intent that conflicting statutes are ineffective" controlled over such conflicting statutes).[8]

[411 S.W.3d 455]

Further, the specific statutory language of section 153.0071(e) trumps section 153.002's more general mandate. Tex. Gov't Code § 311.026(b); *see also Jackson v. State Office of Admin. Hearings,* 351 S.W.3d 290, 297 (Tex.2011) (reiterating the rule that specific statutory provisions prevail over general mandates). Finally, the MSA provision was added long after the general "best interest" provision and therefore prevails as "the statute latest in date of enactment." Tex. Gov't Code § 311.025(a); *Jackson,* 351 S.W.3d at 297. Thus, it is clear that the MSA statute was enacted with the intent that, when parents have agreed that a particular arrangement is in their child's best interest and have reduced that agreement to a writing complying with section 153.0071, courts must defer to them and their agreement.

For these reasons, we hold that section 153.0071(e) encourages parents to peaceably resolve their child-related disputes through mediation by foreclosing a broad best interest inquiry with respect to entry of judgment on properly executed MSAs,[9] ensuring that the time and money spent on mediation will not have been wasted and that the benefits of successful mediation will be realized. Allowing courts to conduct such an inquiry in contravention of the unambiguous statutory

mandate in section 153.0071 has severe consequences that will inevitably harm children. The decisions below ignore clearly expressed legislative intent, undermining the Legislature's goal of protecting children by eroding parents' incentive to work collaboratively for their children's welfare. This frustrates the policies underlying alternative dispute resolution in the custody context, which are firmly grounded in the protection of children.[10]

### IV. A Trial Court's Duty to Take Protective Action

The dissent is concerned that the statute, as written, would require trial courts to ignore evidence that the parents' agreed arrangement would endanger a child by subjecting the child to neglect or abuse. This case, however, does not present that issue. The trial court in this case refused to enter judgment on the parents' MSA because the court believed the agreed arrangement was not in the child's best interest, not because the court believed the arrangement would subject the child to neglect or abuse or would otherwise endanger the child. Thus, we need not, and should not, decide in this case the contours of a trial court's duties and discretion when faced with an MSA that would endanger a child, as that issue is not before us and any such opinion would be advisory.

Nevertheless, because endangerment appears to lie at the heart of the dissent's concern, we are compelled to note that section 153.0071 does not require a trial court to blindly leave a child whose welfare

[411 S.W.3d 456]

is at risk in harm's way. To the contrary, courts can never stand idly by while children are placed in situations that threaten their health and safety. However, this does not mean courts can refuse to abide by section 153.0071(e) by denying a motion to enter



-8-

*In re Lee*, 411 S.W.3d 445, 56 Tex. Sup. Ct. J. 1247 (Tex. 2013)

judgment on a properly executed MSA on best interest grounds. [11] Trial courts have other statutorily endorsed methods by which to protect children from harm without eviscerating section 153.0071(e)'s mandatory language or reading language into the statute under the guise of "interpreting" it.

The Family Code provides trial courts with numerous mechanisms for protecting a child's physical and emotional welfare, both during and after the pendency of a suit affecting the parent-child relationship (SAPCR). For example, a trial court may find it necessary to involve a government agency like the Department of Family and Protective Services (DFPS), the agency charged with the duty to investigate and protect endangered children, before rendering final judgment. Specifically, a court "having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect ... *shall immediately* " notify DFPS or another appropriate agency. Tex. Fam.Code § 261.101 (emphasis added); *see also id.* § 261.103. Under these and related statutes, when a person has cause to believe that a child is being or may be harmed by abuse or neglect, a DFPS investigation will be triggered, regardless of whether a SAPCR is pending. *Id.* § 261.101; *id.* § 261.301(a) ("The investigation shall be conducted without regard to any pending suit affecting the parent-child relationship."); *see also id.* § 153.0071(g) (stating that the applicability of the provisions for confidentiality of alternative dispute resolution procedures "does not affect the duty of a person to report abuse or neglect under Section 261.101"). [12] In these and similar types of situations, a trial court may enter temporary orders, temporary restraining orders, and temporary injunctions to protect a child's safety and welfare, all upon proper motion, before rendering the final order. [13] The trial court may also appoint a representative for the child, such as an amicus attorney or an attorney ad litem. *See id.* § 107.021. Even after issuing a final order, a trial court may act to protect the safety and welfare of a child by issuing protective orders, by issuing temporary orders during an appeal, by ruling on motions to

[411 S.W.3d 457]

modify, or through habeas corpus proceedings, again upon proper motion. [14]

While instigating any of the protective measures described above or elsewhere in the Family Code does not allow a trial court to conduct a broad best interest inquiry in ruling on a motion to enter judgment on an MSA under section 153.0071, it may warrant the trial court's exercise of discretion to continue the MSA hearing for a reasonable time. This allows the trial court, upon proper motion, to render any temporary orders that might be necessary and to determine whether further protective action should be taken. In the event the trial court involves DFPS, a continuance will provide the court with the benefit of the resulting investigation.

Finally, we note that the Legislature's choice to defer to the parties' best interest determination in the specific context of mediation recognizes that there are safeguards inherent in that particular form of dispute resolution compared to various other methods of amicably settling disputes. [15] Under Texas law, "[m]ediation is a forum in which an impartial person, the mediator, facilitates communication between parties to promote reconciliation, settlement, or understanding among them." Tex. Civ. Prac. & Rem.Code § 154.023(a). To qualify for appointment by the court as an impartial third party when a case is referred to an alternative dispute resolution procedure like mediation, a person must meet certain requirements for training in alternative dispute resolution techniques. *Id.* § 154.052(a). To qualify for appointment "in a dispute relating to the parent-child relationship," the person must complete additional training "in the fields of family dynamics, child development, and family



In re Lee, 411 S.W.3d 445, 56 Tex. Sup. Ct. J. 1374 (2013)

law." *Id.* § 154.052(b). Significantly, all participants in the proceeding, "including the impartial third party," are subject to the mandatory DFPS reporting requirements discussed above. *Id.* § 154.053(d). Thus, the process itself is geared toward protecting children.[16]

In sum, we hold today that a trial court may not deny a motion to enter judgment

[411 S.W.3d 458]

on a properly executed MSA under section 153.0071 based on a broad best interest inquiry. But we certainly do not hold that a child's welfare may be ignored. Rather, we recognize that section 261.101's mandatory duty to report abuse or neglect, the numerous other statutes authorizing protective action by the trial court, and the safeguards inherent in the mediation process fulfill the need to ensure that children are protected. And they do so without subjecting MSAs to an impermissible level of scrutiny that threatens to undermine the benefits of mediation. The trial court's authority to continue an MSA hearing and to take protective action under the various statutes discussed above is triggered not by a determination that an MSA is not in a child's best interest, but by evidence that a child's welfare is in jeopardy. Thus, the mediation process and its benefits are preserved, and, most importantly, children are protected.

### V. The MSA in This Case

The MSA in this case contains a broad range of provisions governing conservatorship of the child, responsibility for health insurance and medical expenses for the child, child support, possession of and access to the child, and allocation of other parental rights and duties. Included among these is the protective provision enjoining Scott from being within five miles of the child at all times, requiring Stephanie to provide Benjamin with information on Scott's

whereabouts during her visits with the child, and allowing Benjamin to monitor compliance with the provision.[17] Compliance with the MSA, then, means the child will have no contact with Scott.

As is relevant to section 153.0071, the MSA is signed by the parties and their lawyers,[18] and it displays in boldfaced, capitalized, and underlined letters that it is irrevocable; thus, it meets the statutory requirements described in that statute to make the agreement binding on Stephanie and Benjamin. *See* Tex. Fam.Code § 153.0071(d). Additionally, the parties admit that Benjamin was not a victim of family violence, and thus the exception in subsection (e–1) does not apply. The trial court nevertheless denied the motion to enter judgment on the MSA and set the matter for trial based on the court's conclusion that the MSA was not in the child's best interest.[19] Because section 153.0071

[411 S.W.3d 459]

did not permit the court to do so, the court's actions were an abuse of discretion.

### VI. Additional Response to the Dissent

The dissent claims that the Court's holding compels trial courts to disregard the fundamental public policies of protecting children from harm and acting in their best interests. 411 S.W.3d at 486. Nothing could be further from the truth. Rather, we are respecting the Legislature's well-supported policy determination, reflected in the plain language of the MSA statute, that courts should defer to the parties' determinations regarding the best interest of their children when those decisions are made in the context of a statutorily compliant MSA. As discussed above, the harmful effects of litigation in family disputes are well-documented, leading the Legislature to vigorously promote the avoidance of such litigation. This is particularly so when the parties reach



-10-

127

agreement pursuant to the mediation process, which is itself designed to ensure that children are protected. The dissent engages in a tortured reading of the MSA statute, flouts well-settled principles of statutory interpretation, and ignores the ramifications of discouraging mediation. And it does so unnecessarily, as our children's welfare can, and indeed must, be protected at the same time that the mediation process and its benefits are preserved.

We agree with the dissent that "[s]urely the Legislature did not commit a useless act in enacting each of more than one hundred statutory provisions to assist courts in determining *how* and *when* to consider a child's best interest." 411 S.W.3d at 476. direction to courts to make best interest determinations in so many other provisions reinforces our interpretation of section 153.0071, rather than the dissent's, and highlights the particular policy considerations, discussed at length above, underlying enforcement of statutorily compliant MSAs. The dissent erroneously concludes that those provisions support grafting similar language onto section 153.0071, even though the Legislature chose not to include it. For example, the dissent reads subsection (e–1), the family violence exception, "to allow a trial court to consider the terms of a modification when the presumption that MSA parties act in the best interest of the child has been negated." *Id.* at 473.[20] But the exception is not nearly as broad as the dissent suggests. Instead, the Legislature carefully identified the specific circumstance in which a trial court may override the parties' best interest determinations and decline to enter judgment on an MSA: when a party to the MSA is a victim of family violence, and the family violence impaired the party's ability to make decisions.[21]Tex. Fam.Code § 153.0071(e–1).

[411 S.W.3d 460]

The dissent's insistence that "nothing in the statute expressly limits a trial court's authority to decline to enter judgment on a properly executed, binding MSA to the family violence context addressed in section 153.0071(e–1)" raises the question: why include the exception at all? *See*411 S.W.3d at 477.

The dissent dismisses our concern that allowing statutorily compliant MSAs to be set aside on best interest grounds will interfere with the state policy favoring peaceable resolution of family disputes and will discourage parties from engaging in mediation. *Id.* at 472. We disagree, as (apparently) did the Legislature in failing to include a best interest determination as a prerequisite for or barrier to entry of judgment on an MSA. Why would parties spend considerable time, effort, and money to mediate their dispute in accordance with the statutory requirements when the trial court could very well decide to hold a full trial on the merits anyway? The dissent's claim that this will happen only in rare cases simply is not supportable.

To that end, a trial court's determination that an MSA is not in a child's best interest is not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm. Rather, "best interest" is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion. *See Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976) (identifying nine factors that may be considered in determining best interest).[22] Under the dissent's interpretation, the trial court would thus have significant leeway, in contravention of the statute's intent, to decide when entry of judgment on a statutorily compliant MSA is or is not appropriate. The possibility that this would lead to an increase in child-related litigation is very real, as parents would be encouraged to contest on best interest grounds the very agreements



In re Lee, 411 S.W.3d 445, 66 Tex. Sup. Ct. J. 1025 (2013)

that they freely entered into through mediation.[23] Even more concerning, parents

[411 S.W.3d 461]

would be discouraged from using the mediation process to begin with, out of concern that their agreements could be ignored and their efforts wasted.

Ultimately, the dissent's suggestion that enforcing section 153.0071 as written leads to an absurd result falls flat. If it were indeed the case that our interpretation would leave trial courts with no ability to protect a child from an MSA that put a child's welfare at risk, we would agree with that suggestion. But as discussed at length above, that simply is not the case, as trial courts have numerous tools at their disposal to protect children that operate in conjunction with, rather than in opposition to, the mandate in section 153.0071.[24]

### VII. Conclusion

Because the MSA in this case meets the Family Code's requirements for a binding agreement, and because neither party was a victim of family violence, we hold that the trial court abused its discretion by denying the motion to enter judgment on the MSA. Accordingly, we conditionally grant mandamus relief. We order the trial court to withdraw its orders denying entry of judgment on the MSA and setting the matter for trial. We are confident that the court will comply, and the writ will issue only if it does not.

**Justice GUZMAN filed a concurring opinion.**
**Justice GREEN filed a dissenting opinion, in which Chief Justice JEFFERSON, Justice HECHT, and Justice DEVINE joined.**

**Justice GUZMAN, concurring.**

In this mandamus proceeding, the Court must construe section 153.0071 of the Texas Family Code to determine whether the trial court abused its discretion by refusing to enter judgment on a properly executed mediated settlement agreement (MSA) and instead setting the matter for trial. Despite discord on other issues, the opinions make several matters apparent. First, the Court holds that section 153.0071 of the Family Code prohibits a trial court from conducting a broad best-interest inquiry at a hearing for the purpose of entering judgment on a properly executed MSA.[1] Second, a different majority of the Court would hold that a trial court does not abuse its discretion by refusing to enter judgment on an MSA that could endanger the safety and welfare of a child—an issue on which the remaining four justices express no opinion.[2] Third,

[411 S.W.3d 462]

no Justice disputes that trial courts possess a number of mechanisms to protect children from endangerment, such as issuing temporary orders and contacting the Texas Department of Family and Protective Services. Finally, a majority of the Court agrees that if there is evidence of endangerment, an additional mechanism the trial court possesses to protect the child is to refuse to enter judgment on the MSA.

I write separately because although I agree with Court that section 153.0071 precludes a broad best-interest inquiry, I also believe that it does not preclude an endangerment inquiry. The Court fails to address the endangerment inquiry, but I believe the issue is critical because the facts of this case potentially implicate the inquiry—discussion of which provides much-needed guidance to trial courts. I agree with the Court that mandamus is appropriate because there is legally insufficient evidence of endangerment to support the trial court's decisions to set aside the MSA and place the matter on its trial docket. The trial court



-12-

In re Lee, 411 S.W.3d 445, 56 Tex.Sup.Ct.J. 1215 (2013)

sustained a hearsay objection to the only statement at the hearing that could have demonstrated the mother might not comply with the MSA (a statement from the father that the mother informed him after signing the MSA that she did not have to inform him of her and her husband's whereabouts). Thus, this record is sparse and does not establish the threshold I believe must be met before a trial court may disregard legislative policy concerning the deference to which MSAs are entitled. Accordingly, I believe the trial court abused its discretion and therefore join the Court's decision to conditionally grant mandamus relief as well as all but Parts IV and VI of the Court's opinion. If on remand the trial court considers evidence and finds that entry of judgment on the MSA could endanger the child, I am certain the trial court will take appropriate action.

## I. Background

The parties in this case entered into a settlement agreement after a lengthy mediation in which they were both represented by counsel. The MSA was memorialized in accordance with section 153.0071(d) of the Family Code, which requires trial courts to enter judgment on a properly executed MSA notwithstanding any other rule of law (unless the MSA was procured due to family violence). Tex. Fam.Code §§ 153.0071(d)–(e–1). But, as often happens in family law cases, the agreement began to unravel after the parties left the mediation. In fact, this particular agreement began to fall apart during the "prove-up" in front of an associate judge.3

The matter was subsequently presented to the district court judge, who conducted a *de novo* hearing and expressly indicated she did not have the record from the hearing before the associate judge.4 The trial court heard limited evidence and argument from the child's mother, Stephanie Lee, and father, Benjamin Redus. Although Redus had alleged before the associate

[411 S.W.3d 463]

judge that Stephanie allowed her husband—a convicted sex offender—to sleep naked with Redus's daughter in the bed, tellingly, he did not repeat this allegation to the trial court. And importantly, this record does not establish that the trial court considered Redus's prior testimony.

In refusing to enter judgment on the MSA, the trial court held, without further explanation, that the MSA was "not in the best interest of the child [ ]." In addition to entering an order refusing to enter judgment on the MSA, the trial court set the entire matter for trial.

## II. Discussion

The question in this mandamus proceeding is whether the trial court's orders denying the MSA and setting the matter for trial constitute an abuse of discretion. Mandamus relief will lie if the relator establishes a clear abuse of discretion for which there is no adequate appellate remedy. *In re AutoNation, Inc.,* 228 S.W.3d 663, 667 (Tex.2007) (orig. proceeding). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to constitute a clear and prejudicial error of law. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992) (orig. proceeding). Regarding factual issues, a trial court abuses its discretion if it reasonably could only have reached one decision. *Id.* at 840;*see GTE Commc'ns Sys. Corp. v. Tanner,* 856 S.W.2d 725, 729 (Tex.1993) (orig. proceeding) (granting mandamus relief when no evidence supported trial court determination). But a trial court has no discretion in determining what the law is or in applying the law to the facts, even when an area of the law is unsettled. *Walker,* 827 S.W.2d at 840;*Huie v. DeShazo,* 922 S.W.2d 920, 927–28 (Tex.1996) (orig. proceeding).



In re Lee, 411 S.W.3d 445, 46 Tex. Sup. Ct. J. 1242 (2013)

Here, Stephanie argues that the court's refusing to enter judgment on the MSA and setting the matter for trial were abuses of discretion because section 153.0071 of the Family Code forecloses a broad best-interest inquiry. Redus contends that the trial court's actions were proper because the Family Code always allows a trial court to examine the best interests of the child.

Our courts of appeals have wrestled with precisely what inquiry, if any, section 153.0071 allows.[5] I agree with the Court that section 153.0071 in fact forecloses a broad best-interest inquiry. In doing so, the statute furthers the time-honored "presumption that fit parents act in the best interests of their children"[6] and comports with the public policy and purpose of mediation by letting the parties settle their affairs "as they see fit"— keeping those matters out of the courtroom.[7]

But I disagree that this principle alone resolves this proceeding. I agree with the dissent to the extent it believes that a

[411 S.W.3d 464]

contextual reading of the Family Code allows a narrow inquiry into whether entering judgment on an MSA could endanger the safety and welfare of a child.[8] *See Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004) ("We must read the statute as a whole and not just isolated portions."). The dissent convincingly argues that requiring the trial court to enter a judgment that could endanger the child would be an absurd result. 411 S.W.3d 445, 486 (Green, J., dissenting). It is, in my view, not only absurd but also plainly nonsensical and against public policy to read section 153.0071 to require a trial court to enter judgment on an MSA when presented with evidence that doing so could endanger the child.[9] *See Combs v. Health Care Servs. Corp.,* 401 S.W.3d 623, 629 (Tex.2013); *Molinet v. Kimbrell,* 356 S.W.3d 407, 411 (Tex.2011). In holding that the statute forecloses the broad

best-interest inquiry, the Court does not expressly state whether the Family Code allows a narrow endangerment inquiry.[10] But allowing the inquiry places the statute in accord with the Family Code's many mechanisms to protect the safety and welfare of children[11] and preserves the right of the State, as *parens patriae,* to intervene when parents' decisions could endanger the safety and welfare of their children.[12]

Here, however, even assuming the trial court's inquiry was a narrow inquiry into whether entering judgment on the MSA could endanger the child, the dissent and I diverge as to whether there was legally sufficient evidence of endangerment.

### III. Application

Applying the above framework, it was an abuse of discretion for the trial court to refuse the MSA and set the matter for trial because no legally sufficient evidence of endangerment was admitted at the *de*

[411 S.W.3d 465]

*novo* hearing. Initially, it is important to note the MSA contains an injunction requiring Scott Lee, a registered sex offender, to not be within five miles of the daughter when Stephanie has possession of her and to inform Redus through Stephanie of Scott's whereabouts during Stephanie's possession. As the Court properly observes, "[c]ompliance with the MSA, then, means the child will have no contact with Scott." 411 S.W.3d 445, 458. Thus, entering judgment on the MSA could only endanger the daughter if Stephanie violated the MSA by allowing Scott to violate the injunction.

There was no legally sufficient evidence admitted at the hearing before the trial court that Stephanie would violate the MSA by allowing Scott to violate the injunction. Redus testified at the hearing that approximately one week after signing the MSA, Stephanie



-14-

informed him that "I don't have to tell you everywhere we go." But the trial court sustained opposing counsel's hearsay objection to the statement. Redus did not challenge that ruling on appeal, and neither side asked Stephanie if she intended to comply with the MSA. Because on its face the MSA does not endanger the child, and the trial court heard no legally sufficient evidence that entering judgment on the MSA could endanger the child because Stephanie would violate the MSA, mandamus relief is warranted for this particular situation. *See Walker,* 827 S.W.2d at 840.[13]

The dissent mischaracterizes the record in an attempt to buttress its conclusion that the trial court did not abuse its discretion. Specifically, the dissent concludes that "[n]ot only did this mother admit on the record that she allowed her daughter to have unsupervised visitation with a registered sex offender, but her testimony informed the trial court that she had helped her husband to violate the terms of an existing court order by allowing such contact." 411 S.W.3d at 467 (Green, J., dissenting). The law and the record, however, belie this bold assertion. As to the law, courts must presume parties will comply with their orders, just as we presume that fit parents act in the best interest of their children (including when entering into MSAs). [14]Section 153.0071 enforces these presumptions unless there is rebutting evidence that entering judgment on the MSA could endanger the safety and welfare of the child. As to the record, Stephanie never testified whether she would comply with the MSA. The dissent relies upon testimony by Stephanie that it believes indicates she knew Scott had violated his probation. 411 S.W.3d at 467 & n. 2 (Green, J., dissenting). But this is not evidence that Stephanie would violate the potential court order at issue. Importantly, unlike the probation order—which would not subject Stephanie to punishment for violations—a judgment on this MSA would bind Stephanie to comply and subject her to contempt of court,

including potential incarceration, for a violation. And notably, even this testimony itself is not as unequivocal as the dissent suggests. When specifically asked about Scott's probation violation, Stephanie stated that it "was that he was—I had unsupervised visitation contact with my daughter," an ambiguous statement at best. Later, upon

[411 S.W.3d 466]

direct inquiry as to whether she allowed unsupervised visits to occur, Stephanie responded "[n]o, she has not." Though the hearing involved no further inquiry as to this issue, the dissent interprets this testimony to mean unsupervised contact did occur between Stephanie's husband and her daughter—which is still irrelevant to the MSA. 411 S.W.3d at 467 & n. 2 (Green, J., dissenting).

Finally, it is not uncommon for family courts to find themselves at a crossroads between divining the legislature's intent on a particular statute and making expedient decisions regarding the safety and welfare of the children entrusted to their judgment. Often, they must interpret statutory language without the benefit of guidance from the court of last resort. This difficulty is greatly heightened by the significant effect family law decisions have on the daily lives of parties. I have no doubt that the experienced trial judge in this case—now having the benefit of this Court's interpretation—will protect the safety and welfare of the child within the parameters established by the Family Code and consistent with legislative policy choices embodied in section 153.0071.

### IV. Conclusion

In sum, I believe section 153.0071 of the Family Code precludes a broad best-interest inquiry. A trial court may, however, when presented with evidence that entering judgment on an MSA could endanger the safety and welfare of a child, refuse to enter



-15-

In re Lee, 411 S.W.3d 445, 66 Tex. Sup. Ct. J. 1247 (Tex. 2013)

judgment on the MSA. But because the record before us today reveals no legally sufficient evidence that entering judgment on the MSA could endanger the safety and welfare of the child, I join all but Parts IV and VI of the Court's opinion, as well as its decision that conditional mandamus relief is warranted. *See Walker*, 827 S.W.2d at 840.

## Justice GREEN, joined by Chief Justice JEFFERSON, Justice HECHT, and Justice DEVINE, dissenting.

The Court holds that a trial court cannot deny a motion to enter judgment on a binding mediated settlement agreement (MSA) to modify child custody, possession, or access based on a broad inquiry into the child's best interest. 411 S.W.3d at 482. Although the Court tries to distinguish between this case—in which the trial court stated on the record that it was not in the best interest of the child to approve the MSA—and a case in which modification pursuant to an MSA could endanger a child, here it is a distinction without a difference. Whether the trial court calls its grounds "best interest" or "endangerment," the bottom line is the same—the trial court, having heard testimony of the parties, refused to adopt the parents' agreed modification that it believed would subject the child to exposure to a registered sex offender. The Legislature has made the policy of this state clear: "The best interest of the child *shall always be the primary consideration* of the court in determining the issues of conservatorship and possession of and access to the child." Tex. Fam.Code § 153.002 (emphasis added). I would hold that under Texas Family Code section 153.0071, and the Family Code as a whole, a trial court has discretion to refuse to enter judgment on a modification pursuant to an MSA that could endanger the child's safety and welfare and is, therefore, not in the child's best interest. [1] To suggest that the Legislature

[411 S.W.3d 467]

intended otherwise is, I believe, absurd. I respectfully dissent.

## I. Facts and Procedural Background

Stephanie Lee, mother of a young girl, knew when she started dating Scott Lee that he was a convicted sex offender. She later married the sex offender. Despite knowing the conditions of Scott's deferred adjudication, which apparently prohibited him from being around children, she allowed her daughter to be in his presence. She allowed Scott to live with her and her daughter, knowing that it violated the terms of his probation. She allowed her daughter to have unsupervised contact with Scott, knowing that it violated his probation.[2] Moreover, Benjamin Redus, the child's father, testified before the associate judge that Stephanie had allowed her daughter to sleep in the bed between her and Scott, who was naked.[3] Not only did this mother admit on the record that she allowed her daughter to have unsupervised visitation with a registered sex offender, but her testimony informed the trial court that she had helped her husband to violate the terms of an existing court order by allowing such contact.

After additional probation conditions were imposed on Scott following his probation violations, the child went to live with her father. Benjamin later filed a petition to modify the parent-child relationship, alleging that circumstances had materially and substantially changed because Stephanie had voluntarily relinquished the primary care and possession of the child to him for more than six months. *See* Tex. Fam.Code §§ 156.101, .401. Benjamin asserted that Stephanie's "poor parenting decisions ... have placed our daughter in danger" and that Stephanie had "a history or pattern of child neglect directed against [the child]." He requested that the court limit Stephanie's possession and access and grant her only supervised visitation, and he sought to enjoin



In re *** 411 S.W.3d 145, 166 Tex. *** *** 2013)

Stephanie from allowing Scott to be within twenty miles of the child.

Benjamin and Stephanie ultimately entered into an MSA reflecting their agreed modification of the initial order that established custody and possession. The MSA gave Benjamin the exclusive right to designate the primary residence of the child—a right previously afforded Stephanie—and allowed Stephanie periodic, unsupervised possession of the child. Additionally, the MSA contained a provision directed at Scott, who did not attend the mediation and was not a party to the suit or the MSA:

At all times[,] Scott Lee is enjoined from being within 5 miles of [the daughter]. During the mother's periods of possession with [the daughter], Scott Lee shall notify [Benjamin] through Stephanie Lee by e-mail or other mail where he shall be staying ... [a]nd the make and model of the vehicle he will be driving. This shall be done at least 5 days prior to any visits. [Benjamin] shall have the right to have an agent or himself monitor [Scott] Lee's location by

[411 S.W.3d 468]

either calling or driving by the location at reasonable times.

Although both Benjamin and Stephanie maintained that the MSA was in the child's best interest when the MSA was presented to the associate judge for entry of judgment, the associate judge refused to accept the MSA. Benjamin later requested to withdraw his consent to the MSA, stating that he believed it was not in the best interest of his daughter. He testified before the district court that he no longer believed the agreement was in his daughter's best interest and that when he signed the MSA, he was under the impression that Scott was still under probation guidelines and was going to move, which had not happened. The district court, which heard only brief testimony from Stephanie and

Benjamin, determined that the MSA was not in the best interest of the child and denied Stephanie's motion to enter judgment on the MSA. The court then set the case for a full evidentiary trial.

## II. Section 153.0071 and the Family Code

This case presents a single issue of first impression: Does section 153.0071 of the Texas Family Code allow a trial court any discretion to refuse to enter judgment on an MSA that seeks to modify an existing court order pertaining to possession, access, or conservatorship of a child when the MSA complies with the statutory prerequisites but the court determines that the MSA endangers the child's safety and welfare and, thus, is not in the child's best interest? I believe it does.

### A. Statutory Provisions

Since at least 1935, Texas statutes have reflected the policy of this state to ensure that trial courts protect minor children's best interests. *See* Act of May 15, 1935, 44th Leg., R.S., ch. 39, § 1, 1935 Tex. Gen. Laws 111, 112 (providing that the trial court "shall make such orders regarding the custody and support of each such [minor] child or children, as is for the best interest of same"); Act of May 25, 1973, 63d Leg., R.S., ch. 543, § 1, sec. 14.07(a), 1973 Tex. Gen. Laws 1411, 1425 ("The best interest of the child shall always be the primary consideration of the court...."). Section 153.002 of the Texas Family Code describes this overarching policy: "The best interest of the child *shall always* be the *primary consideration* of the court in determining the issues of conservatorship and possession of and access to the child." Tex. Fam.Code § 153.002 (emphasis added). In suits affecting the parent-child relationship, it is the public policy of the State of Texas to:

(1) assure that children will have frequent and continuing contact with parents *who*



-17-

134

In re _____ 411 S.W.3d 465, _6 Tex. _____ Civ. ___ 3d (Tex. 2013)

*have shown the ability to act in the best interest of the child;*

(2) provide a *safe,* stable, and nonviolent environment for the child; and

(3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage.

*Id.* § 153.001(a) (emphasis added).


Texas statutes also reflect the state's general public policy "to encourage the peaceable resolution of disputes, with special consideration given to disputes involving the parent-child relationship, including the mediation of issues involving conservatorship, possession, and support of children, and the early settlement of pending litigation through voluntary settlement procedures." Tex. Civ. Prac. & Rem.Code § 154.002. Advancing that policy, the Legislature enacted Texas Family Code section 153.0071 to address the resolution of suits affecting the parent-child relationship, providing in pertinent part:

[411 S.W.3d 469]

(a) On written agreement of the parties, the court may refer a suit affecting the parent-child relationship to arbitration. The agreement must state whether the arbitration is binding or non-binding.

(b) If the parties agree to binding arbitration, the court shall render an order reflecting the arbitrator's award unless the court determines at a non-jury hearing that the award is not in the best interest of the child. The burden of proof at a hearing under this subsection is on the party seeking to avoid rendition of an order based on the arbitrator's award.

(c) On the written agreement of the parties or on the court's own motion, the court may refer a suit affecting the parent-child relationship to mediation.

(d) A mediated settlement agreement is binding on the parties if the agreement:

(1) provides, in a prominently displayed statement that is in boldfaced type or capital letters or underlined, that the agreement is not subject to revocation;

(2) is signed by each party to the agreement; and

(3) is signed by the party's attorney, if any, who is present at the time the agreement is signed.

(e) If a mediated settlement agreement meets the requirements of Subsection (d), a party is entitled to judgment on the mediated settlement agreement notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law.

(e–1) Notwithstanding Subsections (d) and (e), a court may decline to enter a judgment on a mediated settlement agreement if the court finds that:

(1) a party to the agreement was a victim of family violence, and that circumstance impaired the party's ability to make decisions; and

(2) the agreement is not in the child's best interest.

Tex. Fam.Code § 153.0071.[4] When first enacted in 1995, section 153.0071 addressed resolution of both dissolution-of-marriage cases and suits affecting the parent-child relationship, but in 1997 the Legislature enacted Family Code section 6.602 to address alternative dispute resolution in divorce cases and limited section 153.0071 to suits affecting the parent-child relationship. *See* Act of May



-18-

In re Lee, 411 S.W.3d 445, 66 Tex. Sup. Ct. J. 421 (Tex. 2013)

26, 1995, 74th Leg., R.S., ch. 751, § 27, sec. 153.0071, 1995 Tex. Gen. Laws 3888, 3899; Act of April 7, 1997, 75th Leg., R.S., ch. 7, § 1, sec. 6.602, 1997 Tex. Gen. Laws 8, 31–32; Act of April 7, 1997, 75th Leg., R.S., ch. 937, § 3, sec. 153.0071(f), 1997 Tex. Gen. Laws 2941, 2941. In 2005, the Legislature added the family violence provision in 153.0071(e–1), expressly recognizing a trial court's role in considering the best interest of a child when presented with an MSA. Act of June 18, 2005, 79th Leg., R.S., ch. 916, § 7, sec. 153.0071(e–1), 2005 Tex. Gen. Laws 3148, 3150.

### B. Analysis of Section 153.0071

Stephanie contends that she is "entitled to judgment" on the MSA because the

[411 S.W.3d 470]

MSA meets section 153.0071(d)'s prerequisites and the family violence provision set forth in section 153.0071(e–1) does not apply. See Tex. Fam.Code § 153.0071(d), (e), (e–1). I do not disagree that this MSA is binding on the parties or that the family violence provision does not apply in this case, but the Court's statutory analysis must not end there. We construe statutes as a whole, not as isolated provisions. See, e.g., Tex. Dep't of Transp. v. City of Sunset Valley, 146 S.W.3d 637, 642 (Tex.2004). We take into consideration the statutory context. Molinet v. Kimberll, 356 S.W.3d 407, 411 (Tex.2011) ("The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results."); Tex. Lottery Comm'n v. First State Bank of DeQueen, 325 S.W.3d 628, 635 (Tex.2010) ("We rely on the plain meaning of the text as expressing legislative intent unless a different meaning is supplied by legislative definition or is apparent from the context...."). When analyzing the plain language of section 153.0071, the Court cannot ignore the

fundamental best interest consideration required by section 153.002 and the overarching public policies set forth in section 153.001 to ensure the safety and welfare of children. See Tex. Fam.Code §§ 153.001, .002, .0071.

### 1. "Entitled to Judgment" Should Not Be Read As Absolute

I agree that section 153.0071 does not require a trial court to determine that an MSA is in a child's best interest before entering judgment on an MSA. This makes sense because trial courts will generally delegate to parties entering an MSA the role of ensuring that the child's best interest is protected. See id. § 151.001(a)(2) ("A parent of a child has the following rights and duties ... the duty of care, control, protection, and reasonable discipline of the child...."). As we explained in Miller ex rel. Miller v. HCA, Inc.:

The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.

The Texas Legislature has likewise recognized that parents are presumed to be appropriate decision-makers....

118 S.W.3d 758, 766 (Tex.2003) (internal citations omitted); see In re Derzapf, 219 S.W.3d 327, 333 (Tex.2007) (recognizing that the Legislature amended the grandparent access statute following the United States Supreme Court's plurality opinion in Troxel v. Granville, 530 U.S. 57, 68, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), to provide that "a trial court must presume that a fit parent acts in his or her child's best interest"). Trial courts, therefore, should refrain from performing a broad best interest inquiry or conducting a full evidentiary hearing on every MSA



-19-

presented. The question here is what happens when the trial court believes, based on evidence, that the parties have entered into an MSA without safeguarding the child's best interest. Can the presumption that parties act in the child's best interest, and protect the child's safety and welfare, be rebutted or negated? And does the Family Code, in that situation, allow the trial court to ensure that the child's safety and welfare are protected by refusing to enter judgment on an MSA that places the child in danger? I believe the answer to both questions is yes.

Section 153.0071(e) states that if an MSA satisfies the prerequisites of 153.0071(d), "a party is entitled to judgment

[411 S.W.3d 471]

on the [MSA] notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law." Tex. Fam.Code § 153.0071(e). The Court implies that "entitled to judgment" is absolute, making the presumption that parties act in a child's best interest irrebuttable and disallowing a trial court discretion to reject an MSA that jeopardizes a child's safety and welfare.[5] But when read in context and in harmony with other statutory provisions, I cannot conclude that the Legislature intended such an absurd result. *See Molinet,* 356 S.W.3d at 411 (recognizing that a statute's plain language is the best indicator of the Legislature's intent, "unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results").

Woven throughout the Family Code is the clearly defined policy of this state that courts must ensure protection of a child's best interest. *See*Tex. Fam.Code §§ 153.001–.002. More than one hundred sections of the Family Code contain specific provisions to protect children's best interests.[6] Indeed, children who are the subject of custody cases

are particularly vulnerable, and Texas family law, as a whole, seeks to address the needs and interests of those children, who generally do not have a voice in the legal system and often cannot fully exercise their legal rights and advocate for their interests. *See, e.g., Miller,* 118 S.W.3d at 766 ("The State's role as *parens patriae* permits it to intercede in parental decision-making under certain circumstances.... The Texas Legislature has acknowledged the limitations on parental decision-making."); *In re A.V.,* 113 S.W.3d 355, 361 (Tex.2003) (recognizing that courts cannot ignore section 153.001's remedial purpose of protecting abused and neglected children, even in parental rights termination proceedings). The Family Code's many best interest provisions reflect this state's policy that children's interests are to be paramount in legal proceedings, and that judges have the power to safeguard children from endangerment. *See, e.g., In re E.R.,* 385 S.W.3d 552, 555 (Tex.2012) (referring to the "State's responsibility to promote the child's best interest" and recognizing that although "a parent must remain vigilant with respect to her child's welfare, ... courts must *always* consider the child's best interest" (emphasis added));

[411 S.W.3d 472]

*Miller,* 118 S.W.3d at 766 ("Of course, this broad grant of parental decision-making authority is not without limits."). Although "the emotional and physical danger to the child now and in the future" is but one factor we listed as pertinent to a best interest determination, *see Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976), surely a custody, possession, or access arrangement that endangers a child's safety and welfare is not in the child's best interest and, thus, should not be adopted as the court's judgment.

The Family Code provision governing modification of orders for custody, possession, access, and determination of



residence reflects this state policy favoring judicial authority to protect children's best interests. Section 156.101 provides, in pertinent part:

The court may modify an order that provides for the appointment of a conservator of a child, that provides the terms and conditions of conservatorship, or that provides for the possession of or access to a child *if modification would be in the best interest of the child* and:

(1) the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since ...

(A) the date of the rendition of the order;
...

... or

(3) the conservator who has the exclusive right to designate the primary residence of the child has voluntarily relinquished the primary care and possession of the child to another person for at least six months.

Tex. Fam.Code § 156.101 (emphasis added). Nothing in section 156.101 addresses the processes through which modification terms can be reached, but regardless of whether those terms reflect a party agreement as expressed in a Rule 11 agreement, agreed parenting plan, or MSA, or are the product of binding arbitration or a full evidentiary hearing, the result is the same—the trial court modifies the terms of an earlier order that provided for conservatorship, possession, access, or determination of residence. Section 156.101 requires that a trial court modify such an order only when it would be in the child's best interest.

Section 153.0071, which reflects the state policy favoring the peaceable resolution of

family disputes through alternative dispute resolution (ADR) procedures, *see*Tex. Civ. Prac. & Rem.Code § 154.002, allows a trial court to enter judgment on an MSA for modification without a best interest determination. But the statute does not require trial courts to *always* enter judgment on binding MSAs without considering a child's best interest, as the Court's opinion suggests. In fact, the statute expressly authorizes consideration of a child's best interest in some MSA cases. *See*Tex. Fam.Code § 153.0071(e–1). Section 153.0071(e–1), enacted a decade after the other MSA provisions, allows a trial court to consider a child's best interest when a party to an MSA was a victim of family violence, which impaired that party's decision-making ability. *See id.* "Family violence," as used in the Family Code, includes a threat that reasonably places the party or a household member "in fear of imminent physical harm, bodily injury, assault, or sexual assault." *Id.* §§ 71.004(1), 101.0125. The family violence provision in section 153.0071(e–1) makes sense only when read to mean that (1) a party's impaired judgment resulting from physical violence or the threat of violence negates the presumption that the parties acted in the child's best interest in entering the MSA, and (2) the trial court can therefore look beyond the face of the MSA and consider whether the terms and

[411 S.W.3d 473]

provisions of the agreement are, in fact, in the best interest of the child. If the trial court determines that, despite family violence and impaired judgment, the MSA is in the child's best interest, the court must enter judgment on the MSA. But if the agreement is not in the child's best interest, the trial court can reject the agreement. Had the Legislature used "or" instead of "and" between the two parts of that family violence provision, a trial court would be able to reject an MSA simply because a parent was induced by family violence to enter into an MSA. But by using "and," the



Legislature affirmed that the court's paramount concern, even in the case of MSAs obtained through family violence, is the child's best interest.[7] Although there is no indication that the family violence provision in section 153.0071(e−1) applies here, I believe that this last-enacted part of section 153.0071 indicates the will of the Legislature to allow a trial court to consider the terms of a modification when the presumption that MSA parties act in the best interest of the child has been negated. I further believe that section 153.0071, in the context of the Family Code as a whole, affords a trial court discretion to decline to enter judgment on a modification pursuant to an MSA when the court determines that it threatens a child's safety and welfare and is therefore not in the child's best interest. *See* Tex. Gov't Code § 311.025 (instructing that when statutes or statutory amendments are irreconcilable, those statutes or amendments enacted latest prevail).

Allowing trial court discretion to consider the terms of an MSA in rare cases such as this comports with section 153.004 of the Family Code, which allows a trial court to protect a child's safety and welfare in family violence cases by hearing evidence to ensure that a parent is granted access to a child only when it would not endanger the child and would be in the child's best interest. Section 153.004 states, in relevant part:

(b) The court may not appoint joint managing conservators if credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by one parent directed against the other parent, a spouse, or a child....

(c) The court shall consider the commission of family violence in determining whether to deny, restrict, or limit the possession of a child by a parent who is appointed as a possessory conservator.

[411 S.W.3d 474]

(d) The court may not allow a parent to have access to a child for whom it is shown by a preponderance of the evidence that there is a history or pattern of committing family violence during the two years preceding the date of the filing of the suit or during the pendency of the suit, unless the court:

(1) finds that awarding the parent access to the child *would not endanger the child's physical health or emotional welfare* and *would be in the best interest of the child;* and

(2) renders a possession order that is designed to *protect the safety and well-being of the child* and any other person who has been a victim of family violence committed by the parent and that may include a requirement that:

(A) the periods of access be continuously supervised by an entity or person chosen by the court;....

(e) It is a *rebuttable presumption that it is not in the best interest of a child* for a parent to have unsupervised visitation with the child if credible evidence is presented of a history or pattern or past or present child neglect or physical or sexual abuse by that parent directed against the other parent, a spouse, or a child.

Tex. Fam.Code § 153.004 (emphasis added). Although some of the language of section 153.004 is directed at the acts of a parent, "family violence" is defined more broadly in the Family Code, to include:

(1) an act by a member of a family *or household* against another member of the family *or household* that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is *a threat* that reasonably places the member *in fear of* imminent physical harm, bodily injury, assault, or sexual assault ... [or]



In re ... (M 2014) ... 6 Texas ... (2013)

(2) abuse, as that term is defined by Sections 261.001(1)(C), (E), and (G), by a member of a family *or household* toward a child of the family or household.

*Id.* §§ 71.004(1) (emphasis added), 101.0125. The definition of "abuse" in section 261.001(1)(C) includes "physical injury that results in substantial harm to the child, or the *genuine threat of substantial harm* from physical injury to the child." Id. § 261.001(1)(C) (emphasis added). Taken together, it is nonsensical and absurd to read section 153.0071 as requiring a trial court to enter a judgment that section 153.004 prohibits a trial court from entering, especially in light of the specific directive that "[t]he best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." Id. § 153.002; *see also Jose Carreras, M.D., P.A. v. Marroquin,* 339 S.W.3d 68, 73 (Tex.2011) (recognizing that this Court "interpret [s] statutes to avoid an absurd result").

In the recently-enacted Collaborative Law Act (CLA), which contains a provision very similar to section 153.0071(e) but is not implicated in this case, the Legislature expressly authorized trial courts to issue emergency orders to protect children's welfare, despite the fact that the parties are engaging in a collaborative process to avoid litigation. *See* Tex. Fam.Code § 15.104. Section 15.104 of the Family Code provides:

During a collaborative family law process, a tribunal may issue an emergency order *to protect the health, safety, welfare, or interest of a party or a family,* as defined by Section 71.003. If the emergency order is granted without the agreement of all parties, the granting of the order terminates the collaborative process.

[411 S.W.3d 475]

*Id.* (emphasis added). Under the CLA, the collaborative family law process concludes by "resolution of a ... signed record," presumably meaning a signed settlement agreement. *See id.* § 15.102(c)(1). However, a collaborative process does not conclude "if, with the consent of the parties to a signed record resolving all or part of the collaborative matter, a party requests a tribunal to approve a resolution of the collaborative family matter or any part of that matter as evidenced by a signed record." *Id.* § 15.102(h). So when parties present a signed settlement agreement to a trial court judge for approval or entry of judgment, the court has authority to issue an emergency order to protect the safety or welfare of the children. The CLA thus confirms the Legislature's intent that trial courts are to protect children from harm and protect their best interests, even when children are placed at risk of harm by an agreement reached by the parties through a collaborative process.

I read section 153.0071, in the broader context of the family violence provision and the Family Code as a whole, as allowing a trial court discretion in rare cases such as this to consider the terms of an MSA before issuing a modification order, when evidence negates the presumption that the parties acted in the child's best interest when negotiating or agreeing to an MSA. This reading gives effect to the state policy favoring amicable, efficient resolution of disputes through ADR, while also giving effect to the state policy ensuring protection of children's best interests in custody, possession, and access cases. *See* Tex. Fam.Code §§ 153.001–.002, 156.101; Tex. Civ. Prac. & Rem.Code § 154.002; *see also Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex.1982) ("The trial court is given wide latitude in determining the best interests of a minor child."); *Leonard v. Lane,* 821 S.W.2d 275, 277 (Tex.App.–Houston [1st Dist.] 1991, writ denied) ("The court has the right to act in the best interest of the child, notwithstanding



any agreements of the parties."). Moreover, this construction of the statute harmonizes provisions of the Family Code to streamline resolution of disputes in most suits affecting the parent-child relationship, while allowing trial courts to safeguard children's welfare in rare cases where parents or caregivers cannot be trusted to do so. In this case, Stephanie, who would be given unsupervised possession under the MSA, testified that she dated and then married a man she knew to be a convicted sex offender, and testified that she allowed him to live with her and her young daughter and allowed him unsupervised contact with the child, both in violation of his probation restrictions. Although the MSA contains provisions requiring Scott to stay away from the child during Stephanie's periods of possession, I question the enforceability of those provisions against either Stephanie, whose agreement purports to bind a non-party, or Scott, who did not agree to those provisions and is not a party to the lawsuit. I cannot join the Court in concluding that the trial court here abused its discretion by refusing to enter judgment on the MSA and ordering a full evidentiary hearing. Nor can I agree with the concurrence that the trial court abused it discretion because the evidence of endangerment was insufficient. *See* 411 S.W.3d at 464–65.

The Court takes the position that recognizing a trial court's discretion to consider an MSA's terms in some MSA cases renders the family violence provision in section 153.0071(e–1), as well as other statutory provisions mentioning children's best interests, mere surplusage. *See id.* at 453; *In re Caballero,* 272 S.W.3d 595, 599 (Tex.2008) (instructing that "we 'give effect to all [a statute's] words and, if possible, do not treat any statutory language as

[411 S.W.3d 476]

mere surplusage' " (quoting *State v. Shumake,* 199 S.W.3d 279, 287 (Tex.2006))). I do not accept that use of the term "best

interest" outside the expression of the state's policy in sections 153.001 and 153.002 is surplusage; rather, I read the "best interest" provisions in section 153.0071(e–1) and elsewhere in the Family Code as guidance to courts implementing the overarching policy directive expressed in sections 153.001 and 153.002. Surely the Legislature did not commit a useless act in enacting each of more than one hundred statutory provisions to assist courts in determining *how* and *when* to consider a child's best interest.[8]*See Tex. Lottery Comm'n,* 325 S.W.3d at 637 ("Courts 'do not lightly presume that the Legislature may have done a useless act.' " (quoting *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.,* 966 S.W.2d 482, 485 (Tex.1998))). No, the Legislature continues to enact provisions using "best interest" to further the clearly defined policy of the state that best interest *always* be the court's primary consideration, and that trial courts are to protect the safety and welfare of children.

As further support for its construction, the Court points to the arbitration provision in section 153.0071(b), which allows a trial court to consider the best interest of the child before entering judgment on an arbitrator's award, as indicating that the Legislature knew how to authorize courts to refuse to enter judgment on best interest grounds but chose not to do so for MSAs. *See* 411 S.W.3d at 473. I read the Legislature's language in section 153.0071(b) as wholly consistent with the Family Code's overarching policy that courts have discretion to protect the best interests of children, and not inconsistent with section 153.0071(e), under which courts generally presume that MSA parties have ensured that an MSA is in the child's best interest. In the rare instance that the evidence before the trial court negates that presumption, however, I believe the Family Code gives the court discretion to consider whether a proposed modification could place a child's safety or welfare at risk and thus not be in the child's best interest, just as the court has discretion



-24-

141

In re Lee, 411 S.W.3d 445, 56 Tex. Sup. Ct. J. 1374 (Tex. 2013)

to consider whether an arbitration award is in a child's best interest. Under the MSA between Stephanie and Benjamin, any disputes regarding interpretation or performance of the agreement or its provisions are to be decided by binding arbitration conducted by the mediator, [9] which the trial court could then review on best interest grounds pursuant to section 153.0071(b). It seems nonsensical to conclude, as the Court does, that the trial court cannot consider the child's best interest at the MSA stage but could consider the child's best interest only after an arbitration award deciding issues relating the entry, interpretation, or performance of the MSA.[10]

To be clear, I would not hold that a trial court can refuse to enter judgment on an MSA based on any one of the factors we listed in *Holley v. Adams* as pertinent to a

[411 S.W.3d 477]

best interest determination. *See* 544 S.W.2d at 371–72. That issue is not before us in this case,[11] as here we must decide only whether a trial court has discretion to reject an MSA that the trial court determines, based on evidence, places a child's safety and welfare in danger and, consequently, cannot possibly be in the child's best interest. I would hold that, under the unusual facts of this case, the trial court did not abuse its discretion by declining to enter judgment on the MSA that provides Stephanie unsupervised visitation and contains protective provisions directed only at Scott, who is not a party to the agreement or the lawsuit.

## 2. "Notwithstanding ... Another Rule of Law" Should Be Read Narrowly

The Court reads "notwithstanding ... another rule of law" in section 153.0071(e) broadly, as evidencing legislative intent that cases involving binding MSAs be excepted from the overarching public policy interests embodied (1) in section 153.002—that "[t]he

best interest of the child shall always be" a court's "primary consideration" when "determining the issues of conservatorship and possession of and access to the child," and (2) in section 153.001—the state's public policy to "provide a safe, stable, and nonviolent environment for the child." *See* 411 S.W.3d at 468. But nothing in the statute expressly overrides either the Family Code's fundamental requirement that the court act in a manner consistent with the child's best interest or the express best interest provision for modifications in section 156.101. In addition, nothing in the statute expressly limits a trial court's authority to decline to enter judgment on a properly executed, binding MSA to the family violence context addressed in section 153.0071(e–1).

Although the Court cites our recent opinion in *Molinet v. Kimbrell,* 356 S.W.3d 407 (Tex.2011), as support for its construction, we have never construed the precise language in section 153.0071(e). *See* 411 S.W.3d at 450–51. In *Molinet,* we considered a limitations statute that applied "[n]otwithstanding any other law," where a separate conflict-of-laws provision stated that in the event of a conflict, the chapter containing the limitations statute prevails. *See* 356 S.W.3d at 411–15. We held that the limitations statute conflicted with a separate statute regarding joining persons designated as responsible third parties, and that the Legislature resolved the conflict in favor of the limitations statute. *See*

[411 S.W.3d 478]

*id.* at 413. That analysis offers little guidance here, where the statutory language differs significantly and there is no conflict-of-laws provision to help resolve any conflict.

The Court equates *Molinet* 's "[n]otwithstanding any other law ...," language with the language at issue in this case: "... notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law."



-25-

142

*See* 411 S.W.3d at 454. But we cannot presume that the Legislature used the different terms interchangeably. *See Spradlin v. Jim Walter Homes, Inc.,* 34 S.W.3d 578, 580 (Tex.2000) ("[W]e ... must presume that the Legislature chose its words carefully....." (citing *City of Beaumont v. Bouillion,* 896 S.W.2d 143, 148 (Tex.1995))). In fact, we "presume the Legislature selected language in a statute with care and that every word or phrase was used with a purpose in mind." *Tex. Lottery Comm'n,* 325 S.W.3d at 635. Although "another" can mean simply "an additional," it seems more likely in the context of section 153.0071(e) that the Legislature used "another" to mean "one more person or thing of the same type as before." *See Another Definition,* MacmillanDictionary.com, *http:// www. macmillan dictionary. com/ dictionary/ british/ another* (last visited Sept. 18, 2013); *Another Definition,* OxfordDictionaries.com, *http:// oxford dictionaries. com/ american english/another?q=another* (last visited Sept. 18, 2013) (defining "another" as "used to refer to an additional person or thing of the same type as one already mentioned or known about; one more; a further"); see also *In re Hall,* 286 S.W.3d 925, 929 (Tex.2009) (explaining that "if a different, more limited, or precise definition is apparent from the term's use in the context of the statute, we apply that meaning," and applying the second dictionary definition of "detention"). I would construe "another rule of law" with reference to section 153.0071(e)'s preceding clause, "Rule 11 of the Texas Rules of Civil Procedure."

Prior to the enactment of ADR provisions in section 153.0071, parties settled family disputes by entering into agreements pursuant to Texas Rule of Civil Procedure 11, Chapter 154 of the Civil Practice and Remedies Code, and general principles of contract law. *See In re Calderon,* 96 S.W.3d 711, 717–18 (Tex.App.–Tyler 2003, orig. proceeding). Rule 11 provides a mechanism for parties or attorneys to narrow the issues

before the trial court and independently resolve other matters in a pending lawsuit through properly executed written agreements. Tex.R. Civ. P. 11 ("Unless otherwise provided in these rules, no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record."); *see also Fortis Benefits v. Cantu,* 234 S.W.3d 642, 651 (Tex.2007); *Padilla v. LaFrance,* 907 S.W.2d 454, 459–61 (Tex.1995). If a party to a settlement agreement—typically a Rule 11 agreement—withdrew consent before the trial court entered judgment, the other party could enforce the agreement only as any other contract, by filing a separate breach-of-contract suit. *See Calderon,* 96 S.W.3d at 718. With the enactment of section 153.0071 and the later enactment of section 6.602 for resolution of divorce disputes, the Legislature created a procedural shortcut to eliminate the requirement of a separate suit for enforcement of MSAs when a party repudiates the agreement, instead allowing the opposing party to easily seek enforcement of, and judgment on, an MSA that meets the statutory prerequisites, without a separate breach-of-contract suit. *See id.* ("[W]e hold that the phrase 'notwithstanding

[411 S.W.3d 479]

Rule 11, Texas Rules of Procedure or another rule of law' in section 153.0071(e) means that Rule 11, Chapter 154 of the Texas Civil Practice and Remedies Code, and general contract law, insofar as they apply to the enforcement of settlement agreements, do not apply to the enforcement of a mediated settlement agreement in a [suit affecting the parent-child relationship (SAPCR) ] if the agreement meets the requirements of 153.0071(d)."); *Boyd v. Boyd,* 67 S.W.3d 398, 403 (Tex.App.–Fort Worth 2002, no pet.) (holding that "notwithstanding Rule 11 ... or another rule of law" means "the requirements

-26-

In re Joab, 411 S.W.3d 445, 66 Tex.Sup.Ct.J. 421 (Tex. 2013)

of [R]ule 11 and the common law that ordinarily apply to the enforcement of settlement agreements do not apply to mediated settlements ... if the agreements meet the three requirements listed"); *Cayan v. Cayan,* 38 S.W.3d 161, 164–66 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (holding that the "notwithstanding Rule 11 ... or another rule of law" language reflects the Legislature's intent to eliminate the requirement of enforcement by a separate suit and that "another rule of law" refers to the rules of law that require a separate suit for enforcement). Because section 153.0071(e) specifically refers to Rule 11 agreements—the primary mechanism for settlement agreements prior to enactment of section 153.0071—I interpret the general phrase "another rule of law" in this instance to mean that, regardless of any provisions under which similar types of agreements to resolve family disputes may be repudiated or withdrawn prior to entry of judgment, a party's withdrawal of consent to a binding MSA shall not interfere with the entry of judgment on or enforcement of a properly executed, binding MSA. This Court agreed with this view when it considered section 6.602, which provides for MSAs in divorce cases and contains the same language at issue in section 153.0071. *See Milner v. Milner,* 361 S.W.3d 615, 618 (Tex.2012) ("[O]nce signed, an MSA cannot be revoked like other settlement agreements.").

By giving the phrase "notwithstanding ... another rule of law" such an expansive meaning, the Court renders meaningless the Legislature's specific reference to Rule 11. If the Legislature intended "another rule of law" to mean *all* rules of law without restriction, then the Legislature would not have needed to reference Rule 11. *See Leordeanu v. Am. Prot. Ins. Co.,* 330 S.W.3d 239, 248 n. 35 (Tex.2010) ("We construe statutes to give effect to every provision and ensure that no provision is rendered meaningless or superfluous."). Under the canon of construction *noscitur a sociis,* we interpret

the Legislature's words in their statutory context. *See, e.g., U.S. Fid. & Guar. Co. v. Goudeau,* 272 S.W.3d 603, 606 (Tex.2008) ("Under the traditional canon of construction *noscitur a sociis* ('a word is known by the company it keeps'), each of the words used ... must be construed in context."); *Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 750 (Tex.2006) ("In construing the [statutory] term, we are governed by the traditional canon of construction *noscitur a sociis*—'that a word is known by the company it keeps.' "); *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 29 (Tex.2003) ("[T]he meaning of particular words in a statute may be ascertained by reference to other words associated with them in the same statute."). The purpose of this rule of statutory construction is "to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words." *Fiess,* 202 S.W.3d at 750 n. 29 (quoting *Gustafson v. Alloyd Co.,* 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)). Because "another rule of law" appears in the context of "Rule 11, Texas Rules of Civil Procedure," I would construe the phrase narrowly.

[411 S.W.3d 480]

The Court suggests that allowing a trial court to consider the specific terms of an MSA before entering judgment, even in a very rare case such as this, would undermine the state's strong public policy in favor of ADR. *See* 411 S.W.3d at 460. But the overarching best interest policy expressed in section 153.002 of the Family Code and the ADR public policy in section 154.002 of the Civil Practice and Remedies Code are not incompatible or mutually exclusive. *Compare* Tex. Fam.Code § 153.002, *with* Tex. Civ. Prac. & Rem.Code § 154.002. I would harmonize those provisions to promote the state's strong interest in both, by encouraging parties to rely upon ADR procedures to amicably and peaceably resolve disputes but also by providing courts the judicial oversight to effectuate the state's fundamental and longstanding public policy



-27-

In re Lee, 411 S.W.3d 445 (2013)
5 Tex.... 135.32 (2013)

of acting in the child's best interest—especially, in those rare cases, when parents may not. I am not convinced, as Stephanie argues and the Court seems to believe, that recognizing the trial court's authority to protect children from custody and possession modifications that threaten their safety and welfare, and are therefore not in their best interests, would unravel the entire structure and efficacy of ADR procedures in child custody disputes. Nor am I convinced that parties in suits affecting the parent-child relationship would cease to rely upon the mechanisms of peaceable resolution through mediation or another form of ADR. Rather, I believe that sensible parties would continue to rely upon the most effective and efficient procedures available to resolve their disputes.[12]

We must presume that the Legislature enacted section 153.0071 with the intent that it not conflict with existing statutory provisions such as sections 153.001 and 153.002, that it further the public interest, and that it lead to a just and reasonable result. *See* Tex. Gov't Code § 311.021. "[I]t is settled that every word in a statute is presumed to have been used for a purpose; and a cardinal rule of statutory construction is that each sentence, clause and word is to be given effect if reasonable and possible." *Perkins v. State,* 367 S.W.2d 140, 146 (Tex.1963). Guided by the Legislature's specific reference to Rule 11 agreements and use of the word "another," I do not read "notwithstanding ... another rule of law" so broadly as to mean any and all other statutory provisions. In fact, I believe such a broad construction leads to an absurd result, as it potentially allows parties to circumvent statutory provisions enacted to protect children, as well as the clear policy of the state to ensure protection of children's best interests. *See Jose Carreras, M.D., P.A. v. Marroquin,* 339 S.W.3d 68, 73 (Tex.2011) ( "We ... interpret statutes to avoid an absurd result."); *City of Rockwall v. Hughes,* 246 S.W.3d 621, 625–26 (Tex.2008) ("[W]e

construe the statute's words according to their plain and common meaning ... unless such a construction leads to absurd results."); *Leonard,* 821 S.W.2d at 278 ("Parties cannot by contract deprive the court of its power to guard the best interest of the child.").

## III. The Trial Court's Discretion to Reject This MSA

The trial court clearly determined, based on Stephanie's own admissions, that Stephanie has little regard for court orders

[411 S.W.3d 481]

to protect children from her sex-offender husband, and that she has repeatedly made decisions against her daughter's best interest, putting her daughter at substantial risk. Thus, this is a rare case where a party's testimony negated the presumption that the parties acted in the child's best interest when entering into the MSA. Under these circumstances, I would hold that it was not an abuse of discretion for the court to consider the terms of the MSA and whether the modification, which would allow Stephanie unsupervised periods of possession, posed a threat to the child's safety and welfare.

Although the MSA contains provisions to keep Scott away from the child during Stephanie's periods of possession and appears at first glance to offer the child more protection than the 2007 order adjudicating parentage,[13] those protective provisions are directed only at Scott, who is not a party to the MSA or the lawsuit. The MSA provides:

At all times[,] Scott Lee is enjoined from being within 5 miles of [the daughter]. During the mother's periods of possession with [the daughter], Scott Lee shall notify [Benjamin] through Stephanie Lee by e-mail or other mail where he shall be staying ... [a]nd the make and model of the vehicle he will be driving. This shall be done at least 5 days prior to any visits. [Benjamin] shall have the

fastcase

-28-

right to have an agent or himself monitor [Scott] Lee's location by either calling or driving by the location at reasonable times.[14]

Under this provision, Stephanie could have only one duty with regard to protecting her child from exposure to the registered sex offender who lives with her: She must pass along to Benjamin information that Scott provides. But Stephanie can perform only if Scott provides the notification in the first place. If Scott offers no information, the MSA requires nothing of Stephanie. If Scott does not stay the required distance from the child, the MSA requires nothing of Stephanie. If Scott appears at the house while the child is there, the MSA requires nothing of Stephanie. Scott could provide no location or vehicle information, could appear at the house during Stephanie's period of possession, and could climb naked into bed with the child, and Stephanie would have complied with the MSA. The effectiveness of the MSA's provisions designed to safeguard the child's welfare depend almost entirely on the voluntary actions of Scott, a non-party.

[411 S.W.3d 482]

The parties have not briefed or argued the enforceability of those protective provisions aimed at Scott, and that question is not squarely before us in this proceeding. Nevertheless, I question the enforceability of MSA provisions that purport to bind a non-party and require little if anything of the parties themselves to protect the child from harm, as well as the availability of a remedy for failure to comply.[15]*See*Tex. Fam.Code § 153.0071(d) ("A mediated settlement agreement is binding *on the parties* if the agreement [satisfies particular requirements]." (emphasis added)); *cf. Graff v. Beard,* 858 S.W.2d 918, 920 (Tex.1993) ("Under Texas law, in the absence of a relationship between the parties giving rise to the right of control, one person is under no

legal duty to control the conduct of another...."). The Court, which agrees that the MSA could have been more "artfully worded," *see*411 S.W.3d at 458 n. 17, rationalizes that only a violation of the agreement could subject the child to harm. But the Court misses the point—a possession and access modification that (1) does not require Stephanie to keep the child away from Scott, (2) contains no supervision requirements, and (3) relies on Scott to act voluntarily in accordance with an MSA that he did not agree to does, on its face, subject the child to harm.

The Court suggests that the trial court can cure the MSA's inartful wording by altering the agreement to clarify its terms. *See id.* That proposition was not briefed or argued, and I am not convinced that the trial court can take such action. The Court relies on *Haynes v. Haynes,* 180 S.W.3d 927, 930 (Tex.App.–Dallas 2006, no pet.), a case involving a property division settlement in a divorce and not an MSA to modify child custody, access, or possession. *See id.* at 928–29. *Haynes* relied on *McLendon v. McLendon,* 847 S.W.2d 601, 606 (Tex.App.–Dallas 1992, writ denied), an earlier case from the same court that also involved a property division settlement in a divorce and addressed a Rule 11 agreement, not an MSA under the Family Code. *See id.* at 604–06;*Haynes,* 180 S.W.3d at 930. Although this Court has not, until today, addressed trial court authority to modify the terms of an MSA under section 153.0071,[16] we have previously

[411 S.W.3d 483]

held that "a final judgment which is founded upon a settlement agreement reached by the parties must be in strict or literal compliance with that agreement." *Vickrey v. Am. Youth Camps, Inc.,* 532 S.W.2d 292, 292 (Tex.1976). Just over a year ago, this Court held that when an MSA contained a process for resolution of disputes regarding ambiguities in the MSA's terms, the mediator was the



In re ___, 411 S.W.3d 145, 56 Tex. Sup. Ct. J. 347 (Tex. 2013)

appropriate authority under the MSA to resolve a factual dispute regarding the parties' intent, not the trial court. *See Milner,* 361 S.W.3d at 622. The MSA in this case contains just such a provision, under which disputes regarding "the interpretation, omitted issues, and/or performance" of the MSA shall be resolved by phone conference with the mediator or, if unsuccessful, by binding arbitration with the mediator serving as arbitrator. I cannot understand why this Court would hold that the parties in *Milner* must, pursuant to their agreement, have the mediator resolve issues regarding the parties' intent, and hold that the trial court can modify the parties' agreement in this case to reflect the parties' "clear intent." *See*411 S.W.3d at 458 n. 17. Even if a trial court can, as the Court says, modify an MSA to effectuate and implement the parties' intent, I find no support in this case for the Court's conclusion that the parties clearly intended to require Stephanie to keep the child at least five miles away from Scott at all times. *See id.* The MSA provides only that Stephanie must pass on information provided to her by Scott. Nowhere does the record indicate that Stephanie intended herself to be bound by and face contempt charges for violation of the provision requiring *Scott* to stay five miles from the child. Just as we cannot assume that every MSA parents agree to is in their child's best interest, we cannot assume that every provision in an MSA was intended to protect the child to the maximum extent possible. I would hold, as this Court did in *Milner,* that any question regarding the parties' intent with regard to the protective provisions in this MSA must be resolved by the mediator according to the MSA, and not by the trial court. And even if there were no question or ambiguity about the parties' intent, the issue of whether a trial court can modify the terms of the MSA to "clarify" that intent is best left for another day and not decided in a footnote, without briefing or argument.

The trial court heard only brief testimony from Stephanie and Benjamin in a short hearing on a motion for entry of judgment on the MSA, but neither party put on any additional evidence.[17] In this

[411 S.W.3d 484]

instance, where the MSA does not require Stephanie's periods of possession to be supervised, as Benjamin had requested in his motion to modify the 2007 order, and where the child's welfare depends upon the acts of a non-party to the MSA who, testimony indicates, has previously disregarded a court order that apparently prohibited him from being around children, I would hold that it was not an abuse of discretion for the trial court to decline to enter judgment on the MSA and instead set the case for trial at which the parties can put on evidence of whether unsupervised visitation with Stephanie is in the child's best interest. [18]*See Holley,* 544 S.W.2d at 371–72 (describing factors pertinent to the best interest determination, including the emotional and physical dangers to the child now and in the future).

Believing that a trial court can protect children subject to harmful MSAs by continuing hearings seeking entry of judgment, the plurality attempts to resolve the absurdity of the Court's holding by telling trial courts to stall. *See*411 S.W.3d at 459. But we cannot have it both ways—either the Family Code requires a trial court to enter judgment on a statutorily compliant MSA when it is presented, or the Family Code allows the trial court discretion not to enter judgment when the MSA's modification terms jeopardize the child's safety and welfare. Under the plurality's analysis, it is unlikely that a trial court would ever discover that a modification pursuant to an MSA would jeopardize a child's safety and welfare. Even if the trial court did somehow reach that conclusion, the plurality concludes that the trial court can do nothing about that except delay the inevitable entry of judgment. *See id.* at 473. To allow the court to do otherwise—to

fastcase

-30-

In re Marriage of Smith, 115 S.W.3d 145, 66 Tex.Sup.Ct.J. 131 (Tex. 2013)

reject an MSA it determines could subject the child to harm—would, in the plurality's view, mean that a trial court can conduct a broad best interest inquiry. But a court armed with enough information to determine that a child is in danger under an MSA need not analyze the *Holley* factors to conclude that modification pursuant to the MSA is not in the child's best interest. Any MSA that places a child's safety and welfare in danger—through unenforceable provisions that could leave a child exposed to a convicted sex offender, or otherwise—simply cannot

[411 S.W.3d 485]

be in a child's best interest. To say that a trial court can do nothing except delay entry of judgment and call the Department of Family and Protective Services runs counter to public policy and leaves children whose parents act against their best interest without a voice—without protection—in the legal system. I believe that the Legislature intended for trial court authority to extend beyond simply placing an MSA in legal limbo and to include the discretion to refuse entry of judgment on dangerous MSAs. Moreover, I believe that the plurality's continuance procedure, which seemingly allows trial courts to put off entry of judgment that the Court implies is non-discretionary, invites parties to file mandamus actions seeking to force trial courts to stop delaying the inevitable entry of judgment on MSAs that satisfy the statutory prerequisites.

Further, the plurality advises that a trial court faced with a potentially harmful MSA should issue some sort of temporary orders or protective orders in conjunction with entry of judgment. *Id.* at 456. If the Family Code allowed trial courts to issue whatever orders are necessary to protect children, there might be no disagreement in this case. But the Family Code limits the availability of protective actions, and trial courts often must rely on parties protecting children's best interests to request such orders.[19] For

example, although the Family Code authorizes a trial court to make temporary orders for the safety and welfare of the child, such orders are available while a SAPCR is pending and "before final order," making the availability in cases of statutorily-compliant MSAs questionable. *See* Tex. Fam.Code § 105.001; *Ex parte Brown,* 382 S.W.2d 97, 99 (Tex.1964) (explaining that once a trial court has rendered judgment awarding custody of a child, a temporary custody order is no longer in effect). Even if temporary orders could be issued in this MSA context, it seems a perversion of the Family Code to suggest that trial courts should delay entry of judgment *for the purpose* of entering temporary orders. Similarly, although the Family Code authorizes a trial court to issue a protective order, several things must happen before the court can do so: an adult must file an application to protect a child from family violence, the respondent accused of family violence must have notice and an opportunity to answer, the trial court must conduct a hearing, and the court must find that family violence occurred and is likely to occur in the future. *See* Tex. Fam.Code §§ 81.001, 82.001–.005, .021, .041–.043, 84.001, 85.001, .021. If the Family Code contains a provision under which this trial court could have entered orders to ensure protection of this child despite the MSA, nobody has told us where to find it. Even if, as the plurality assumes, trial courts can mitigate the effects of harmful MSAs by issuing some sort of orders to protect children, what might those orders look like? Could the trial court in this case order that Stephanie's periods of possession be supervised? Could the trial court order that Stephanie keep the child out of the Scott's presence? Although such orders would certainly do more to protect the child, they would also alter the parties' agreement, a result that the Court believes the Legislature intended to avoid. In the end, although I agree with the sentiment that trial courts must protect children from harm, the plurality's purported solution to the problem posed by its interpretation of section



-31-

In re ___, 411 S.W.3d 145, 65 Tex. Sup. Ct. J. 24 (Tex. 2013)

153.0071—which is not much of a solution at all when the Court prohibits trial courts from rejecting dangerous MSAs—relies on a "tortured

[411 S.W.3d 486]

reading" of the Family Code's protective action provisions. *See* 411 S.W.3d at 459 (referring to the dissent's interpretation of the MSA statute as a "tortured reading").

Compelling the trial court to disregard the fundamental public policies set forth in sections 153.001 and 153.002, including the policy to "provide a safe, stable, and nonviolent environment for the child," simply because the parents executed an irrevocable MSA would not only render these policies meaningless, but yield an absurd result. Tex. Fam.Code § 153.001(a)(2); *see Jose Carreras, M.D., P.A.,* 339 S.W.3d at 73. I can easily imagine scenarios more outlandish than this, where parents execute an MSA that puts a child in even more danger. It would be absurd and nonsensical for a trial court to have no ability to protect a child from such an MSA, and to compel the court to enter judgment on an MSA that it concludes could be harmful to the child. The Court's overwrought opinion purports to protect the interests of children by championing the mediated settlement agreement process, but when a child is placed in danger by the actual terms of an agreement, as opposed to the process by which a dispute is resolved, the Court's holding falls short.

### IV. Mandamus Relief

In granting mandamus relief, the Court orders the trial court to do two things: (1) vacate its order denying Stephanie's motion to enter judgment on the MSA, and (2) vacate its order setting the case for trial. Nowhere does the Court say that the trial court must enter judgment on the MSA. It is a curious result—a trial court cannot deny a motion to enter judgment, but a trial court need not

actually enter judgment; a party is "entitled to judgment," and cannot be denied judgment, but may not actually get the judgment to which she is entitled. Why would the Court issue such a perplexing ruling?

Perhaps it is all a matter of semantics. One could argue that the Court's opinion *impliedly* requires the trial court to enter judgment on the MSA. But as a court of last resort, we are not usually in the business of implying rulings.

Perhaps the Court hopes the trial court will not have to sign a judgment on this MSA because it will instead delay so that it can enter temporary orders, and then DFPS will seek to have Stephanie's parental rights terminated or take some action that will moot the MSA issue. But we are not usually in the business of banking on unpredictable contingencies either.

Surely the Court's conspicuous lack of an order directing the trial court to enter judgment on the MSA must mean *something*. After all, Stephanie's petition for writ of mandamus specifically requested that the Court grant a writ requiring the trial court to enter judgment based upon the MSA. I think the absence of any requirement that the trial court enter judgment on the MSA can be explained only as follows: (1) a majority of this Court believes that the Family Code allows a trial court discretion to refuse to sign a judgment pursuant to an MSA that places a child's safety and welfare in danger, and (2) a majority of this Court does not believe that the Family Code requires the trial court, on this record, to enter judgment on this MSA. Of course, the Court does not say that either. But if a majority of the Court believed "entitled to judgment ... notwithstanding ... another rule of law" created a non-discretionary, ministerial duty to enter judgment, surely it would say so. Instead, the Court goes out of its way to avoid saying just that, and in the process provides no guidance



about what a trial court is to do with an MSA that endangers a child, or what this trial

[411 S.W.3d 487]

court is to do with this MSA. The only clear holding today appears to be that a trial court cannot refuse to enter judgment on an MSA using the words "best interest."

If the trial court here believes, based on the evidence presented, that the child's safety and welfare will be endangered under a modification pursuant to the MSA, then it appears the court can comply with this Court's ruling by withdrawing its order rejecting the MSA on best interest grounds and issuing a new order rejecting the MSA on endangerment grounds. Or maybe, as the concurrence implies, the court could hear additional evidence to inquire further into the child's safety and welfare under the MSA and, if appropriate, issue a new order rejecting the MSA on endangerment grounds. See 411 S.W.3d at 483–84. Only then will the Court explain today's curious ruling and give trial courts and the family law bar guidance on whether and when a trial court has discretion to refuse to enter judgment on an MSA that places a child's safety and welfare in danger.

For the reasons explained, I believe a trial court faced with such an MSA is entitled to use the best tool available—rejection of the dangerous MSA—to protect the child.

### V. Conclusion

I would hold that, in a rare case in which the presumption that MSA parties acted in a child's best interest has been negated by evidence, the trial court does not abuse its discretion by considering the terms of an MSA's custody, possession, or access modification. If those terms jeopardize a child's safety and welfare, so that the modification could not possibly be in the child's best interest, I would hold that the trial court does not abuse its discretion by refusing

to enter judgment on the MSA. Here, the mother admitted on the record that she (1) allowed her husband, a registered sex offender, unsupervised contact with her daughter, (2) resided with the sex offender in her home, despite knowing that it was a violation of his conditions of probation, and (3) allowed her husband to violate the terms of his probation through contact with her daughter. I would deny Stephanie's petition for writ of mandamus.

--------

Notes:

1. Stephanie was represented by substitute counsel at the hearing, but neither Stephanie nor her attorney who signed the MSA was present and therefore could not respond to any allegations made by Benjamin at the hearing. Benjamin appeared personally and, although his attorney who signed the MSA did not appear with him, he was accompanied by alternate counsel. Finally, the Attorney General was represented by counsel at the hearing, although the Attorney General was not a party to either the MSA or the mediation.

2. In her brief, Stephanie admits that Scott received a deferred adjudication for a sex offense years earlier in 2001.

3. See, e.g., Sarah H. Ramsey, Rep., Conference Report and Action Plan, High–Conflict Custody Cases: Reforming the System for Children, 34 FAM. L.Q. 589, 589 (2001) (discussing "recommendations for changes in the legal and mental health systems to reduce the impact of high-conflict custody cases on children").



In re Lee, 411 S.W.3d 445, 456 Tex. Civ. App. (Tex. 2013)

4. *See* Ramsey, *supra* note 3, at 589–90 (detailing the damaging impact high-conflict custody litigation can have on the children involved); *see also* Robert F. Cochran, Jr., *Legal Ethics and Collaborative Practice Ethics,* 38 Hofstra L.Rev. 537, 539 (2009) (noting the "growing recognition that children are collateral damage in many divorces, especially high conflict divorces"); Linda D. Elrod, *Reforming the System to Protect Children in High–Conflict Custody Cases,* 28 Wm. Mitchell L.Rev. 495, 501–04 (2001) (criticizing the adversarial system as unnecessarily harmful to children); Clare Huntington, *Repairing Family Law,* 57 Duke L.J. 1245, 1284–85 (2008) ("Family law disputes carry terrible potential for a high level of emotional harm.... High-conflict divorces hold even greater potential of harm for the parties and children." (footnotes omitted)); Jessica J. Sauer, *Mediating Child Custody Disputes for High Conflict Couples: Structuring Mediation to Accommodate the Needs and Desires of Litigious Parents,* 7 Pepp. Disp. Resol. L.J. J. 501, 509–14 (2007) (discussing the health benefits of mediation for children in custody cases).

5. *See* Huntington, *supra* note 4, at 1283 ("Whatever breach the members of the family have suffered, subjecting that breach to the pressures of the adversarial system is likely to heighten the emotions surrounding the breach."); Jana B. Singer, *Dispute Resolution and the Postdivorce Family: Implications of a Paradigm Shift,* 47 Fam. Ct. Rev. 363, 363 (2009) (commenting on the move away from the adversary paradigm in family law because "social science suggests that children's adjustment to divorce and separation depends significantly on their parents' behavior during and after the separation process: the higher the levels of parental conflict to which children are exposed, the more negative the effects of family dissolution"); Solangel Maldonado, *Taking Account of Children's Emotions: Anger and Forgiveness in "Renegotiated Families,"* 16 Va. J. Soc. Pol'y & L. 443, 444–45 (2009) ("Anger causes too many divorcing parents to behave badly—to disparage the other parent or interfere with access to the child, to withhold child support, to contest custody out of spite, and, in rare cases, to make false accusations of abuse. Legal scholars have recognized that interparental anger is harmful to both parents and children and have advocated for reforms, such as no fault divorce, mediation, and parenting education, in an effort to alleviate parties' anger during and after the divorce." (footnotes omitted)); *see also* Carla B. Garrity & Mitchell A. Baris, Caught in the Middle: Protecting the Children of High–Conflict Divorce E E E 83 (1994) (noting that "for families and children caught in the stress of parental alienation, litigation is likely to exacerbate the polarization").

6. While this is an issue of first impression in this Court, several courts of appeals have analyzed the statute governing entry of judgment on MSAs. *See In re S.A.D.S.,* No. 2–09–302–CV, 413 S.W.3d 434, 438–39, 2010 WL 3193520, at *4 (Tex.App.–Fort Worth Aug. 12, 2010, no pet.) ("The express provision on mediated settlement agreements, however, contains no express exceptions giving the trial court discretion not to enforce the mediated settlement agreement."); *Barina v. Barina,* No. 03–08–00341–CV, 2008 WL 4951224, at *4 (Tex.App.–Austin Nov. 21, 2008, no pet.) (mem. op.) ("Unless there is an allegation of family violence, a section 153.0071 agreement may be ruled on without a determination by the trial court that the terms of the agreement are in the best interest of the child."); *Beyers v. Roberts,* 199 S.W.3d 354, 360 (Tex.App.–Houston [1st Dist.] 2006, pet. denied) (noting that a trial court may hold a best interest hearing in an MSA case if presented with proper facts); *Zimmerman v. Zimmerman,* No. 04–04–00347–CV, 2005 WL 1812613, at *1 (Tex.App.–San Antonio Aug. 3, 2005, pet.



In re J.A.W.–N., 94 S.W.3d 119 Tex.App.-Corpus Christi (2013)

denied) (mem. op.) (holding that the trial court was required to enter judgment on the agreement); *Garcia–Udall v. Udall,* 141 S.W.3d 323, 331–32 (Tex.App.–Dallas 2004, no pet.) (holding that the trial court had no authority to enter a judgment that varied from the terms of the MSA, but that the court did have authority not to enforce illegal provisions in the MSA); *In re Circone,* 122 S.W.3d 403, 406 (Tex.App.–Texarkana 2003, no pet.) ("The Family Code contains no language allowing the trial court to review the mediation and explicitly requires the court to enter judgment based on the mediation agreement."); *In re J.A.W.–N.,* 94 S.W.3d 119, 121 (Tex.App.–Corpus Christi 2002, no pet.) (concluding that if the requirements for a binding MSA are met, the parties are entitled to have the MSA enforced); *Alvarez v. Reiser,* 958 S.W.3d 232, 233 (Tex.App.– Eastland 1997, pet. denied) (holding that even if one party withdraws its consent to the MSA, the trial court is required to enter judgment on the agreement).

7. Mandamus relief is available to remedy a trial court's erroneous refusal to enter judgment on an MSA. *See Mantas v. Fifth Court of Appeals,* 925 S.W.2d 656, 659 (Tex.1996) (orig. proceeding) (holding that the relator lacked an adequate remedy by appeal with respect to the court of appeals' refusal to abate the appeal pending resolution of a separate action to enforce a settlement agreement, noting that "[i]f the agreement is ultimately upheld, [relator] will have lost much of the settlement's benefit if he has been required to expend time and resources in prosecuting the appeal"). In a child-related dispute, the inadequacy of the appellate remedy in the context of refusal to enforce a settlement agreement is even more pronounced because the significant benefits to the family in peaceably resolving the dispute through mediation are lost.

8. The dissent would hold that the reference to Rule 11 narrows the mandate such that subsection (e) controls only over other "provisions under which similar types of agreements to resolve family disputes may be repudiated or withdrawn prior to entry of judgment." 411 S.W.3d at 479. This is undercut by subsection (e–1), which allows the trial court to decline to enter judgment on an MSA if the family violence exception is met and the MSA is not in the child's best interest, " *[n]otwithstanding Subsections (d) and (e)."* Tex. Fam.Code § 153.0071(e–1) (emphasis added). There would have been no need to include such "notwithstanding" language in subsection (e–1) if subsection (e) were intended to control only in the narrow set of circumstances specified by the dissent.

9. Again, the court may decline to enter judgment when the family violence exception is met.

10. Several lower courts have addressed the issue of whether section 153.0071 mandates entry of judgment on a statutorily compliant MSA under any and all circumstances, even where, for example, the agreement " 'was illegal or ... was procured by fraud, duress, coercion, or other dishonest means.' " *See, e.g., In re Calderon,* 96 S.W.3d 711, 718 (Tex.App.–Tyler 2003, orig. proceeding) (quoting *Boyd v. Boyd,* 67 S.W.3d 398, 403 (Tex.App.–Fort Worth 2002, no pet.) (analyzing comparable Family Code provision governing MSAs in suits involving marital property)). That issue is not presented or decided here.

11. As discussed further below, a best interest inquiry is much broader than an evaluation of whether the child's physical or emotional welfare is in jeopardy.



In re [...] 414 S.W. 3d 1 (45 [...] 56 Tex. [...] C. [...] 3d [...] 2013)

12. As noted above, in this manner, section 153.0071 effectively places parents involved in a SAPCR who enter into valid MSAs in the same position as parents in intact families-they are presumed to act in their child's best interest in reaching an agreement, subject to a DFPS investigation if a report of suspected abuse or neglect is made.

13. *See, e.g.,*Tex. Fam.Code § 105.001(a) ("In a suit, the court may make a temporary order, including the modification of a prior temporary order, for the safety and welfare of the child...."); *id.* § 105.001(b) ("[T]emporary restraining orders and temporary injunctions ... shall be granted without the necessity of an affidavit or verified pleading...."); *id.* § 105.001(c) (providing that a temporary order may not be rendered taking the child into the possession of the court or of a designated person, or excluding a parent from possession of or access to the child, except on a verified pleading or affidavit); *see also id.* § 156.006(b) (providing that while a modification suit is pending, the court may not render a temporary order that alters which person has the exclusive right to designate the child's primary residence under a final order unless the temporary order is necessary to protect "the child's physical health or emotional development" and is in the best interest of the child).

14. *See, e.g.,*Tex. Fam.Code § 81.001 (requiring a court to render a protective order if it finds that family violence has occurred and is likely to occur in the future); *id.* § 82.002(a) (allowing an adult family member to seek a protective order "to protect the applicant or any other member of the applicant's family"); *id.* § 85.001 (providing for issuance of protective orders when court finds that family violence has occurred and is likely to occur in the future); *id.* § 109.001(a) (allowing trial courts to issue temporary orders "to preserve and protect the safety and

welfare of the child during the pendency of the appeal"); *id.* § 156.101(a)(1) (allowing modification of an order if it would be in the child's best interest and the circumstances of the child have materially and substantially changed since the date of the signing of the MSA); *id.* § 157.374 (providing that in habeas corpus proceedings, "the court may render an appropriate temporary order if there is a serious immediate question concerning the welfare of the child").

15. The dissent cites the inapplicable Collaborative Law Act, which allows a tribunal to "issue an emergency order [during the process] to protect the health, safety, welfare, or interest of a party or a family." Tex. Fam.Code § 15.104. We note that engagement in the collaborative law process under this Act "operates as a stay of the proceeding," *id.* § 15.103(a), and that section 15.104 provides limited authority for the court to act notwithstanding the stay, *id.* § 15.104.

16. The mediator in the underlying case was Judge Leta Parks. Judge Parks was an associate judge in Harris County for eighteen years and is board-certified in family law. She is a former President of Gulf Coast Family Law Specialists and a former President of the Association of Family and Conciliation Courts, Texas Chapter.

17. The dissent expresses concern that the injunction provision is directed more at Scott, a nonparty, than at Stephanie. *See* 411 S.W.3d at 483. We agree that the provision could have been more artfully worded, but the intent is clear: Stephanie may not allow the child to come within five miles of Scott. Further, in entering judgment on an MSA, trial courts may include "[t]erms necessary to effectuate and implement the parties' agreement" so long as they do not substantively alter it. *Haynes v. Haynes,* 180



-36-

S.W.3d 927, 930 (Tex.App.–Dallas 2006, no pet.). Thus, to the extent there is no dispute about the parties' intent, the trial court has discretion to provide clarification of this or any other provision. In the unlikely event the parties disagree on the intent of this provision, that dispute may be resolved in accordance with the terms of the MSA. *Milner v. Milner,* 361 S.W.3d 615, 622 (Tex.2012).

18. Benjamin's argument that the MSA does not meet the statutory requirements because it is not signed by the Office of the Attorney General of Texas (the Office) misunderstands the signature requirement. He argues that the statute requires the signature of the Office because the Office is "a party to this litigation." However, the statute only requires the signature of "each party *to the agreement.*" Tex. Fam.Code § 153.0071(d)(2) (emphasis added). Because the Office is not a party to the agreement, its signature is not required for the MSA to be binding.

19. The dissent characterizes the trial court's rejection of the MSA as being based on the trial court's "clear[ ] determin[ation], based on Stephanie's own admissions, that Stephanie has little regard for court orders to protect children from her sex-offender husband, and that she has repeatedly made decisions against her daughter's best interest, which put her daughter at substantial risk." 411 S.W.3d at 480–81. But the trial court made no such findings. As noted above, the trial court stated only that the MSA "is not in the best interest of the child[ ]."

20. We recognize the serious policy reasons underlying the Family Code's numerous references to a child's best interest and agree that a child's best interest should always be the paramount concern when adjudicating custody and access issues. We simply disagree about whether the statute requires courts to defer to parents' decisions about such matters within the context of properly executed MSAs.

21. The dissent aptly notes that "[h]ad the Legislature used 'or' instead of 'and' between the two parts of that family violence provision, a trial court would be able to reject an MSA simply because a parent was induced by family violence to enter into an MSA." 411 S.W.3d at 473. By the same token, had the Legislature used "or" instead of "and" between the two parts of the provision, a trial court would be able to reject an MSA solely because the court concluded it was not in a child's best interest. But the Legislature did use the word "and," and the trial court cannot reject an MSA without making affirmative findings as to both parts.

22. Those factors are: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley,* 544 S.W.2d at 372.

23. The dissent insists that it is not reading section 153.0071 to allow a trial court to "refuse to enter judgment on an MSA based on any one of the [*Holley* ] factors" and that the issue presented here is "whether a trial court has discretion to reject an MSA that the trial court determines, based on evidence,



In re Lee, 411 S.W.3d 445, 466 Tex.Comm. (Tex. 2013)

places a child's safety and welfare in danger and, consequently, cannot possibly be in the child's best interest." 411 S.W.3d at 477. But again, the trial court made no endangerment findings, stating only that the MSA "is not in the best interest of the child[ ]." More importantly, there is simply no principled basis for the line the dissent draws between those MSAs on which a trial court must enter judgment and those they may disregard. The dissent thus ignores the clear mandate in section 153.0071 and trivializes the numerous other means by which trial courts can and must protect children. In the end, the dissent envisions a trial on whether the disputed MSA provision is in the child's best interest under *Holley, id.* at 484, which is exactly what the Legislature intended to foreclose under section 153.0071.

24. The dissent's assertion that "we cannot have it both ways" misses the point—that protecting children involves shielding them from high-conflict custody disputes as well as from abuse and neglect. Continuing the case until an investigation is complete—so that the trial court has sufficient information upon which to make a proper determination about whether protective orders should be entered contemporaneously with the MSA—makes complete sense and furthers this critical policy.

1. Justice Johnson, Justice Willett, myself, Justice Lehrmann, and Justice Boyd conclude that section 153.0071 precludes a broad best-interest inquiry on a properly executed MSA. 411 S.W.3d 445, 447. Parts IV and VI of Justice Lehrmann's opinion are a plurality, but for ease of reference, this writing will refer to that opinion and the Justices who join it as the Court.

2. Chief Justice Jefferson, Justice Hecht, Justice Green, myself, and Justice Devine believe that section 153.0071 does not

preclude an endangerment inquiry. 411 S.W.3d 445, 466 & n. 1 (Green, J., dissenting); *infra* Part II. Though the Court expressly avoids the issue, 411 S.W.3d at 486, the dissent observes that the Court's decision to not require the trial court here to enter judgment on the MSA must mean the Court recognizes that a trial court may refuse to enter judgment on an MSA that could endanger a child's safety and welfare. 411 S.W.3d at 486–87 (Green, J., dissenting).

3. Associate judges in family law cases are appointed pursuant to Chapter 201 of the Family Code.

4. The trial court acknowledged "there is no written report" from the hearing before the associate judge "save and except what's on this docket sheet" and accordingly conducted a *de novo* hearing. Under section 201.015(a) of the Family Code, "[a] party may request a de novo hearing before the referring court...." Tex. Fam.Code § 201.015(a). In addition, the referring court " *may* also consider the record from the hearing before the associate judge." *Id.* § 201.015(c) (emphasis added).

5. *See, e.g., Philipp v. Tex. Dep't of Family & Protective Servs.,* No. 03–11–00418–CV, 2012 WL 1149291, at *10 (Tex.App.–Austin Apr. 4, 2012, no pet.) (mem. op.) ("although a trial court may do so if presented with proper facts, nothing in section 153.0071 requires best-interest hearings in every case involving a mediated settlement agreement"); *Barina v. Barina,* No. 03–08–00341–CV, 2008 WL 4951224, at *5 (Tex.App.–Austin Nov. 21, 2008, no pet.) (mem. op.) (holding that section 153.0071 does not allow a trial court to refuse to enter judgment on an MSA when one party believes the agreement is different than what the plain language of the MSA reflects); *Beyers v. Roberts,* 199 S.W.3d 354, 359 (Tex.App.–Houston [1st Dist.] 2006, pet. denied) ("Nothing in [section 153.0071] requires that a trial court conduct a best interest hearing before entering an order



-38-

In re M.A.H., 1 S.W.3d 445, 65 Tex. Sup. Ct. J. 431 (Tex. 2013)

pursuant to a mediated settlement agreement.").

6. *Troxel v. Granville,* 530 U.S. 57, 68, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

7. *Barina,* 2008 WL 4951224, at *4.

8. Emotional and physical danger to the child is one of the nine factors in determining the best interest of the child. *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976).

9. The contractual defense of illegality may also allow a trial court to refuse to enter judgment on an MSA that could endanger the safety and welfare of a child. It is illegal to contract to harm a child. Further, it is well established that courts may refuse to enforce contracts that are either expressly or impliedly prohibited by statute or by public policy. *Woolsey v. Panhandle Ref. Co.,* 131 Tex. 449, 116 S.W.2d 675, 678 (1938). Though we have yet to decide the issue, our courts of appeals have observed that MSAs are contracts and courts may not enforce them if they are illegal. *See, e.g., Garcia–Udall v. Udall,* 141 S.W.3d 323, 331–32 (Tex.App.–Dallas 2004, no pet.) ("A trial court has authority not to enforce illegal provisions in mediated settlement agreements."). Thus, an MSA containing provisions that would result in abuse is void. *See, e.g., United States v. King,* 840 F.2d 1276, 1283 (6th Cir.1988) ("[A] parent's contract allowing a third person to burn, assault, or torture his child is void.").

10. As the dissent observes, the Court's decision to not mandamus the trial court to enter judgment on the MSA must mean the Court believes "that the Family Code allows a trial court discretion to refuse to sign a judgment pursuant to an MSA that places a child's safety and welfare in danger." 411 S.W.3d at 486 (Green, J., dissenting).

11. .411 S.W.3d at 456 (discussing temporary orders, temporary restraining orders, temporary injunctions, protective orders, motions to modify, habeas corpus proceedings, continuing the MSA hearing, and contacting the Texas Department of Family and Protective Services as options under the Family Code to protect the safety and welfare of the child).

12. *See, e.g., Santosky v. Kramer,* 455 U.S. 745, 766, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (recognizing the state retains "a *parens patriae* interest in preserving and promoting the welfare of the child"); *Miller v. HCA, Inc.,* 118 S.W.3d 758, 766 (Tex.2003) ("The State's role as *parens patriae* permits it to intercede in parental decision-making under certain circumstances.").

13. In deciding to refuse the MSA and set the matter for trial, the trial court also disregarded portions of the MSA wholly unrelated to any allegations of endangerment, such as provisions setting child support amounts, determining which parent would cover the child's health insurance, and which parent would claim the child as a dependent for federal income tax purposes.

14. *See Troxel,* 530 U.S. at 68, 120 S.Ct. 2054 ("there is a presumption that fit parents act in the best interests of their children").

1. The concurrence agrees with this conclusion. 411 S.W.3d at 461. Therefore, a majority this Court would hold that a trial court does not abuse its discretion by refusing to enter judgment on an MSA that places a child's safety and welfare at risk.

2. In a hearing before the trial court, Stephanie was asked about an April 6, 2009, violation of Scott's deferred adjudication. When the trial court asked about the nature of the violation, Stephanie responded: "It was that he was—I had unsupervised visitation contact with my daughter." Later, when asked if Scott "has taken care of [the child] without your supervision," Stephanie answered, "No, she has not." Although the record is not entirely clear, I interpret Stephanie's



-39-

testimony to mean that her sex-offender husband was allowed to be alone with the child, in violation of his probation.

3. Benjamin did not repeat this allegation during the hearing before the district court judge.

4. The Collaborative Family Law Act, enacted in 2011, contains a similar provision:

(a) A settlement agreement under [chapter 15, the Collaborative Family Law Act] is enforceable in the same manner as a written settlement agreement under Section 154.071, Civil Practice and Remedies Code.

(b) Notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law, a party is entitled to judgment on a collaborative family law settlement agreement if the agreement:

(1) provides, in a prominently displayed statement that is in boldfaced type, capitalized, or underlined, that the agreement is not subject to revocation; and

(2) is signed by each party to the agreement and the collaborative lawyer of each party.

Tex. Fam.Code § 15.105.

5. Yet, curiously, the Court has not ordered the trial court to enter judgment on the MSA.

6. *See, e.g.,* Tex. Fam.Code §§ 2.103(a), (f); 31.002(a); 31.005; 33.003(i); 33.008(a); 45.004(a); 51.11(b); 54.04(i); 54.05(m); 54.11(k); 60.010; 85.001(b); 85.005(c); 105.004(2); 105.009(a); 107.001(1), (5); 107.002(a), (e); 107.004(e); 107.005(a), (c); 107.008(b), (c); 107.011(a), (b); 107.021(a), (b); 153.001(a); 153.002; 153.004(b), (d), (e); 153.006(c); 153.007(b), (d); 153.0071(b), (e–1); 153.009(c); 153.015(b); 153.072; 153.131(a), (b); 153.133(a); 153.134(a); 153.191; 153.193; 153.252(2); 153.254(a); 153.256(1); 153.257; 153.312(a); 153.317(a); 153.373(2); 153.374(b); 153.433(a), (b); 153.501(b); 153.551(c); 153.601(4); 153.605(b); 153.6051(b); 153.6082(e); 153.703(a), (c); 153.704(d); 153.705(a), (c); 153.709(b); 154.122(a); 154.123(a), (b); 154.124(b), (d); 154.131(c); 154.182(b); 156.006(b); 156.101(a); 156.102(b); 156.103(a), (b); 156.402(a), (b); 156.409(a–2); 160.608(b); 161.001(2); 161.003(a); 161.004(a); 161.005(a); 161.007(3); 161.101; 161.103(b); 161.2011(a); 161.204; 161.205(2); 162.0025; 162.009(b); 162.010(c); 162.014(b); 162.015(a); 162.016(a), (b); 162.020; 162.102; 162.2061(a); 162.302(e); 162.308(a); 231.101(d); 261.004(b); 262.1015(b); 262.114(c); 263.102(c); 262.201(e); 262.205(e); 263.007(b); 263.302; 263.3026(b); 263.306(a); 263.307; 263.401(b); 263.403(a); 263.404(a); 263.502(c), (d); 263.503(a), (b); 264.108(a); 264.403(b); 264.601(2); 264.754; 264.903(c); 266.004(b), (e), (g); 266.0041(b), (c), (e); 266.010(g), (i).

7. At oral argument, Benjamin's counsel stated that he believed the Legislature inadvertently used "and" instead of "or" in the family violence provision, despite its intention to allow trial courts to consider the child's best interest before entering judgment on an MSA. *See* Tex. Fam.Code § 153.0071(e–1); *Bd. of Ins. Comm'rs of Tex. v. Guardian Life Ins. Co. of Tex.,* 142 Tex. 630, 180 S.W.2d 906, 908 (Tex.1944) (explaining that "and" is sometimes construed as "or," but only when "the context favors the conversion; as where it must be done in order to effectuate the manifest intention of the user; and where not to do so would render the meaning ambiguous, or result in an absurdity; or would be tantamount to a refusal to correct a mistake"). I am not convinced that the Legislature erred in this instance, as it is plausible that the Legislature, in the interest of avoiding the hardship of prolonged custody litigation on children in family violence situations, would want a court to invalidate



an MSA that was the result of family violence only if the court finds that the MSA is not in the child's best interest. I do not disagree with Benjamin, however, that the Legislature might effectuate the overarching policy for courts to act in the child's best interest, as codified in section 153.002 and expressed throughout the Family Code, by allowing trial courts to reject MSAs when either the family violence requirement is met *or* the court finds it is not in the best interest of the child. I leave Benjamin's suggested revision of the statute to the Legislature to enact an amendment as it deems necessary.

8. *See supra* at n. 6.

9. Under the MSA, the parties agreed to have their attorneys first attempt to resolve disputes through phone conference with the mediator, and if the disputes cannot be resolved by phone conference, then they are to be decided by arbitration, with the mediator serving as arbitrator.

10. Under this construction, Benjamin is powerless to challenge the MSA when a motion for entry of judgment is being considered. Instead, he must wait until the trial court enters judgment on the MSA and then challenge its enforcement through arbitration and, ultimately, again in court. Surely this inefficient process is not what the Legislature intended.

11. The Court suggests I misstate the issue because the trial court rejected the MSA on best interest grounds and did not make specific findings that the MSA places the child's safety and welfare in danger. 411 S.W.3d at 460 n. 23. But findings necessary to support a trial court judgment will be implied when they are supported by evidence. *See, e.g., Sixth RMA Partners, L.P. v. Sibley,* 111 S.W.3d 46, 52 (Tex.2003) ("When neither party requests findings of fact and conclusions of law, it is implied that the trial court made all fact findings necessary to support its judgment." (citing *BMC Software*

*Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002))); *Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990) (per curiam) (holding that findings of fact should be implied in favor of an order modifying child support (citing *Lemons v. EMW Mfg. Co.,* 747 S.W.2d 372, 373 (Tex.1988) (per curiam))). In the hearing before the trial court, there was no discussion of the specific *Holley* factors, but there was testimony about Scott, his contact with the child, and resulting probation violations. I believe I have accurately stated the issue and that in this case, as with any case in which an MSA endangers a child, these grounds for rejecting an MSA—that it jeopardizes a child's safety and that it is not in the child's best interest— are simply two sides of the same coin. Whether the trial court abused its discretion in rejecting an MSA that puts a child's safety and welfare in danger should not come down to whether the trial court used the word "endangerment" or tracked the language of the statute and instead used the phrase "not in the best interest of the child."

12. If parents know what is best for their children, as the Court believes, and if children suffer needlessly from traditional custody litigation, a fact the Court says is well-documented, and if successful mediation largely avoids those harmful effects, as the Court asserts, then why would parents opt not to use mediation to settle their disputes? *See* 411 S.W.3d at 459.

13. The record contains no indication that the trial court has issued temporary orders or otherwise altered the custody, possession, and access provisions of the 2007 order.

14. Because the MSA uses the word "enjoined," the Court and the concurrence refer to the protective provision as an injunction. 411 S.W.3d at 458 n. 17. The parties have presented no arguments about whether an agreed MSA provision could be construed as or enforced as a true injunction. *See* Tex. Fam.Code § 105.001 (providing for



-41-

trial court issuance of temporary injunctions in family law matters); *see, e.g., Peck v. Peck,* 172 S.W.3d 26, 35 (Tex.App.–Dallas 2005, pet. denied) (noting that although the Family Code does not speak to permanent injunctions, many Texas cases address final orders in family law matters that incorporate permanent injunctions). Nor have the parties presented arguments about whether an MSA provision, if it indeed can be an injunction, could be binding on a person who is not a party to the MSA or the lawsuit. *See*Tex.R. Civ. P. 683 (stating that an order granting an injunction "is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise"). I leave those questions for another day, but I do not assume that simply because Stephanie and Benjamin chose to "enjoin" a nonparty, it is in fact an injunction that can be enforced against Scott.

15.  We have held that third parties can be bound by arbitration agreements they did not sign under certain circumstances, but those cases are inapplicable here. *See, e.g., In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 738–39 (Tex.2005) (explaining that, under federal substantive law, non-signatories have been bound by arbitration agreements under contract and agency law principles of (1) incorporation by reference, (2) assumption, (3) agency, (4) alter ego, (5) equitable estoppel, and (6) third-party beneficiary).

16.  The issue is far from settled in the courts of appeals. *See, e.g., Byrd v. Byrd,* No. 04–11–00700–CV, 2012 WL 6013424, at *3, 2012 Tex.App. LEXIS 9840, at *10 (Tex.App.–San Antonio Nov. 30, 2012, no pet.) (mem. op.) ("While a trial court in these circumstances has authority not to enforce the mediated settlement agreement, it has no authority to sign a judgment that varies from the terms of the mediated settlement agreement."); *Philipp v. Tex. Dep't of Family*

*& Protective Servs.,* No. 03–11–00418–CV, 2012 WL 1149291, at *4 n. 3, 2012 Tex.App. LEXIS 2760, at *12 & n. 3 (Tex.App.–Austin Apr. 4, 2012, no pet.) (mem. op.) ("The trial court has no authority to enter a judgment that varies from the terms of the mediated settlement agreement," and even if the family violence provision were implicated, "the trial court would be permitted only to decline to enter a judgment on the MSA, not to modify its terms."); *Garcia–Udall v. Udall,* 141 S.W.3d 323, 332 (Tex.App.–Dallas 2004, no pet.) ("[T]he trial court has no authority to enter a judgment that varies from the terms of the mediated settlement agreement."). *But see, e.g., Wallace v. McFarlane,* No. 01–10–00368–CV, 2013 WL 4507843, at *8, 2013 Tex.App. LEXIS 10587, at *22 (Tex.App.–Houston [1st Dist.] Aug. 22, 2013, no pet. h.) ("A trial court may modify the terms of an MSA, however, so long as those modifications do not add terms, significantly alter the original terms, or undermine the parties' intent.").

17.  The concurrence concludes that the record does not support a finding that entry of judgment on the MSA could endanger the child. 411 S.W.3d at 464–65. We give trial courts wide latitude in determining matters relating to a child's best interest, however. *See Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex.1982). "With the opportunity to observe the appearance and demeanor of the witnesses, to weigh their testimony, and evaluate the virtues of parties, no one is in a position to do this better than the trial court." *Taylor v. Meek,* 154 Tex. 305, 276 S.W.2d 787, 790 (Tex.1955) (quoting *Valentine v. Valentine,* 203 S.W.2d 693, 696 (Tex.Civ.App.–Amarillo 1947, no writ)). We must not second-guess the trial court simply because we read short, awkwardly-phrased testimony differently. *See E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995) ("The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles[,] ... not whether, 'in the opinion of

fastcase

-42-

the reviewing court, the facts present an appropriate case for the trial court's action.' " (internal citations omitted)); *Walker v. Packer,* 827 S.W.2d 833, 839–40 (Tex.1992) ("[T]he reviewing court may not substitute its judgment for that of the trial court.... Even if the reviewing court would have decided the issue differently, it cannot disturb the trial court's decision unless it is shown to be arbitrary and unreasonable."); *Bell v. Campbell,* 328 S.W.3d 618, 620 (Tex.App.–El Paso 2010, no pet.) ("We recognize that the trial court is best situated to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record."). I agree with the concurrence that a finding of endangerment and rejection of an MSA on that basis should not occur without evidentiary support, but I disagree with the conclusions the concurrence draws on this record. Under our mandamus standard of review, any evidence of endangerment—even arguably ambiguous statements, and even when there is conflicting evidence—is *some* evidence; when then there is some evidence to support the trial court's decision, no abuse of discretion exists. *See Gen. Tire, Inc. v. Kepple,* 970 S.W.2d 520, 526 (Tex.1998) ("An abuse of discretion does not exist where the trial court bases its decisions on conflicting evidence." (quoting *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978))); *Beaumont Bank, N.A. v. Buller,* 806 S.W.2d 223, 226 (Tex.1991) ("Although the court of appeals reversed the trial court on the ground that there was 'no evidence' to support the issuance of the turnover order, the court of appeals should have reviewed the trial court's judgment under an abuse of discretion standard." (internal citations omitted)).

18. I disagree with the concurrence's implication that a trial court with concerns about a child's safety under an MSA must, at the prove-up stage, conduct a full evidentiary hearing regarding the potential effects of the modification and the intent of parties and

non-parties to comply with provisions of the MSA.

19. The Court again misses the critical question in cases such as this—what can a trial court do when parents are not acting in the child's best interest?

**Andrew Goodman**

| | |
|---|---|
| **From:** | Fastcase <support@fastcase.com> |
| **Sent:** | Tuesday, August 04, 2020 5:04 PM |
| **To:** | Andrew Goodman |
| **Subject:** | Fastcase Document - Scruggs v. Linn |



This document has been sent to you by a user in the Fastcase Research Platform.

You can find a permanent public version of the document here:
https://go.fastcase.com/e/427522/k0b8CMh4y7fy2bywmv1M2blwMkTk3d/6mlbqh/971480442?h=kBGH-RJFp0QbfOropLYcUJXtjd8x5jRolNMmN-lmXgM

Please find the full text of the document below:

---

443 S.W.3d 373

**Charles Keener SCRUGGS, Appellant**
v.
**Heather Maude LINN, Appellee.**

**No. 14–12–01168–CV.**

**Court of Appeals of Texas, Houston (14th Dist.).**

**Aug. 19, 2014.**

[443 S.W.3d 375]

Gerson D. Bloom, George William Vie, III, Galveston, for Appellant.

David J. Wukoson, Houston, for Appellee.

Panel consists of Chief Justice FROST and Justices JAMISON and WISE.

**OPINION**

MARTHA HILL JAMISON, Justice.

This case involves a dispute between an oral surgeon and a neurologist over retroactive child support for their now adult daughters. In four issues, appellant Charles Keener Scruggs complains of the trial court's judgment against him for attorney's fees, costs, and retroactive child support in favor of appellee Heather

1

161

Maude Linn in this suit seeking modification of a final order rendered in a suit affecting the parent-child relationship.[1] We reverse and remand the trial court's judgment against Scruggs for amicus attorney fees for a determination of whether the award is in compliance with the parties' mediated settlement agreement (MSA). We affirm the trial court's judgment in all other respects.

[443 S.W.3d 376]

### *Background*

Scruggs and Linn divorced in 2002. They had two daughters during their marriage. In the final divorce decree, Scruggs and Linn were appointed as joint managing conservators of their daughters, and Scruggs was ordered to pay child support in the amount of $1,250 per month. Scruggs filed his petition to modify the parent-child relationship in 2008, alleging the circumstances of the children had "materially and substantially changed since the date of the rendition of the" divorce decree, as the children then were living with Scruggs most of the time. Scruggs sought to be appointed the joint managing conservator of the children with the right, among other things, to designate their primary residence. Scruggs also sought to terminate his child support obligation on the basis that Linn had "voluntarily relinquished actual care, control, and possession of the children for at least six months."

Linn filed a counter-petition seeking the right to determine the domicile of the children, retroactive child support, and an increase in Scruggs's child support obligation. Scruggs amended his petition to seek child support from Linn and to allege that he was "the conservator with the exclusive right to determine the children's residence" and no longer alleged that Linn had "voluntarily relinquished actual care, control, and possession of the children for at least six months" or sought to terminate his child support obligation. The amicus attorney who represented the children filed an original answer seeking her fees and expenses as costs.

Scruggs and Linn subsequently entered into the MSA[2] , including, in relevant part, the following terms:

- Scruggs had the right to receive child support from Linn;

- Linn was required to pay $1,160.60 per month in child support beginning June 1, 2010;[3]

- Retroactive child support, if any, would be determined by the trial court;

- Scruggs would reimburse Linn for his portion of any counseling fees paid by Linn on his behalf and would pay any balance owed by him to the psychologist;[4] and

- Scruggs and Linn would pay any balance owed to the amicus attorney before trial and would divide evenly any amicus fees incurred "for trial."

The issues of retroactive child support and attorney's fees were tried to the bench. The trial court thereafter entered a letter "ruling" as follows in relevant part:

- The amicus attorney's fees were "to be paid according to the MSA within 7 days of the final order." The amicus attorney was awarded $4,156.38.

- Scruggs would reimburse Linn for his portion of counseling fees, totaling $5,600, and the remaining counseling fees would be divided evenly between Scruggs and Linn.

- Scruggs and Linn would each pay their own attorney's fees.

[443 S.W.3d 377]

- Scruggs owed Linn $28,750 in retroactive child support, offset by $17,409.90 owed to Scruggs by Linn, leaving a total owed by Scruggs to Linn of $11,341.

- Other costs and fees would be paid by the parties who incurred them.

2

Linn filed two motions for reconsideration, arguing that the trial court was required to order Scruggs to pay her attorney's fees and all court costs under section 157.167 of the Texas Family Code.[5] The trial court denied the first motion but granted the second and subsequently issued another letter "ruling" that, in addition to the first ruling, required Scruggs to pay $15,000 of Linn's attorney's fees and costs of court.

The trial court thereafter signed a document entitled "Order in Suit to Modify Parent–Child Relationships" (Order), in which it rendered judgment against Scruggs for the retroactive child support offset of $11,341, attorney's fees, and costs. The costs, totaling $18,175, included court-appointed psychologist's fees of $5,230, a high conflict parenting coordinator fee of $925, and amicus attorney fees of $4,604.69.

Scruggs filed a motion for new trial, a request for findings of fact and conclusions of law, and a notice of appeal. The trial court initially did not file findings of fact and conclusions of law. We abated the appeal, and after the trial court filed findings of fact and conclusions of law, the appeal was reinstated.

### Discussion

In four issues, Scruggs argues the trial court abused its discretion because (1) imposing the costs enumerated in the Order on Scruggs was contrary to the MSA and the award of attorney's fees was not provided for in the MSA; (2) the award of attorney's fees was not required under the Family Code; and (3) the trial court should have terminated Scruggs's child support obligation as of the date he filed the modification suit.

To prevail in a modification suit, a party seeking relief must show that the circumstances of the children or a person affected by the order have materially and substantially changed since the date of the divorce decree. *See* Tex. Fam.Code § 156.401(a)(1) ; *In re D.S., 76 S.W.3d 512*, 520 (Tex.App.-Houston [14th Dist.] 2002, no pet.). In determining whether child support should be modified, the trial court is obliged to examine the circumstances of the children and parents at the time of the divorce decree and the circumstances existing at the time of trial in the modification suit. *See In re D.S.,* 76 S.W.3d at 520. Upon a showing of the requisite changed circumstances, the trial court may alter the child support obligations. *See id.*

Trial courts have broad discretion to determine and modify the amount of child support that a parent must pay. *See id.* We review the trial court's modification ruling under the abuse-of-discretion standard. *See id.* The test for abuse of discretion is whether the trial court acted arbitrarily or unreasonably, or whether it acted without reference to any guiding rules or principles. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex.1990). An abuse of discretion does not occur when the record contains some evidence of a substantial

[443 S.W.3d 378]

and probative character to support the trial court's ruling. *In re T.J.L., 97 S.W.3d 257*, 266 (Tex.App.Houston [14th Dist.] 2002, no pet.).

### I. What is covered by the MSA?

In his second and third issues, Scruggs argues the trial court's rendition of judgment against him for costs and attorney's fees is contrary to the terms of the parties' negotiated MSA. "If a mediated settlement agreement meets [statutory requirements[6] ], a party is entitled to judgment on the mediated settlement agreement notwithstanding ... another rule of law." Tex. Fam.Code § 153.0071(e) ; *see In re Lee, 411 S.W.3d 445*, 447 (Tex.2013). A trial court generally does not have discretion to decline to enter judgment on or deviate from an MSA.[7] *See* Tex. Fam.Code § 153.0071(e) ; *see also Lee,* 411 S.W.3d at 452–53.

### A. Attorney's fees award is not contrary to the MSA.

In his second issue, Scruggs argues that the MSA reserved only the issue of retroactive child support for trial and thus the trial court abused its discretion in ordering him to pay some of Linn's attorney's fees.[8] The MSA does not address attorney's fees. However, it is labeled as a "partial" MSA and addresses retroactive child

support, as follows: "Issue of whether one parent, or both, owe the other parent retro-active or past due child support, shall be determined by the Court." Contrary to Scruggs' assertion, the MSA does not reserve "only" this issue. Linn argues that the judgment for attorney's fees against Scruggs was mandated by the Family Code. *See* Tex. Fam.Code § 157.167 (discussed in detail below). Section 157.167 mandates an award of attorney's fees against the party who failed to make child support payments, except under certain specific circumstances, discussed below. *See id.* Because the MSA, according to its own title—"Binding Mediated Settlement Agreement—Partial SAPCR"—and terms, is merely a partial settlement and does not address attorney's fees, and because the fees issue is related to retroactive child support—the issue expressly reserved for trial in the MSA—we conclude the trial court's award of attorney's fees to Linn was not contrary to the MSA.

**B. Costs award is contrary to the MSA only to the extent that the amicus attorney's fees incurred prior to trial were not paid by the party who owed them and the amicus attorney's fees incurred for trial were not divided equally.**

In his third issue, Scruggs contends the trial court abused its discretion in awarding costs to Linn that purportedly varied from the terms of the MSA. In the MSA, the parties agreed (1) each party was responsible for 50% of the counseling fees, Scruggs would reimburse Linn for any portion of the counseling fees that she paid

[443 S.W.3d 379]

on his behalf, and Scruggs would pay the counselor directly for any remaining fees he owed; and (2) the parties would pay the amicus attorney "100% of any balance owed to her by either mother or father prior to trial" and each party would pay half of the remaining balance of the time billed for trial within seven days after the completion of trial.

The trial court, in its findings of fact and conclusions of law, found that Linn had "paid in full her court ordered share of the expenses and charges of the Court appointed Amicus, the Court appointed psychologist, and the Court appointed high conflict parenting coordinator" and that Scruggs had failed to pay his share of the same. The court broke down the costs awarded to Linn as follows:

- "fees paid to the Court appointed high conflict parenting coordinator ... in the amount of $925;"
- "fees paid to the Amicus in the amount of $12,000.00; and"
- "fees ... paid to the Court appointed psychologist ... which were to be paid by [Scruggs] in the amount of $5,230.00."

In the judgment, the court further awarded the amicus attorney $4,604.69 to be paid by Scruggs.

**Counseling fees.** As set forth above, the parties agreed in the MSA that each party was responsible for 50% of the counseling fees, Scruggs would reimburse Linn for any portion of the counseling fees that she paid on his behalf, and Scruggs would pay the counselor directly for any remaining fees he owed her. At trial, Linn testified that Scruggs owed her $5,600 that she paid to the court appointed psychologist on Scruggs's behalf. It is not clear why the court awarded Linn only $5,230 as costs, but Linn's testimony is evidence of a substantial and probative character that Scruggs owed her $5,600 under the MSA. Accordingly, the trial court's award of $5,230 to Linn for counseling fees was not contrary to the MSA, and the trial court did not abuse its discretion in rendering judgment against Scruggs for this amount.

**Amicus attorney fees.** Scruggs argues that the parties agreed in the MSA to divide the amicus attorney fees "fifty-fifty" and thus the trial court abused its discretion in ordering him to reimburse Linn $12,000 in fees she paid to the amicus attorney and to pay the amicus attorney $4,604.69 in additional fees. The MSA is not as clear as Scruggs represents. It reads, "Parents shall pay the Amicus 100% of any balance owed to her by either mother or father prior to trial with the remaining time billed for trial to be pa[id] 50/50 by each parent within seven days of trial's completion." The MSA neither indicates what fees were owed to the amicus

4

164

attorney by Scruggs or by Linn before trial nor states that the balance owed "prior to trial" was to be divided equally between Scruggs and Linn.

The party seeking to recover attorney's fees carries the burden of proof. *Stewart Title Guar. Co. v. Sterling,* *822 S.W.2d 1,* 10 (Tex.1991) ; *In re A.L.S.,* *338 S.W.3d 59,* 69–70 (Tex.App.-Houston [14th Dist.] 2011, pet. denied). At trial, Linn argued that Scruggs was required under the statute to pay the amicus attorney fees. *See* Tex. Fam.Code § 157.167(a). Accordingly, Linn had the burden to show she was entitled to the $12,000 reimbursement from Scruggs and to show Scruggs was responsible for the remaining fees owed to the amicus attorney.

Linn testified that she had paid the amicus attorney $12,000. The amicus attorney testified, "[M]y firm has been paid [$] 13,000 by each party. Both have paid equally up to this point. The last invoice

[443 S.W.3d 380]

that was submitted, our firm was owed [$]2,656.38. As of this week up until I calculated, ... that would bring my invoice as of today to $4,156.38." However, there is no evidence in the record of the balance, if any, "owed to [the amicus attorney] by either mother or father *prior to trial* " or "the remaining time *billed for trial* " under the MSA.[9] Linn did not meet her burden to show Scruggs was required to pay the amicus attorney fees because the trial court was required to comply with the terms of the MSA, which required Linn and Scruggs to "pay the Amicus 100% of any balance owed to her by either mother or father prior to trial with the remaining time billed for trial to be pa[id] 50/50 by each parent within seven days of trial's completion."[10] Thus, Linn was required to show what amount, if any, of amicus attorney's fees Scruggs owed her and the amicus attorney under the MSA. The record does not include the breakdown of (1) what amount was owed before trial and by whom and (2) what amount was billed for trial, which under the MSA was to be split equally between Scruggs and Linn.[11]

As set forth above, the trial court was required to comply with the terms of the MSA. *See* Tex. Fam.Code § 153.0071(e) ; *Lee,* 411 S.W.3d at 447. We conclude that under the MSA, the trial court was required to award the amicus attorney her fees owed before trial against the party who owed those fees and divide those amicus attorney's fees incurred for trial equally between Scruggs and Linn. We reverse that portion of the trial court's judgment ordering Scruggs to reimburse Linn $12,000 she paid in amicus attorney's fees and to pay the amicus attorney $4,604.69. We remand this issue (1) for proceedings to determine what amount, if any, was owed to the amicus attorney before trial and by whom and what amount was billed for trial; and (2) subsequently to order each party to pay the amicus attorney the amount each owes under the terms of the MSA.

**High conflict parenting coordinator fees.** Scruggs also complains that the judgment against him for this fee of $925 is contrary to the MSA. The trial court appointed a high conflict parenting coordinator at Linn and the amicus attorney's request. The MSA does not address this fee. Although it states that the issue of retroactive child support "shall be determined by the [trial] Court," it does not limit the court from considering other issues not expressly covered by the MSA. We conclude the trial court's judgment against Scruggs for this fee is not contrary to the MSA. The trial court did not abuse its discretion in rendering judgment against Scruggs for this amount based on his claim that it is contrary to the MSA.

**Conclusion.** The trial court's judgment against Scruggs for Linn's attorney's fees, counseling fees, and high conflict parenting coordinator fees is not contrary to the MSA, as Scruggs contends. Accordingly, the trial court did not render a judgment contrary to the MSA or abuse its discretion

[443 S.W.3d 381]

in rendering judgment against Scruggs as to these fees. We overrule Scruggs's second issue pertaining to his argument that Linn's attorney's fee award was contrary to the MSA. We cannot determine from the record whether the judgment for amicus attorney's fees is contrary to the MSA. We reverse and remand this issue as discussed above. We overrule Scruggs's third issue in all other respects.

## II. Was the attorney's fee award against Scruggs allowed under or mandated by the Family Code?

Scruggs also argues in his second issue that the trial court erroneously concluded it was required to render judgment for Linn's attorney's fees against Scruggs, and in so doing, abused its discretion. In its findings of fact and conclusions of law, the trial court concluded Linn was entitled to her attorney's fees "pursuant to Sections 106.002 and 157.167(a) " and "no good cause exists under Sections [sic] 157.167(c) ... to waive the requirement that ... Scruggs pay [Linn's] reasonable attorney fees and court costs."

Section 106.002, entitled "Attorney's Fees and Expenses," allows the trial court to render judgment for reasonable attorney's fees and expenses to be paid directly to the attorney. Tex. Fam.Code § 106.002(a). Section 157.167 states, in relevant part: "If the court finds that the respondent has failed to make child support payments, the court shall order the respondent to pay the movant's reasonable attorney's fees and all court costs in addition to the arrearages."*Id.* § 157.167(a). Under subsection (c), "for good cause shown, the court may waive the requirement that the respondent pay attorney's fees and costs if the court states the reasons supporting that finding." *Id.* § 157.167(c). The trial court has broad discretion in awarding attorney's fees, particularly in child support cases. *In re W.R.B.,* No. 05–12–00776–CV, 2014 WL 1008222, at *7 (Tex.App.-Dallas Feb. 20, 2014, pet. filed) (mem. op.)

Scruggs argues that because the trial court determined that he and Linn had both failed to make child support payments, "it could have ordered either party to pay the other's attorney's fees." Construing this argument liberally to be an argument that Scruggs showed good cause for the trial court to waive the attorney's fees requirement, we conclude that Scruggs did not make that showing.[12]

At trial, Scruggs admitted that he made only one or two child support payments after he filed the modification suit. His only explanation was that he thought he did not have to pay child support after filing suit based on advice from counsel: "I got advi[c]e from my attorney who told me I didn't have to pay anymore." On cross examination, Linn's counsel asked,

[443 S.W.3d 382]

"[Y]ou're saying [your attorney], a board certified family law lawyer, told you not to pay child support? That's what you want us to believe?" Linn's counsel also asked Scruggs why, if he thought he no longer had to make payments, he still made one or two payments after filing the modification suit. At first Scruggs responded that his assistant inadvertently made a payment, but then he admitted that he "maybe" signed the check for that payment and wrote "unfair" on it. The trial court, as the factfinder, was the sole judge of Scruggs's credibility and could disbelieve Scruggs's testimony that his attorney told him he did not have to pay child support. *See City of Keller v. Wilson,* 168 S.W.3d 802, 819 (Tex.2005).

Linn, moreover, testified that she was seeking attorney's fees because of Scruggs's behavior in prolonging the modification suit. The trial court could take this evidence into consideration in its good cause determination. *See T.J.L.,* 97 S.W.3d at 266 (noting no abuse of discretion occurs when record contains some evidence of a substantial and probative character to support the trial court's ruling).

Considering the above evidence, we conclude the trial court did not abuse its discretion in concluding that Scruggs did not show good cause for his failure to pay child support and in rendering judgment against him for Linn's attorney's fees.[13] We overrule this issue.

## III. Did Scruggs have a live claim at trial for termination of his child support obligation?

In two issues, Scruggs argues the trial court abused its discretion in awarding retroactive child support to Linn because Scruggs originally pleaded for termination of his child support obligation and he had primary custody of the children. In his original petition, Scruggs sought to terminate his child support obligation on the basis that Linn had "voluntarily relinquished actual care, control, and possession of the children for at least six months." However, he amended his petition to seek child support from Linn and, concededly, no longer sought termination of his child support obligation. As the trial court found in its findings of fact and

6

166

conclusions of law, Scruggs's amended petition was the live petition at trial, and it is the most recent one in the appellate record.

An amended petition completely replaces and supersedes the previous pleading. *See J.M. Huber Corp. v. Santa Fe Energy Res., Inc.*, 871 S.W.2d 842, 844 (Tex.App.-Houston [14th Dist.] 1994, writ denied) ("An amended petition ... supersedes all prior petitions and operates to dismiss ... causes of action to the extent they are omitted from the amended pleading."). Scruggs argues, however, that the MSA gave Linn notice that he was seeking termination of his child support obligation as of the date the modification suit was filed. The MSA states, "Issue of whether one parent, or both, owe the other parent retroactive child support, shall be determined by the Court." It neither indicates which parent had a claim for retroactive child support nor specifies that Scruggs

[443 S.W.3d 383]

was seeking to terminate his child support obligation as of the date the modification suit was filed.[14]

We conclude the trial court did not abuse its discretion in awarding Linn retroactive child support. We overrule these issues.

### Conclusion

Because we cannot determine from the record whether the judgment for amicus attorney's fees is contrary to the MSA, we reverse and remand this issue to the trial court (1) for proceedings to determine what amount, if any, was owed to the amicus attorney before trial and by whom and what amount was billed for trial; and (2) subsequently to order each party to pay the amicus attorney the amount each owes under the terms of the MSA. We affirm the judgment of the trial court in all other respects.

--------

Notes:

[1] Scruggs originally brought five issues. In the first issue, he complained that the trial court erred in failing to file findings of fact and conclusions of law. We abated the appeal, and the trial court subsequently filed findings of fact and conclusions of law. We now address the other issues raised by Scruggs.

[2] The MSA was entitled "Binding Mediated Settlement Agreement–Partial SAPCR."

[3] When the MSA was signed, the elder daughter was 18 years old and no longer subject to child support or possession orders. The younger daughter was 16 years old at that time.

[4] The court appointed a psychologist for the children at the request of Linn and the amicus attorney. The counseling fees covered counseling sessions for the children.

[5] All section references are to the Texas Family Code. Section 157.167, entitled "Respondent to Pay Attorney's Fees and Costs," states: "If the court finds that the respondent has failed to make child support payments, the court shall order [him] to pay the movant's reasonable attorney's fees and all court costs in addition to the arrearages." Tex. Fam.Code § 157.167.

[6] A mediated settlement agreement is binding on the parties if it is signed by each party and by the parties' attorneys who are present at the mediation and states prominently and in emphasized type that it is not subject to revocation. Tex. Fam.Code § 153.0071(d). The parties do not dispute that the MSA is binding.

[7] A narrow exception, inapplicable here, allows a court to decline to enter judgment on a statutorily compliant mediated settlement agreement when a party to the agreement was a victim of family violence, the violence impaired the party's ability to make decisions, and the agreement is not in the child's best interest. *See* Tex. Fam.Code § 153.0071(e–1) ; *see also Lee*, 411 S.W.3d at 452–53.

[8] Scruggs also argues the trial court abused its discretion in rendering judgment against him for Linn's attorney's fees under section 157.167. We discuss that issue below.

[9] (Emphases added.)

[10] Generally, a party with the burden of proof who fails to produce evidence of attorney's fees waives her right to those fees, and an award of zero fees is appropriate. *A.L.S.,* 338 S.W.3d at 70. However, here, evidence of the total amount of the amicus attorney fees was adduced at trial, but the proper breakdown of those fees was not presented.

[11] The amicus attorney's invoices were not part of the appellate record. It is not clear whether the trial court had access to the invoices. We note that Scruggs preserved this issue for our review because he argued that the amount of amicus attorney fees the trial court ordered him to pay conflicted with the terms of the MSA.

[12] Even if he had, the trial court was not required under the statute to waive the fees requirement. Tex. Fam.Code § 157.167(c) ( "[F]or good cause shown, the court *may* waive the requirement that the respondent pay attorney's fees and costs.") (emphasis added). Scruggs also argues that the trial court was not required to render judgment against him under subsection (d). Under subsection (d):

> If the court finds that the respondent is in contempt of court for failure or refusal to pay child support and that the respondent owes $20,000 or more in child support arrearages, the court may not waive the requirement that the respondent pay attorney's fees and costs unless the court also finds that the respondent:
>
> (1) is involuntarily unemployed or is disabled; and
>
> (2) lacks the financial resources to pay the attorney's fees and costs.
>
> *Id.* § 157.167(d). We need not address that argument, as the trial court expressly concluded that it awarded Linn's attorney fees under subsection (a).

[13] Pursuant to the MSA, Linn had agreed to pay child support of $1,160.60 per month beginning June 1, 2010. Linn testified at trial that she was required to make the payments to the Attorney General's State Disbursement Unit. She said that she sent the payments there and they were returned because the custodial parent on the account had not been changed to Scruggs. Linn testified that she took the money she was ordered to pay and put it into a bank account for the children. We need not decide whether Linn showed good cause not to pay child support because Scruggs does not argue on appeal that the trial court should have ordered Linn to pay his attorney's fees.

[14] Linn's counter-petition, however, included a claim for retroactive child support. The trial court concluded that both parents owed retroactive child support but found in its findings of fact and conclusions of law that the amended petition sought only modification of conservatorship, possession, and future child support, and attorney's fees and costs. The court further found that "at the time of trial[, Scruggs] had no active claims remaining from his First Amended Petition ..., only a claim for attorney fees, which could not exist as a stand-alone cause of action, and had not filed a pleading seeking retro-active child support." Scruggs's claims in the amended petition, other than for attorney's fees and costs, were resolved by the MSA.

--------

You are receiving this email because it was requested from the Fastcase Research Platform.

Fastcase Inc.
711 D Street NW
Washington, DC 20004

e: support@fastcase.com
p: 1.866.773.2782

Unsubscribe from email communications

# EXHIBIT "G"

Deepa Biswas Willingham

25

1       A.  453.

2       Q.  I'm sorry?

3       A.  $453.

4       Q.  So is it your testimony that your total income

5   each month is approximately $1,453?

6       A.  Yes.

7       Q.  And once you and Mr. Willingham get divorced,

8   you would agree with me that you cannot afford the

9   mortgage on the Solvang property.  Correct?

10      A.  That is correct.

11      Q.  Okay.  And you would agree with me that your

12  estate does not have enough cash money to be able to pay

13  for Solvang -- the Solvang mortgage.  Correct?

14              MS. BURKETT:  Objection; leading.  There's

15  a lot of leading -- I'm just -- I let it go.

16              MS. RAZAVI ZAND:  She's -- she's not --

17  she's adverse.

18              MS. BURKETT:  Okay.

19              MS. RAZAVI ZAND:  Yeah.

20              MS. BURKETT:  You can answer.

21      Q.  (BY MS. RAZAVI ZAND)  You would agree with me

22  that your estate does not have enough cash or money to

23  pay the mortgage on the Solvang property.  Correct?

24      A.  I don't know.

25      Q.  Do you know how much the mortgage is each month

Deepa Biswas Willingham

26

1   on Solvang?

2      A.   Yes.

3      Q.   How much?

4      A.   It's $9,000.

5      Q.   Okay.  And you would agree with me that you

6   have no way of -- according to your income, it's not

7   possible for you to be able to pay $9,000 per month just

8   for the mortgage on Solvang.  Correct?

9      A.   At the present time.

10     Q.   Okay.  And so how exactly do you believe that

11  you're going to be able to pay for the Solvang property

12  if you don't sell it?

13     A.   I do not know at this point.

14     Q.   So why exactly would you want to keep that

15  piece of property if you don't even know how you're

16  going to pay for it?

17     A.   I didn't say I didn't know how -- how to pay

18  for it.  I said I didn't know how I was -- how I was

19  going to pay for it.

20     Q.   I don't understand the difference between your

21  answer?

22     A.   I'll -- I'll have to decide after the -- our

23  property is -- assets are divided.

24     Q.   Well, you understand that you probably have to

25  make a decision on whether an asset should be sold or

Deepa Biswas Willingham

27

1    kept.  Correct?

2        A.  When it comes to it, I will make that decision.

3        Q.  And you understand that we have trial that's

4    set approximately in the next 30 days.  Correct?

5                THE WITNESS:  Is that correct?

6                MS. BURKETT:  Answer the question.

7        A.  Yeah.

8        Q.  (BY MS. RAZAVI ZAND)  That's correct?

9        A.  Uh-huh.

10       Q.  Right?  You know the trial date.  Correct?

11       A.  Uh-huh.  Yes, I do know.

12       Q.  Okay.  And so how long have you been going

13   through this divorce?

14       A.  I was notified on October 4th by phone that the

15   file -- the divorce had been filed.

16       Q.  Okay.  And that was in 2018, correct?

17       A.  That is correct.

18       Q.  So since 2018, have you thought about what you

19   wanted to do with the Solvang residence?

20       A.  Not in terms of financial breakdown and so on.

21       Q.  So at what point are you going to decide what

22   we're going to do with the Solvang residence?

23       A.  When we have the -- when I know what we --

24   divorce is done, what my financial options are.

25       Q.  Okay.  Well, what I'm -- what I'm trying to

Deepa Biswas Willingham

28

1  understand is that at some point we have to go to trial

2  and at some point you're going to have to tell the court

3  what you actually want from your community estate.  Do

4  you understand that?

5      A.  That is correct.

6      Q.  So if we were in court today, which we're going

7  to be in court in the next 30 days, what are you going

8  to request from the judge with regard to the Solvang

9  residence?  Are you going to ask that you keep it or are

10  you going to ask that it be sold?

11     A.  I'm going to ask that it -- we keep it -- I

12  keep it.

13     Q.  And do you understand that there is no possible

14  way for you to actually pay $9,000 per month for the

15  residence?  Correct?

16     A.  Yes, I -- I cannot pay $9,000 a month.

17     Q.  Okay.  And on top of the mortgage, there's also

18  utilities on that residence as well.  Correct?

19     A.  That is right.

20     Q.  Approximately how much are the utilities on

21  that residence?

22     A.  I do not know.  I don't pay those bills.

23     Q.  Okay.  And you understand that when you and

24  Mr. Willingham are going to get divorced that

25  Mr. Willingham doesn't have to actually pay for a

Deepa Biswas Willingham

29

1    property you're going to --

2        A.  Yes, I know that.

3        Q.  Okay.  So it would be prudent if you actually

4    agree that the residence be sold.  Correct?

5        A.  No, I do not agree with that.

6        Q.  Do you know approximately how much

7    Mr. Willingham makes a month?

8        A.  I -- at the present time he's not -- I do not

9    believe he has a contract.  I don't know.

10       Q.  Okay.  And you understand that Mr. Willingham

11   can't afford the Solvang residence as well.  Correct?

12       A.  I don't think that we as a -- as a couple at

13   the present time we can afford the $9,000, yes.

14       Q.  You can as a couple?

15       A.  Uh-huh.

16       Q.  Is that what you're saying?

17       A.  Uh-huh.

18       Q.  Okay.  And you understand that Mr. Willingham

19   had to actually take a line of credit out to pay for the

20   Solvang residence, correct?

21       A.  I understand that he has done financing various

22   kinds to --

23       Q.  To try to save the property.  Right?

24       A.  That is correct.

25       Q.  Okay.  And there's nothing that you've

Deepa Biswas Willingham

30

1    personally done to try to save that property.  Correct?

2        A.  I'm sorry?

3        Q.  You've -- you've done nothing financially to be

4    able to help with that property.  Correct?

5        A.  That is not correct.

6        Q.  Have you -- do you pay for any of the utilities

7    on that property?

8        A.  No.  But I have --

9        Q.  Okay.  Hold on.  Just listen to my questions.

10   Okay?

11            You don't pay for any of the utilities.

12   Correct?

13       A.  No.

14       Q.  Okay.  And you don't pay for any of the

15   maintenance on the house.  Correct?

16       A.  That is right.

17       Q.  Okay.  And you don't pay for the mortgage.

18   Correct?

19       A.  That is correct.

20       Q.  And you don't pay for the taxes.  Correct?

21       A.  That is correct.

22       Q.  And you don't pay for the insurance on the

23   property.  Correct?

24       A.  That's right.

25       Q.  Okay.  And there's a winery located on the

# EXHIBIT "H"

Deepa Biswas Willingham

40

1   retirement account -- I'm sorry -- the money you receive

2   from retirement and the money you receive from Social

3   Security, you discussed that you deposit it into a Wells

4   Fargo --

5        A.   Wells Fargo mutual savings account.

6        Q.   Okay.  So the -- so the Wells Fargo account is

7   not a checking account, but it's a savings account?

8        A.   That's correct.

9        Q.   Correct?  Okay.

10            All right.  Now, with regard to the

11   townhouse that's located here in Houston, what do you

12   want to do with that townhouse?

13        A.   If it's possible, I want Dick to have it.

14        Q.   Okay.  And when you refer to Dick, you're --

15   you're referring to your husband as Charles Richard

16   Willingham.  Correct?

17        A.   That's correct.

18        Q.   Okay.  Now, there is another piece of property

19   that's located in San Bernardino County.  Correct?

20        A.   That is right.

21        Q.   Okay.  And that's the Ralston property.

22   Correct?

23        A.   That's correct.

24        Q.   And your husband, Dick, received that through

25   an inheritance.  Correct?

Deepa Biswas Willingham

41

1    A.  I believe that -- that there was a trust made

2    by my father-in-law and I haven't seen a copy of the

3    trust, so I cannot say whether it was just given to him

4    or to both of us.

5    Q.  Okay.  And so do you understand that we've

6    provided a copy of that trust in our discovery

7    responses?

8    A.  No, I don't know that.

9    (Exhibit No. 5 marked.)

10    Q.  (BY MS. RAZAVI ZAND)  I'm going to hand you

11    what's been marked as Petitioner's Exhibit 5.  And do

12    you understand that this Ralston property, this is a

13    property that was owned by Mr. Willingham's father.

14    Correct?

15    A.  His father and mother, yes.

16    Q.  Okay.  And so it didn't -- Mr. Willingham did

17    not purchase this property himself during the marriage

18    between you and him.  Correct?

19    A.  That's correct.

20    Q.  Okay.  And this piece of property was actually

21    owned by his father and mother and it was their piece of

22    property.  Correct?

23    A.  That's correct.

24    Q.  Okay.  And you understand that Mr. Willingham's

25    father placed that property in a trust.  Correct?

178

Deepa Biswas Willingham

42

1      A.  That's right.

2      Q.  Okay.  And that's the trust that you're talking

3  about that you -- you state that you've never seen.

4  Correct?

5      A.  No.  I didn't say I didn't -- never seen.  I

6  haven't seen it in the house where it was before.

7      Q.  Okay.  So you've actually reviewed a copy of

8  the trust?

9      A.  Many years ago when it was done.

10     Q.  And so --

11     A.  I'm the one who took my father-in-law to get it

12  done.

13     Q.  Okay.  And so if you're the one who took your

14  father-in-law to get it done, you understand that that

15  property was a property that was owned by

16  Mr. Willingham's father and mother.  Correct?

17     A.  That's right.

18     Q.  Okay.  And I have this -- what's called

19  Petitioner's Exhibit 5 in front of you.  Do you

20  recognize this document?

21     A.  It looks familiar.  I don't know offhand.

22     Q.  Do you see where it says, "Declaration of

23  trust"?

24     A.  Yes.

25     Q.  Okay.  When you say you took Mr. Willingham

Deepa Biswas Willingham

43

1    father to get the trust, were you actually present at

2    the attorney's office to get the trust?

3        A.   That's correct.

4        Q.   Okay.  So does this look like the trust

5    document?

6        A.   I -- I am not sure.  It looks like it.  I don't

7    know.

8        Q.   Now, as far as the property, when you say that

9    you're not sure if Mr. Willingham's father left that

10   property in trust -- well, explain to me, what do you

11   mean that you're not really exactly sure how the

12   property was left?

13       A.   It was my belief that my father-in-law in the

14   trust named both him -- Richard Willingham and myself as

15   the beneficiary of the property with 25,000 allocated to

16   his -- his daughter by a previous marriage.

17       Q.   And when you say "his daughter," you mean

18   Mr. Willingham's --

19       A.   Stepsister.

20       Q.   Stepsister.  Correct?  Not that -- not that

21   Mr. Willingham, your husband, had a daughter.  Correct?

22       A.   No.

23       Q.   Okay.  So looking at the trust, if you can just

24   turn the page.  And ask that you turn to page 3 of the

25   trust.  Do you see Section D?

Case 9:20-bk-10858-MB   Doc 15   Filed 08/05/20   Entered 08/05/20 15:39:02   Desc
Main Document   Page 181 of 191

Deepa Biswas Willingham

44

```
1       A.   Uh-huh.

2       Q.   Okay.  And it says, "On Charlie R. Willingham's

3  death."  And Charlie R. Willingham would be Dick's

4  father.  Correct?

5       A.   That's correct.

6       Q.   Okay.  "On Charlie R. Willingham's death, the

7  trustee shall distribute the trust estate as follows:

8  No. 1, to Charlie R. Willingham's daughter, Gloria Jones

9  Straton, who is also known as Gloria Straton and who has

10  formerly been known as Gloria Joan Mulligan and Gloria

11  Joan Willingham of Dallas, Texas a sum of cash

12  equivalent to 12 percent of the trust estate, but not to

13  exceed 25,000 in cash."  Do you see that part?

14      A.   Yes.

15      Q.   Okay.  And that's what you were actually

16  referring --

17      A.   Yes.

18      Q.   -- to earlier when you said that his father

19  left $25,000 to his sister?

20      A.   That's correct.

21      Q.   Okay.  Or his stepsister, correct?

22      A.   Stepsister.

23      Q.   Okay.  And then No. 2 says, "To Charlie R.

24  Willingham's son, Charles Richard Willingham of Santa

25  Barbara, California."  And that is your husband.
```

Deepa Biswas Willingham

45

1    Correct?

2        A.   That's correct.

3        Q.   Okay.   "The residue of the trust estate.   If

4    Charles Richard Willingham predeceases Charlie R.

5    Willingham, the residue of the trust estate shall be

6    distributed to Deepa Willingham of Santa Barbara,

7    California.   If both Charles Richard Willingham and

8    Deepa Willingham predisease Charlie R. Willingham, the

9    residue of the trust estate shall be distributed to the

10   issue of Charlie R. Willingham's son, Charles Richard

11   Willingham."   Do you see that part?

12       A.   Yes.

13       Q.   Okay.   So you would agree with me that Charles

14   Richard Willingham did not predecease Charlie R.

15   Willingham.   Correct?

16       A.   No.

17       Q.   Okay.   Because he's still here, right?

18       A.   He's still here.

19       Q.   Okay.   And -- and his -- and his father has

20   deceased.   Correct?

21       A.   That's correct.

22       Q.   Okay.   So based off of this, it says here if

23   Charles Richard Willingham predeceases Charlie R.

24   Willingham, the residue of the trust estate shall be

25   distributed to Deepa.   Correct?   So if we look here to

Deepa Biswas Willingham

46

1    Charlie R. Willingham's son, he would get the residue of

2    the estate?

3          A.   Uh-huh.

4          Q.   Okay.  So do you --

5          A.   Yes.

6          Q.   Do you understand that by reading this --

7          A.   Yes.

8          Q.   -- whatever was in the trust because his father

9    died before your husband did that everything actually

10   goes to Mr. Willingham?  Correct?

11         A.   Okay.  I now understand, yes.

12              MS. BURKETT:  Objection; form.

13         Q.   (BY MS. RAZAVI ZAND)  Okay.  Do you -- do you

14   understand that?

15         A.   Yes.

16         Q.   Okay.  So you understand that the home -- that

17   the Ralston property that's located in San Bernardino

18   County was actually given in trust to your husband and

19   not to you.  Correct?

20         A.   That's what it looks like.

21         Q.   Well, I'm asking you, you're -- you're the

22   person that took Mr. Willingham's father to the attorney

23   to get this document done.  Correct?

24         A.   That's right.

25         Q.   Okay.  And so after reading this, you

Deepa Biswas Willingham

1    understand that anything that was left in trust after

2    what was given to Mr. Willingham's stepsister was

3    actually given to Mr. Willingham.  Correct?

4              MS. BURKETT:  Objection; form.

5              Answer the question.

6              THE WITNESS:  Answer?

7              MS. BURKETT:  Yes.

8        A.  Yes.

9        Q.  (BY MS. RAZAVI ZAND)  Okay.  And that if

10   Mr. Willingham, meaning your husband, actually died

11   before his father did, then the remaining portion of the

12   trust would actually have gone to you.  Correct?

13       A.  That's right.

14       Q.  And, obviously, that didn't happen?

15       A.  That's right.

16       Q.  And so do you believe that you have any

17   interest in this Ralston property in San Bernardino

18   County?

19              MS. BURKETT:  Objection; form.

20              Answer the question.

21       A.  Yes.

22       Q.  (BY MS. RAZAVI ZAND)  What interest do you

23   believe that you have in it?

24       A.  Oh, sorry, I didn't --

25       Q.  Do you believe that you have any interest in

Deepa Biswas Willingham

48

1    the Ralston property in San Bernardino County?

2              MS. BURKETT:  Objection; form.

3        Q.  (BY MS. RAZAVI ZAND)  You can answer.

4        A.  No.

5        Q.  What credit cards do you have in your name?

6        A.  I couldn't tell you.  I have to look it up.

7        Q.  Okay.

8        A.  I have a platinum debit card from which --

9    attached to Wells Fargo 0741.

10       Q.  Hold on a second.  It's Wells Fargo --

11       A.  07 --

12       Q.  -- platinum credit card?

13       A.  0741.

14       Q.  Okay.  Is that only in your name?

15       A.  No.

16       Q.  Whose other -- who else is a signatory on that

17   card?

18       A.  C. Richard Willingham, my husband.

19       Q.  What else?  What other credit cards do you

20   have?

21       A.  I have a Visa credit card ending in 8894.

22       Q.  Okay.

23       A.  With no balance in it.  So I cannot use it.

24       Q.  Any other credit cards?

25       A.  Yeah.  Just a minute.  I have a Southwest Visa

Deepa Biswas Willingham

1    with 3218.  No credit in it available to me.  I have

2    a -- another Southwest credit card with 4799 with no

3    credit available to me.  I have a Citibank credit card

4    with 1976 with no credit available to me.

5        Q.  Now, when you say no credit available to you,

6    do you mean that those credit cards are maxed out?

7        A.  That's correct.

8        Q.  Okay.  So do you know the balance on any of

9    these credit cards?

10       A.  No.

11       Q.  Who pays the credit card each month?

12       A.  My -- my husband.

13       Q.  What expenses do you pay for each month?

14       A.  I'm sorry?

15       Q.  What expenses do you pay for each month?

16       A.  For -- for each month?

17       Q.  Yeah, what expenses do you pay for?

18       A.  I pay for Jose's salary.

19       Q.  Uh-huh.  What else?

20       A.  And food.

21       Q.  Now, Ms. Willingham, is there --

22       A.  And -- and the supplies that are needed to

23   maintain the ranch.

24       Q.  When you say "supplies needed to maintain the

25   ranch," what do you mean?

Deepa Biswas Willingham

1    A.  Gas, going to the -- going to the dump,

2    those -- in maintaining the property.

3    Q.  Is there any livestock on the ranch?

4    A.  No.

5    Q.  Now, do you understand that -- how much do you

6    believe that the ranch is worth in Solvang?

7    A.  It was assessed at 1.6.

8    Q.  Okay.  And you understand that when it was

9    assessed at 1.6 million dollars, they didn't take into

10   consideration the rental property that's located on the

11   ranch.  Correct?

12   A.  They did.  The assessor saw the rental

13   property.

14   Q.  Do you understand they didn't take into

15   consideration the vineyard on the ranch?

16   A.  I -- they saw the vineyard on the property.

17   Q.  So if you want -- if you're asking the court

18   that you keep the ranch, how exactly are you going to

19   pay out Mr. Willingham's portion on the ranch?

20   A.  I cannot answer it because we have to -- same

21   way he'll pay out the -- the Houston portion of the

22   townhouse.

23   Q.  Well, the -- how much is the Houston townhouse

24   valued at?

25   A.  I do not know.

Deepa Biswas Willingham

51

1      **Q.**  Approximately?

2      **A.**  I would say around 850,000 to 900,000.

3      **Q.**  So if you believe that it's worth 850,000 to

4  $900,000 and the ranch is worth how much?

5      **A.**  It was assessed at 1.6 million.

6      **Q.**  Okay, 1.6 million.  You would agree with me

7  that the biggest asset that you have in your estate is

8  the ranch in Solvang.  Correct?

9      **A.**  That is right.

10     **Q.**  Okay.  And as far as cash accounts, you and

11  Mr. Willingham don't really have any cash accounts.

12  Correct?

13     **A.**  Yes, we have the -- the checking account that

14  he --

15     **Q.**  How much is in your checking account?

16     **A.**  I don't know.  Last month he transferred

17  $89,000 into it from somewhere.

18     **Q.**  You don't have -- you don't have any accounts

19  with a million dollars in it, do you?

20     **A.**  I'm sorry?

21     **Q.**  You don't have any accounts with a million

22  dollars in it, do you?

23     **A.**  No.

24     **Q.**  Okay.  So if the ranch is worth $1.6 million,

25  what percentage do you believe you should have to pay to

Deepa Biswas Willingham

1    Mr. Willingham?

2         A.   It depends on how we divide up the assets.

3         Q.   How do you think the assets should be divided?

4              MS. BURKETT:   Objection; form.

5         A.   50/50.

6         Q.   (BY MS. RAZAVI ZAND)   Okay.   So if the ranch

7    has to be split 50/50, what is that, $800,000 that

8    you're going to have to pay to Mr. Willingham?

9         A.   I cannot answer the question.

10        Q.   So with regard to -- what -- what assets do you

11   believe that your estate has other than -- you have a

12   ranch that's worth $1.6 million.   Correct?

13        A.   That's right.

14        Q.   Okay.   And that was a ranch that was purchased

15   during marriage.   Correct?

16        A.   That is right.

17        Q.   And you believe that to be community property.

18   Correct?

19              MS. BURKETT:   Objection; form.

20        A.   Yes.

21        Q.   (BY MS. RAZAVI ZAND)   Okay.   Do you understand

22   what community property means?

23        A.   We own it equally.

24        Q.   Okay.   Do you understand that it's something

25   that's purchased during marriage with community funds?

Deepa Biswas Willingham

53

1              MS. BURKETT:  Objection; form.

2         Q.  (BY MS. RAZAVI ZAND)  Do you -- do you

3    understand any of that?  That's all I'm asking.

4         A.  I don't know what you're asking.

5         Q.  Okay.  With regard to the townhouse, the

6    townhouse that Mr. Willingham lives in, that was

7    purchased during marriage.  Correct?

8         A.  That's right.

9         Q.  Okay.  And there are no other pieces of real

10   estate that's part of your community estate.  Correct?

11        A.  That's right.

12        Q.  Okay.  Because the Ralston property is

13   something that Mr. Willingham inherited from his father.

14   Correct?

15        A.  That's right.

16              MS. BURKETT:  Objection; form.

17        Q.  (BY MS. RAZAVI ZAND)  But there's no other

18   pieces of real estate that you're aware of.  Correct?

19        A.  That's right.

20        Q.  Okay.  And you have a retirement.  Correct?

21        A.  Yes.

22        Q.  Okay.

23        A.  453.

24        Q.  I'm sorry?

25        A.  $453.

190

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**30700 RUSSELL RANCH ROAD, SUITE 250, WESTLAKE VILLAGE, CALIFORNIA 91326**


A true and correct copy of the foregoing document entitled (*specify*): **RICHARD WILLINGHAM'S MOTION TO ABSTAIN PER SECTION 305 AND/OR DISMISS PER SECTION 707; DECLARATION OF RICHARD WILLINGHAM** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **08/05/2020**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Jerry Namba, Chapter 7 Trustee – jnambaepiq@earthlink.com; jnamba@eqip7technology.com; jn01@trustesolutions.net
- Reed H. Olmstead, Attorney for Debtor – reed@olmstead.law; olmstead.ecf@gmail.com; r41602@notify.bestcase.com
- United States Trustee – ustpregion16.nd.ecf@usdoj.gov
- Andrew Goodman – Attorney for Richard Willingham – agoodman@andyglaw.com
- 

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On **08/05/2020** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

HON. MARTIN BARASH
U.S. BANKRUPTCY JUDGE
21041 BURBANK BLVD., SUITE 342/CTRM. 303
WOODLAND HILLS, CA. 91367

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____          _____
*Date AUGUST 5, 2020   Printed Name* **ANDREW GOODMAN**          *Signature /s/ ANDREW GOODMAN*

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                        **F 9013-3.1.PROOF.SERVICE**